FILED

**03/04/2022**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

Tracey Leon Wheeler 140083

1946 w. US 40

Greencastle Ind. 46135

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

Civil Action No.

**Tracey Wheeler Plaintiff**

V.

**Indiana Department of Corrections**

**Richard Brown**

**Lagenauer**

**Kathy Alvey**

**Littlejohn**

**Mr. Hendershot**

**Diana Pfeiffer**

**Tony Gray**

**Chaplain Arndt**

**Capt. Hoffman**

**Captain Simpson**

**Officer Wise**

**Wexford Medical Service**

**Richard Wright**

**Tricia Payne**

**Dr. Buck (Dentist)**

**Tim Jellison**

**Doctor Kevin Dew**

**C. Hubbal (Wexford nurse)**

1

**Ms. Hearst (Aramark staff)**

**Sgt. Flammaion**

**Dea Goad**

**Ms. Goldman**

**Ms. Hearst**

**Patricia Cassidy**

**D. Mitchell (Deputy Warden)**

**Major Sturgeon**

**Samantha Burden**

**Laura Purcell**

**Nicole Morris**

**Officer John Doe#1**

**Officer John Doe#2**

**Sgt. John Doe#1**

Karen Godare

---

## AMENED CIVIL RIGHTS COMPLAINT

---

## A. PARTIES

1. I, Tracey Wheeler, am a citizen of Indiana

And presently reside at 1946 w. US 40 Greencastle Ind. 46135

2. Defendant Indiana Department of Corrections is a citizen of Indiana
         (Name of first defendant)

Whose address is 302 w. Washington st. Indianapolis Ind. 46204

And who is employed as Government.

Defendant Richard Brown is a citizen of Indiana
         (Name of 2nd defendant)

Whose address is 302 w. Washington st. Indianapolis Ind. 46204

And who is employed as Prison Official

Defendant Asst. Warden Lagenauer is a citizen of Indiana
            (Name of 3rd defendant)

Whose address is

And who is employed as Asst. Warden

Defendant Kathy Alvey is a citizen of Indiana
            (Name of 4th defendant)

Whose address is 302 w. Washington st. Indianapolis Ind. 46204

And who is employed as State Employee

Defendant Littlejohn is a citizen of Indiana
            (Name of 5th defendant)

Whose address is

And who is employed as Warden

Defendant Mr. Hendershot is a citizen of Indiana
            (Name of 6th defendant)

Whose address is

And who is employed as investigations and intellegence

Defendant Diana Pfeiffer is a citizen of Indiana
            (Name of 7th defendant)

Whose address is

Whose address is employed as grievance specialist

Defendant Tony Grey is a citizen of Indiana
            (Name of 8th defendant)

Whose address is

Whose address is employed as Chaplin

Defendant Chaplin Ardnt is a citizen of Indiana
            (Name of 9th defendant)

3

Whose address is

Whose address is employed as chaplin

Defendant Capt. Simpson is a citizen of Indiana
(Name of 10th defendant)

Whose address is

Whose address is employed as

Defendant officer Wise is a citizen of Indiana
(Name of 11th defendant)

Whose address is

Whose address is employed as correctional officer

Defendant Wexford Medical Services is a citizen of Indiana
(Name of 12th defendant)

Whose address is

Whose address is employed as Medical

Defendant Richard Wright is a citizen of Indiana
(Name of 13th defendant)

Whose address is

Whose address is employed as Medical Director

Defendant Tricia Payne is a citizen of Indiana
(Name of 14th defendant)

Whose address is

Whose address is employed as Dental Assistant

Defendant Dr. Buck is a citizen of Indiana
(Name of 15th defendant)

Whose address is

Whose address is employed as Dentist

Whose address is employed as state employee

Defendant Laura Purcell is a citizen of Indiana
        (Name of 23[th] defendant)

Whose address is

Whose address is employed as state employee

Defendant Nicole Morris is a citizen of Indiana
        (Name of 24th defendant)

Whose address is

Whose address is employed as state employee

Defendant Karen Godare
    (Name of 25th Defendant)

Whose address is: 21390 Old State Rd 37
Branchville, Ind. 47514.

Who is employed as state employee.

Defendant Tim Jellison is a citizen of Indiana
        (Name of 16th defendant)

Whose address is

Whose address is employed as State Employee

Defendant Doctor Kevin Dew is a citizen of Indiana
        (Name of 17th defendant)

Whose address is

Whose address is employed as Doctor

Defendant C. Hubbal is a citizen of Indiana
        (Name of 18th defendant)

Whose address is

Whose address is employed as Nurse

Defendant Samantha Burden is a citizen of Indiana
        (Name of 19th defendant)

Whose address is

Whose address is employed as nurse

Defendant Sgt John Doe#1 is a citizen of Indiana
        (Name of 20th defendant)

Whose address is

Whose address is employed as state employee

Defendant officer John Doe #1 is a citizen of Indiana
        (Name of 21th defendant)

Whose address is

Whose address is employed as state employee

Defendant officer John Doe #2 is a citizen of Indiana
        (Name of 22th defendant)

Whose address is

**Introduction**

This is a 1983 action filed by the plaintiff, Tracey Wheeler, a state prisoner challenging the

conditions of his confinement whereas he is alleging violations of his Constitutional rights to;

Equal Protection of the laws, freedom of Religion, free speech, adequate medical treatment, the

right to be free from, Cruel and unusual Conditions, retaliation, and discrimination and where the

Department of Corrections failed to Act on plaintiffs complaints of violations of his

constitutional rights. The plaintiff is seeking money damages. Plaintiff also seeks an injunctive

and damages Pursuant to the Americans with disabilities Act and the Rehabilitation Act.

### B.  JURISDICTION

1. This cause of action is brought pursuant to (CHECK ONE)

     X 42 U.S.C.  § 1983 (applies to state prisoners)

_____ Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S.    388
(1971) (applies to federal prisoners)

2. _____ Jurisdiction also is invoked pursuant to 28 U.S.C § 1343 (a)(3).  (If you wish
to assert jurisdiction under different or additional statutes, you may list them below.)

_____

_____

### C.  NATURE OF THE CASE

**BREIFLY** state the background of your case.

_____

The Plaintiff, Tracey Wheeler[1] is an inmate at Branchville Correctional Facility, in Branchville Indiana.

## A. Inadequate Medical/Dental Treatment; Cruel and Unusual Conditions; Infringement on Religious Practices; Discrimination and Retaliation

### a)  8th Amendment inadequate Medical and Dental violations

1. Beginning on or about March, 2020, the plaintiff complained of dental (tooth) pain.
2. On or about March 2020 the plaintiff was seen for his initial request in which dental took an X-Ray of tooth #18, however dental provided no further treatment or pain relief and instructed the plaintiff that he would be seen again in about 6-8 weeks.
3. After the plaintiffs initial visit to dental, a division of **Wexford Medical**, in March, 2020 (10) ten months had passed and the plaintiff had not been seen again by dental and he received **no** pain relief or treatment for a tooth that had been in pain for ten months, advising dental that the 325mg Aceiminephertine that commissary provided did not relieve his pain (as this particular pain medication was for minor tooth aches and pain).
4. On or about November, 2020 the plaintiff began to complaining about a second tooth, tooth #17, that began causing him pain. This tooth had a hole and each day this hole was getting bigger and deeper in which the hole (filling fell out) eventually opened up to the plaintiff's nerve.
5. In November, December, 2020 and January 2021, the plaintiff complained and filed grievances explaining to the **Wexford** dental department that he was in extreme pain, that due to the pain he was not sleeping, he was not eating and that the pain relief such as Tylenol offered on commissary was not providing any pain relief. However, despite the plaintiffs continuous complaints he was not provided any treatment or pain relief. (**This amounted to deliberate indifference. Wexford was personally involved where it is responsible for providing dental care to the inmates housed in IDOC facilities.  The**

---

[1] Also referred to as "The Plaintiff" herein

**dentist was personally involved where he was responsible for assessing complaints of pain and providing pain relief.).**

6.  On January 13 2021, the plaintiff continued to complain of pain and advising dental department of Wexford that the Tylenol[2] provided on commissary did not work.

7.  Dental told the plaintiff that there was nothing more than the Tylenol that they could offer, and the dental assistant **Tricia Payne** told the plaintiff that it would be cheaper for him to order it himself off commissary because if dental prescribes it, it would cost him $5.00, the plaintiff advised the defendant that it didn't matter because he was indigent, and he told the defendant that he was already taking Tylenol and it did not work, and the dental assistant stated that the 325mgTylenol is all that dental had to offer, the plaintiff went on to tell the dental assistant, that was a lie because the plaintiff knew of several "white" inmates who were receiving 500mg Naproxen[3] prescribed or recommended by the dental department. **Furthermore IDOC\Wexford also prescribes over the counter 500mg Tylenol, which is commonly given to inmates, and Tricia Payne is authorized to prescribe 500mg Tylenol.** The dental assistant went on to tell the plaintiff that *"[he] needed to worry about himself."* The dental assistant went on to tell the plaintiff that *" he was not in pain, and that if he was that he would be in the corner balled up in crying pain"* and went on to tell the plaintiff that he *" needed to man up"* (these actions and statements of the defendant Tricia Payne exhibited deliberate indifference).

8.  On 1-11-21 he plaintiff received a response to his first grievance and the grievance was deemed resolved, where he was told that he was 'scheduled for a tooth extraction', however that grievance response only seemed to address the issue with the second tooth, tooth #17, and not the first tooth #18 that the plaintiff began complaining about in March of 2020. He explained that tooth #17 had not been assessed and therefore how could that tooth be scheduled for extraction when dental did not even, yet, know whether the tooth could be saved by a simple refilling as the only problem was that the filling had fell out. **(IDOC was personally involved where the state failed to act on the plaintiffs complaints of pain regarding tooth #18, therefore subjecting the plaintiff to a prolonged wanton infliction of pain.)**

---

[2] 325mg Aceermine
[3] Wexford also provides 500mg Acerrmine

9.  On January 13, 2021 the plaintiff filed an additional grievance and he complained that he feared he would be retaliated against by the dental department for that grievances that he filed against them, the plaintiff stated that he feared that during his tooth extraction he would be intentionally harmed or hurt. Soon after this complaint, the plaintiff was seen by dental on 1-15-21 in which he had the second tooth #17 pulled that he began complaining about in November[4], however after the extraction, the plaintiff was not provided any pain relief, even though the post op instructions provided to the plaintiff stated *"to minimize pain take the prescribed pain medication before the Novocain wears off "* , however, after the tooth extraction dental had not prescribed any pain medication and therefore the plaintiff was left in pain for 15 more days (even after he complained numerous times that he was in pain and without **any** pain relief, until he was able to receive a renewed prescription for Tylenol[5] that he was receiving from medical for Migraine Headaches. **(Wexford and the BCF dentist Dr. Buck are personally involved and committed deliberate indifference, whereas, after the tooth was extracted the plaintiff was not provided any pain relief and therefore he was left in pain for 15 days. The IDOC was personally involved where it failed to act on the plaintiffs grievances days before the extraction date and any time after the extraction date, whenever the plaintiff complained to IDOC that he feared that during the extraction he would be retaliated against by the dental department and therefore the dental department would intentionally harm and cause the plaintiff pain (which actually ended up happening)**

10. During this extraction it was determined that the tooth lost a filling all the way down to the nerve thus the dental decided that the tooth needed to go.

11. Because this was a tooth that was nearly affecting the nerve, it is reasonable to believe that this was not a normal tooth pain nor was it minor therefore pain relief stronger than 325mg Acemierphine[6] that was offered on commissary was needed as pain relief.

---

[4] But he received no treatment for the first tooth that he began complaining about in March, 2020 as he was informed that this particular tooth could be saved.
[5] However for nearly a year the plaintiff had notified dental that the Tylenol did not work for the tooth pain
[6] Wexford provides a stronger, 500mg Acemierohine, which would not have created any health concerns or risks whereas the plaintiff was already prescribed the 325mg Acerminphine.

12.  On 1-22-21 the plaintiff was seen by dental in regards to the tooth #18 that initially began causing him pain in March, 2020. And because of these complaints Doctor **Richard Wright** watched in on the visit with dental and during this visit the **dentist defendant Dr. Buck** advised the plaintiff that he was there for a tooth extraction, the plaintiff asked *"why was the tooth being extracted whenever he was told on January 15th 2021 that the tooth could be saved by placing a cap on it?"* In the company of **Doctor Richard Wright** the dentist replied to the plaintiff stating that *"IDOC only permitted dental to pull teeth because IDOC will not pay $800 (eight hundred dollars) to refill or put a cap on teeth that in would be cheaper to simply pull teeth and that it was IDOC policy"*. **(Sufficiently the response by the defendant supports a claim against IDOC, Wexford and the dentist, for inadequate dental care where the plaintiff was limited to care only consisting of pulling teeth, which could have been otherwise saved, based on financial reasons. See; Chance v. Armstrong 143 F.3d at 703-04.**

13.  Because the plaintiff feared for his safety and because the tooth could be saved that plaintiff refused to have his good tooth pulled, whereas the tooth had not been rotten nor had it had any cavities, the only issue was that the previous filling had fell out. Also this tooth was the last tooth that the plaintiff had in which he could perform the basic function of eating, chewing and chopping food down into portions small enough for swallowing. The plaintiff was advise during the dental visit that had he had the tooth pulled that IDOC would not provide dentures whereas IDOC does not consider teeth absolutely necessary for eating, (Doctor Richard Wright followed this reasoning up on Jan. 22nd 2021 with his written statement stating IDOC policy does not consider teeth as an absolute necessity), therefore, the plaintiff decided not to have his tooth pulled until he was able to challenge this policy. **(Sufficiently the plaintiff has stated an 8th Amendment claim in regards to IDOC policy).**

14.  On 1-27-21 after the plaintiffs grievance was decided against him, the plaintiff wrote an informal complaint to **Richard Wright** asking **Richard Wright** why didn't he tell the grievance investigator the truth as he agreed to do on 1-22-21, and Richard Wright responded stating that if the plaintiff needed *"...a witness during any dental producers, [He] I will be happy to stand there during the process"*.

15. As a result of the defendants actions of not treating the plaintiff's tooth that was in pain and threating to pull a tooth that could be saved (**whereas all the tooth needed was a new filling**) the plaintiff suffered an additional (8) months of pain until the plaintiff was moved to a new IDOC facility and seen by the dental department at Putnamville Correctional Facility, where the plaintiff's tooth was then filled on 9-8-21, where there actually was no need to pull the tooth as suggested by the dental department at the Branchville facility.

16. **Wexford, IDOC, Richard Wright, Kathy Alvey and (Dentist) Dr. Buck** were all deliberate indifferent to the plaintiffs dental needs and pain when the defendants **IDOC, Wexford, Kathy Alvey, Richard Wright**, and the **Dentist Dr. Buck** failed to act on the plaintiffs complaints of dental pain and failed to act on the complaints that Wexford dental, **Richard Wright** and the **dentist Dr. Buck** failed to adequately treat the plaintiffs dental needs of his tooth #18.

17. The defendants continued to be deliberate indifferent, when the defendants retaliated against the plaintiff for his complaints against all the defendants, where the defendants Richard Wright, and the dentist **Dr. Buck** told the plaintiff that the '*only treatment he would receive would be to pull his tooth',* however, such treatment was not necessary and would have subjected the plaintiff to a situation that was cruel and unusual, where he would have no longer been able to eat, whereas this tooth #18 was the last tooth that he had left on the left side of his mouth the could complete the chewing function, however the defendants **Richard Wright** and the dentist **Dr. Buck** told the plaintiff that IDOC nor Wexford would provide dentures or partials whereas having teeth was not a necessity (thus the defendant dentist **Dr. Buck** told the plaintiff that the tooth could be saved), therefore the plaintiff elected not to have his tooth pulled, refusing such inadequate treatment, until he had the opportunity to file a grievance and his complaints to the ACLU, (whereas the plaintiff was entitled to refuse the inadequate treatment of the pulling of his tooth where he was first told that the tooth could be saved, however, once the plaintiff began filing complaints he was then told that the tooth could only be pulled, thus, the plaintiff was entitled to seek a grievance in relation to the defendants actions).

18. During the ACLU's investigation of the complaints, Attorney Gavin Rose reached out to the IDOC regarding the plaintiffs complaints of inadequate dental treatment and in

response, Mike Smith, of Health Services Quality Assurance Manager responded and he stated in regards to the treatment at the Branchville facility *' that the plaintiff should seek treatment at the new facility'*

19.  Once the plaintiff sought treatment at the Putnamville facility the plaintiff was seen on 8-5-21 and it was determined that the tooth did not need to be pulled, that the tooth #18 could in fact be refilled and the plaintiff was scheduled for a filling.

20.  On **9-8-21** the plaintiff was seen by IDOC dental provider **Centurion** and his tooth was filled and the plaintiff was instantly relieved of his tooth pain that he suffered for (17) months due to the actions of the Defendants, and able to effectively and adequately eat his meals without pain or discomfort.

21.  On 8-10-20 the plaintiff began complaining of weight loss and a loss of energy due to the fact of; (**a.**) his kosher diet provided by the facility did not contain sufficient calories ; and; (**b.**) his tooth pain was so server that it prevented him from eating, therefore unable to consume enough calories to sustain a healthy life, whereas; the two teeth that were in pain were in fact his back teeth and these were the only teeth that he had left that could complete the normal function of chewing and chopping food into portions small enough for swallowing. But due to the pain of the two teeth the plaintiff was unable to complete the basic function of eating.

22.  On **Nov. 2020** the plaintiff filed a Health care form in which he explained that he had concerns of his rapid weight loss, loss of energy and loss of sleep at night due to lying awake at night due to hunger pains.

23.  The plaintiff was seen by medical and it was determined by medical that the Kosher meals that were being provided by IDOC were inadequate and the plaintiff was advised by medical that the Kosher meals provided by the state did not contain adequate calories and that is why the plaintiff was losing weight and energy and advised the plaintiff that he must increase his calorie intake if he wanted to gain his weight and energy.

24.  Therefore, the plaintiff filed his formal grievance and advised the facility of the opinion from the medical department; and in the facilities response to the plaintiffs grievance, the facility agreed that the kosher diet that the plaintiff was mimicking was insufficient and that the plaintiff must follow the instructions provided by medical, but;

25. Once the plaintiff filed his grievance appeal informing the facility that he was indigent, and therefore he could not afford to buy the foods from commissary that would increase his calorie intake, thus advising the facility that because he was indigent that it was the Departments responsibility to follow the opinions medical requiring that the plaintiff increase his calorie intake, the facility then changed its position and opinion, (once the plaintiff said he was indigent), on the advice from medical, stating that *"the kosher meals were sufficient".*

26. The facility only made this opinion, after it had become known to the facility that the plaintiff was indigent, so that the facility would not have to assume the cost of providing the plaintiff the proper meals as directed by the medical department. Thus; no changes were made to the 11-26-20 instructions by the medical department encouraging the plaintiff to increase his calorie intake.

27. The defendant **Kathy Alvey and the IDOC** was notified of the medical advice instructing the plaintiff to increase his calorie intake, the defendant **Kathy Alvey** and **IDOC** was notified that the plaintiff was indigent and therefore could not do otherwise on his own, thus no action or alternative, by the defendants were attempted to remedy the issue.

28. Although the plaintiff at the time had over $467.00 (four hundred and sixty seven dollars) of earned income in his Re-Entry account (without his consent) the plaintiff was not permitted to access these monies in which he earned working at his prison jobs.

29. Therefore, because the plaintiff was prohibited, by the **defendants IDOC** operated by **Robert Carter**, from accessing these funds he was unable to purchase food from commissary, as prescribed by medical, in order for him to increase his calorie intake so that he could suppress his hunger pains that were keeping him up at night and so he could gain his weight and energy back. Instead, while the plaintiff suffered as he was being deprived of the monetary benefit of his earned income, the facility and IDOC policy held the monies from the plaintiff, for the defendants own benefit, such as; the money accumulated interest and the IDOC and the facility used the money in the re-entry account for investment opportunities in which they profited off of. And because the facility and IDOC was holding the money and not allowing the plaintiff to use the money to treat himself the facility was required to provide the means in which the plaintiff could

be properly treated, but the defendants did not provide anything and allowed the plaintiff to continue in pain and suffering. **(Sufficiently the claims by the plaintiff supports an 8th and 14th Amendment violation).**

30. During all times mentioned herein the defendants, **Tricia Payne, Dentist, IDOC, Wexford, Robert Carter, Richard Wright, Kathy Alvey,** acted with deliberate indifference and violating the plaintiffs 8th and 14th amendment rights to the U.S Constitution, on information and belief, sometimes individually and through their numerous agents, servants and employees in various divisions of the IDOC acted under the color of the law and further acted pursuant to directives, instructions or orders from or with the permission of the defendants **Wexford, IDOC, Robert Carter and Richard Wright**.

31. Wexford was the medical provider for all IDOC facilities including BCF and was responsible for providing dental care and treatment to IDOC inmates and is further responsible of its subordinates and IDOC and Robert Carter are responsible for the conditions in which inmate are housed and treated and are responsible for the acts and conduct of its subordinates. The acts and conduct herein complained of were done with the knowledge, permission, consent and participation of Wexford, IDOC, Richard Wright and Robert Carter in that the defendants promulgates regulations and rules and directives governing the conditions of confinement and dental treatment that inmate receive in IDOC.

32. The **Branchville Correctional facility, Kathy Alvey** and the **Department of Corrections** has failed to act on the medical advice provided by the medical department whereas; the medical department advised the plaintiff if he wanted to gain his weight and energy back that he **Must** increase his calorie intake; ( whereas the Kosher diet that was being provided by the facility did not contain sufficient calories); however, once the plaintiff advised the department that he was indigent and could not purchase any foods off commissary in order to increase his calorie intake **IDOC** did nothing nor took any action, and in fact denied the plaintiffs grievances stating, a response contrary to medical advice, opinion and education, *"that the kosher meals were sufficient"*.

33. Because, the facility failed to act on the medical advice the plaintiff was now forced to either starve or break his religious requirements and accept non-kosher foods from

15

inmates who became concerned about that plaintiffs health and willing to help the plaintiff in his condition where it was visibly clear that the plaintiff was starving, losing weight, and suffering.

## Claim 1: Inadequate Medical/Dental Treatment; Cruel and Unusual Conditions, Discrimination and Retaliation

**Wexford, Tricia Payne, Dentist, IDOC, Robert Carter, and Kathy Alvey**, were deliberate indifferent to the plaintiffs serious dental needs and failed to provide adequate dental treatment in a reasonable time and failed to provide the plaintiff with any pain relief or pain medication subjecting the plaintiff to a prolonged wanton infliction of pain which lasted over 13 months before final treatment related to the two teeth that the plaintiff complained about. **IDOC and Kathy Alvey** are liable where the defendants failed to act when the plaintiff informed the defendants that he feared that the Dental Department would retaliate against him for is complaints and would intentionally cause him pain. Soon after the plaintiff informed the defendants of the potential threat to his safety and the claims of retaliation, the plaintiff was in fact subjected to a prolonged and wanton infliction of pain, where the dentist Dr. Buck pulled the plaintiffs tooth and after surgery the defendant did not provide the plaintiff with any pain relief, the defendants knew the plaintiff was indigent therefore could not buy any medication, the defendants knew that the plaintiff did not have any pain medication in his possession, thus after the dental operation the plaintiff was left in pain for 2 weeks despite his complaints of pain after the operation.

## Claim 2: Retaliation, Inadequate Medical/Dental Treatment Discrimination Cruel and Unusual Conditions,

**Richard Wright, Tricia Payne and Dr. Buck** retaliated against the plaintiff where after the plaintiff began making complaints against that dental department that defendants subjected the plaintiff to a prolonged wanton infliction of pain and inadequate dental treatment, whereas the plaintiff had a dental operation where his tooth that was causing him pain was pulled and after the operation that defendants failed to provide the plaintiff or prescribe the plaintiff any pain medication. The plaintiff complained of pain afterwards and in response Richard Wright and Dr. Buck failed to provide any pain relief.

Also, after the plaintiff's complaints against the defendants the defendants subjected the plaintiff to a dental procedure that was unnecessary, whereas prior to the complaints against the defendants that defendant **Dr. Buck** informed the plaintiff that his tooth #18 could be saved and need not to be pulled, however, the defendants, **IDOC, Wexford, and Dr. Buck** refused to provide the treatment necessary to treat and save the tooth, stating that the only procedures available was to pull the tooth. However, the plaintiff refused to receive the inadequate care and choose to challenge the inadequate treatment in the grievance process and once the plaintiff was transferred to another IDOC facility, the tooth was actually saved and the plaintiff was immediately relieved of his pain. Wexford Medical, Dr. Buck, Tricia Payne, are liable for discrimination were white inmates received 500mg Naproxen and 500mg Tylenol for pain relief but the plaintiff who is black and indigent was not offered the same, in fact the plaintiff was offered nothing.

## b) 8th Amendment Cruel and Unusual Conditions; 1st Amendment Retaliation and Religious practice violations; and 14th Amendment Equal Protection and Discrimination Violations

34.     The plaintiff was not in a facility that was equipped to handle kosher meals, whereas, the BCF facility does not have a Kosher kitchen therefore the facility does not adhere to the dietary requirements for the Kosher meals whereas; the Hebrew Scriptures provides that; *"three days of each week are prescribed as No-Salt days wherein the meals are not prepared with salt nor is salt added. Four weeks each year Hebrew Israelites observe a live foods week. During raw week they abstain from any cooked foods, consuming only vegetables and fruits. Also, they observe four sugarless weeks throughout the year during which only non-processed sweeteners are consumed."* Thus, the T.V Dinners that is being served to the plaintiff was only to be temporary, until the Department was able to place the plaintiff in once of IDOC's Kosher facilities, however, the IDOC refuses

17

to transfer that plaintiff to a facility that is equipped to accommodate kosher diets[7] and instead requires the *"4 slices of non-non-Kosher bread and 3(1oz.) packets of peanut butter at breakfast, and the 8-6 oz. T.V Dinners at lunch and Dinner"* to be the plaintiffs main source of nutrition, this was previously been deemed to be inadequate, See; *Campbell v. Cauthron, 623 f.2d 503 (8ᵗʰ Cir. 1980) ( diet of sweet rolls and T.V dinners was nutritionally inadequate.*

35.    Along with this kosher diet the facility serves the plaintiff 15 slices of bread a day which makes up the majority of the plaintiffs 2500 calorie daily intake; however, because the bread is non-kosher, where it is severed to the plaintiff from an open bread bag that is used by other people in order to serve the rest of the facility the bread is handed by a food server and placed into a plastic bag, or sometimes wrapped in plastic wrap that is dispensed from a dispenser that is used by the entire kitchen crew in order to wrap foods that are non-kosher, and the fact that medical advised the plaintiff, in response to his request to medical, that he is not to be consuming 15 slices of bread a day whereas it was bad for the plaintiff's health.

36.    The plaintiff filed a grievance explaining to the facility that the bread was not kosher, whereas it was being mishandled and not prepackaged or properly packaged, and explained that medical had advised him that he was not to be consuming 15 slices of bread a day as it was a substantial health risk. However, the facility and Kathy Alvey failed to act on the plaintiffs' claims.

37.    The plaintiff more recently in February, 2021 filed a complaint to the chaplain Tony Gray and filed his grievance, stating that his religious practices are being frustrated and infringed upon; whereas; the BCF kitchen is not and has not been koshered, therefore, the kitchen proceeds to prepare and serve the plaintiff food using utensils that have not been koshered.

38.    On 2-19-21 the plaintiff filed a grievance and a complaint to **Tony Gray** stating that 'the Aramark Staff, defendant's **Dea Goad** and **Jane Doe** were serving the plaintiff peanut

---

[7] The facility also does not provide any religious services for Hebrew Israelites and the facility does not recognize the religious holidays for Hebrew and Jewish inmates and does not make accommodations for Hebrew Israelite to participate in major holidays such as Passover which requires fasting, and to fast would require the facility to feed the participating inmates at a specific time just as the facility does for Muslims.

butter that has been scoped with utensils that are not kosher and that this peanut butter was being scoped into a foam cup and served to the plaintiff. This utensil that is being used has had previous contact with non-kosher items and therefore; the scoping utensil is not kosher whereas it has not been **Kasher**, which kashering must undergo a process called **Kashering,** which is done by a Rabbi.

39.  Furthermore, the facility and it's chaplains **Tony Gray** and **Andrew Arndt** has discriminated against the plaintiff and his religion as a Hebrew Israelite, whereas for over a year, despite the plaintiff's many efforts, the facility, IDOC and the defendants **Tony Gray** and **Andrew Arndt** had not provided any religious services or accommodations for cooperate or private worship for the Hebrew Israelites at the facility, as it provides for all other religious groups, despite the plaintiffs many grievances[8] and complaints to the Warden Kathy Alvey, IDOC Commissioner. As well as the Governor of Indiana. The Chaplin **Grey** and **Arndt** was notified about the plaintiffs request to attend religious services and failed to provide the services.

40.  However, to no avail, the plaintiff was disciplined by the IDOC for his complaints whereas he was placed on the arbitrary grievance abuser status and therefore prohibited the plaintiff for making any complaints related to not being able to attend religious services and therefore the plaintiff nor any other Hebrew Israelite has been allowed to participate in any religious services, or cooperate worship. Nor had the plaintiff or any other Hebrew Israelite been allowed to fully participate in or fully observe Holy Days as prescribed by the holy scripture just as other religions are afforded the opportunity to participate in and fully observe their religious Holy days, as the facility makes accommodations for those religious groups.

41.  The actions (thus policies and procedures) of IDOC prohibiting the plaintiff from bringing his grievances to the facility and department has had a destructive, harassing, intimidating and harassing effect on the **Federal Rights** stated herein. Whereas for everyday that the defendants prohibited the plaintiff from filing his grievances regarding his religious practices, irreparable injury was being done to the plaintiff because he was deterred by fear of possible conduct reports for fully and vigorously pursuing his rights.

---

[8] Which were all deemed an abuse of the grievance process and the plaintiff was there prohibited from filing any more grievances.

42.   Beginning in July, 2019 the plaintiff began complaining to Chaplain **Andrew Arndt** and **Tony gray** about the nutritional inadequacies and improper service and handling of his kosher meals, these complaints then cumulated into discrimination and retaliation and resulting into disciplinary action, confiscation and destruction of personal property and denial of religious services.

43.   On **8-10-20** at 7:28 am, the plaintiffs' counselor electronically scanned (Emailed) an informal complaint to defendant **Tony Gray** in which the plaintiff made a complaint against Tony Gray accusing him of being discriminatory and not doing his job as a Chaplin.

44.   When **Tony Gary** received this Email he became upset whereas as he was offended by the plaintiff words and in retaliation for the plaintiffs complaint against **Tony Gray**, on 8-10-20 at approx. 12pm the defendant, **Tony Gray**, came to the plaintiffs dormitory and conducted a property search of the plaintiff property and confiscated an "open" bag of coffee[9] and an "open" bag of tortilla chips[10] and **Tony Gray** proceeded to write the plaintiff up on conduct for possession of 'Unauthorized" property.

45.   The defendants reasoning behind why these items were unauthorized property was because *"the items were not listed on the plaintiffs commissary receipts from the last 90 days"* , thus, prior to the defendant, who is only a chaplain, conducting this search he went out his way to review the plaintiffs prior purchase of commissary. Armed with information as to what was not on the plaintiffs previous orders within the last 60 days the defendant knew what to look for that could be used as evidence to write the plaintiff up on conduct, and therefore, the defendant seen that the plaintiff had not purchased coffee or chips within the last 60 days so he knew when he found the coffee and chips (which are common items possessed by inmates) that he could write the plaintiff up on a conduct report, therefore, the defendant wrote the plaintiff up for a bag of coffee that contained a "teaspoon" of coffee and a bag of chips that contained a hand full of chips, this write up for unauthorized possession of these items that had no monetary value, and items that every inmate has in their possession whether they purchased it or not was **"Arbitrary and Capricious"**, especially when the plaintiff advised the defendant that he

---

[9] Which was Kosher
[10] Which were Kosher

did in fact purchase the items; and produced the receipts prior to the defendants writing the conduct report, proving that the items had been purchased by the plaintiff; however, the defendant stated that the plaintiff would have to take this up with the disciplinary hearing board, (although the defendant had not yet wrote the conduct report). These actions subjected to plaintiff to a potential loss of time extending his stay in prison.

46.    On **8-11-20** the plaintiff filed his informal grievance to Kathy Alvey and he explained that he was discriminated and retaliated against, whereas the plaintiff stated that on the morning of **8-10-20**, at approx. 7am he emailed an informal complaint to Tony Gray against Tony Gray, and that the plaintiff was subjected to a property search and conduct report, wherever no other inmates, especially white inmates, were searched by the defendant and since the plaintiff had been in the facility he has not ever seen the chaplain conduct property searches and write inmates up for possessing open and half eaten commissary items, the plaintiff went on to explain that if the chaplain wanted to use the excuse 'that the search was a part of searching for non-kosher items', that this excuse shall fail, whereas the items that were taken were in **fact** kosher items. In response, Kathy Alvey stated that *"part of Chaplain Gray's duties is to track these diets and to ensure compliance. You were not the only one he checked on. Chaplain Gray did shake your box down, but an officer was always present. You and your property are subjected to search at any point. No policy or procedure was violated"*. This response by the Warden is, admitting that the search was related to the plaintiff's religion and that the Chaplin was in fact looking for items in which the defendant could write conduct on the plaintiff for.

47.    Therefore, on **8-16-20** the plaintiff responded to the informal stating that he *"I never insisted that the search of my property by the chaplain was against policy, I alleged that the search was in retaliation whereas prior to the search on this same day, at 7am that morning an informal complaint was emailed to chaplain Gray which was a complaint against him and at approx. 12pm that same day, after he read the complaint, he was searching my property which is not normal for a chaplain and the officer was only present at the request of the chaplain therefore [the search] was not random and secondly there was no purpose for the chaplain to initiate a shakedown of my property as you would suggest he was authorized to do, in order to check for whether I was in compliance with my religious diet, whereas policy and constitutional law states that*

*once a Kosher diet is approved that there isn't any more scrutiny of the sincerity of that religion. Second, I am not prohibited from possessing Non-Kosher items, especially non-kosher items that were purchased prior to the application and approval of the kosher diet, whereas upon approval I was not required to throw away my personal property, however, prior to approval of the kosher diet, you knew I had non-kosher items in my possession[11] (see your response to grievance # 111671), the chaplain knew that I had non-kosher items, and central office knew that I had non-kosher items, whereas, it was stipulated in a Feb. 26th denial of my kosher application. However, on July 2020 this kosher was approved and no search of my property was ever conducted. Whereas, policy only states that after approval my commissary orders will be monitored."*

48. Thus; a search of the plaintiff's property was not a monitor of his commissary.

49. On **8-11-20** the plaintiff then filed his formal grievance complaining of discrimination and retaliation.

50. During the investigation of the grievance the defendant Tony Grey stated that he suspected that the plaintiff had been trading food for other food, thus he did not state how he suspected this when in fact the plaintiff had not been on the kosher diet for over two weeks, the defendant was armed with the ability to check the plaintiffs commissary orders and there could see that the plaintiff had not ordered any food, therefore, what food did the defendant suspect that the plaintiff was trading.

51. Furthermore, the kosher agreement did not prohibit the plaintiff from trading food for other food, thus, the defendant had no reason to be concerned about what the plaintiff does with his food, if he would have had any.

52. On **8-21-20** the grievance specialist, returned the plaintiffs grievance, indicating to the plaintiff that the conduct report was destroyed and that his commissary receipts were reviewed to prove that he had purchased the items. And that the grievance specialist was informed that the items were given back to the plaintiff. However, the plaintiff returned the grievance stating that his items had not been retuned and that he wanted to proceed with his grievance.

---

[11] However the items confiscated were in fact kosher items, thus the plaintiff was permitted to possess them in accordance to the reasoning by the Warden.

53.   During the grievance process the defendant Tony Grey admitted that he was armed with a print-out reflecting the last 60 days of the plaintiff's commissary purchases.

54.   On this print-out there were no food purchases by the plaintiff in the last 60 days, thus he was indigent.

55.   The defendants Tony Grey states that his sole purpose for the search of the plaintiffs property was to check to see if the plaintiff was in compliance with his religious diet (however, once the plaintiff was approved there was to be no other scrutiny on the plaintiff religious practices, furthermore, this search was not a part of any of the defendants job duties as it relates to Kosher diets), however, the items confiscated were in fact kosher (Coffee and tortilla Chips)

56.   Thus, the defendant confiscated these kosher items for the sole purpose of issuing a conduct report in retaliation for the plaintiff's complaints against his earlier that morning.

57.   The defendants concerns were only to issue a conduct report, rather than correcting any allege misconduct, whereas the plaintiff possessed over $60.00 in new and unopened hygiene items in which he had not purchased on commissary in the last 60 days and the defendant did not confiscated whereas these items also were not on the print-out possessed by the defendant (because the defendant was in fact satisfied once he felt he found something "the food items" that he could issue a conduct report for)

58.   The defendants statements during the grievance process exhibits the defendants anger towards the plaintiff and exhibits that the defendant wanted the plaintiff disciplined for something and\or anything **See; Ex. A,** and the defendant statements exhibits that he discriminated against Hebrew Israelites where he stated *" religious diets here have really contribute to my mis-trust"*

59.   The defendant also goes on to provide false information to the warden when he stated *"Do you realize that within IDOC each year, approximately 1,000 applications for kosher diets are requested and processed? That is staggering-considering we have never had a request here at Branchville for a corresponding Jewish or Hebrew Israelite service. One would think that these applicants would also want religious services as well…."*

60.   This statement was in fact untrue whereas the plaintiff has numerous times requested for Hebrew services beginning in December of 2019.

23

61.　On 10-2-20 the grievance specialist answered the plaintiff's grievance and stated that the grievance was founded and stated that; ***"at this point, your food items are probably not consumable. Your best option may be file a tort claim".*** Thus; but for the chaplains actions the plaintiff was deprived of his property. **These items were unable to be recovered during the trot claim process**.

62.　The plaintiff filed his grievance appeal complaining that **officer Wise** had refused to return the plaintiffs property within a reasonable time and due to her actions the items were no longer consumable[12], the plaintiff also raised a complaint against officers Wise's shift Captain, **Capt. Hoffman** whereas Capt. Hoffman stated in his grievance response that returning the plaintiffs property was not priority[13]. In response to the plaintiffs appeal the warden also advised the plaintiff to file a tort claim.

63.　On 9-21-20, In a grievance response defendant **Andrew Arndt** failed to recognize the most important holy day of the year which is Yom Kippur by stating that the plaintiff's request for the facility to make accommodations so that he could fully observe this Holy Day did not meet the requirements in policy for accommodating "fast", and that the plaintiff was free to fast.

64.　However, the plaintiff was not free to fast because without accommodations made by the facility and authorized by the chaplain, the plaintiff was not able to receive his morning meals within the required time frame in which he would be able to consume the meal, and then the plaintiff would not have been able to receive his night meals in order to break his fast, and the plaintiff could not receive his meals and save them until he was able to break his fast whereas the plaintiff was not required to bring his food back from the dining hall and without authorization the plaintiff was not able to save his food. So therefore, the chaplain and the facility did in fact hinder the plaintiff freedoms to fully practice his religion and faith and beliefs.

---

[12] The actions of officer Wise exhibited deliberated indifference towards the plaintiff's property and his property interest.
[13] Capt. Hoffman's statements exhibited deliberate indifference towards the plaintiff's property and property interest.

65. Tony Gray responded to the same informal complaint and he stated **"kind of disappointing that he files a grievance on something he had never asked or requested first..."**

66. However, **Tony Gray's** response was a lie and an attempt to thwart the grievance process whereas the plaintiff in fact gave the chaplains and the facility notice of his concerns of wanting to participate in his religious Holy Days;

67. Where on **12-19-19**, plaintiff sent a request to the chapel requesting to sign up for Hebrew Israelite services (**Tony Gray responded**) see; **Ex. B**

68. On **6-10-20** the plaintiff's counselor electronically scanned an informal complaint to Tony Gray from the plaintiff in which he stated that he *'would like his religious holidays to be observed and allow me to fully participate in the holidays and fully observe my holidays and diets, I can't fully exercise my religion such as fasting because the facility doesn't recognize my religious holidays....'* However, no action was taken.

69. On **9-13-20**, and **9-14-20** the plaintiff sent a request to the chapel and advising the chapel department the following *"there are some major Jewish holidays coming up and I would like to fully observe these holidays on Sept. 18th (Jewish New Year) and Yom Kippur which is important that consists of fasting on Sept. 27th. I would like to know if you can place the proper accommodations for me to observe these holidays?"*

70. The defendants, **IDOC, Robert Carter, Aramark (contracted to provide and prepare kosher meals), Tony Gray, Andrew Arndt, Kathy Alvey, Dea Goad, Jane DOE#1,** Violated the plaintiffs 1st and 14th amendment rights where the defendants herein acted under the color of state law in their individual and official capacity as it relates to the acts and conduct herein complained of.

## Claim 3: Cruel and unusual conditions

The defendants' **IDOC and Aramark** are liable for subjecting the plaintiff to cruel and unusual conditions where the defendants were serving the plaintiff 15 slices of bread, two 8-6 oz. microwave meals, an apple and 3-4, 1ounce peanut butter packets a day.[14]Thus, the 15 slices of bread contributed to over half of the plaintiffs calorie intake, and therefore according to medical

---

[14] No beverage was included in this diet.

25

advised the plaintiff that consuming 15 slices of bread was harmful and the plaintiff should not be eating 15 slices of bread a day. Thus, this was bad for his health. **Kathy Alvey and IDOC** are liable where the defendants failed to act when the plaintiff complained of the substantial risk to his health and that the diet was affecting his health.

## Claim 4: <u>Retaliation and Religious practice violations;</u>

The defendants **Dea Goad, who is the Aramark supervisor, and Kathy Alvey** are liable for violations against that plaintiffs rights for religious practices, where the defendants knew or should have known that the Aramark Kitchen staff were serving the plaintiff items that were not kosher, even after the plaintiffs complaints the defendants failed to act. Tony Grey and Andrew Arndt who are the prison chaplains and responsible for religious matter are liable where they failed to act on the plaintiffs complaints regarding the infringements on his religious practices

## Claim 5: Equal Protection\discrimination\ Retaliation

**Tony Gray, Andrew Arndt, Kathy Alvey, and IDOC** are liable for the violations against the plaintiff's equal protection rights to religious services and accommodations for holy days and corporate and private worship as the defendants provided for other religious groups. **Tony Gray** is liable for the retaliation against the plaintiff for his religious practices.

## c) <u>8th Amendment Cruel and unusual Conditions and Inadequate Medical Care violations</u>

71.   Beginning on April 20, 2020 and on June 10th, 2020 the plaintiff complained of air pollution, whereas inmates were smoking some kind of toxic drug (unknown to the plaintiff but; well known to the Branchville Correctional facility, Warden Alvey), and this toxic second hand smoke from this drug was affecting the plaintiffs appetite, vision, and gave him Migraine Headaches. (Which he now suffers from frequent migraines[15],

---

[15] Which he is now on chronic care for.

and blurred vision.[16]), the plaintiff also complained that he feared for his safety whereas inmates were hallucinating on this drug and becoming violent.

72.    However, the BCF[17], Warden Alvey and the IDOC failed to act on the plaintiffs complaints and did not provide the plaintiff any relief from the polluted environment or the pain and suffering.

73.    During the grievance process, the facility stated stating that the only way that the plaintiff would receive relief is if the plaintiff reported and provided the names of the inmates that were smoking.

74.    The plaintiff complained in his grievances that giving the names would jeopardize his safety whereas everyone (all the inmates) knew that the plaintiff was complaining about the smoking and had anyone been busted for trafficking or smoking the plaintiff would have been a target for a violent attack.

75.    However, although the plaintiff had not provided any names he advised the facility that *"everyone was smoking"*. However, the facility nor IDOC acted on the plaintiff's complaints or information.

76.    After complaining about the air pollution to the Facility (Kathy Alvey) and IDOC and the Department and the facility (Kathy Alvey) failing to take any action on the plaintiffs safety concerns and health risks, the plaintiff submitted a Health Care request and he explained to the Wexford Medical Department that he was getting *" real bad headaches every time"* the plaintiff *"...smelled whatever drug inmates were smoking"* and the [he] *"...felt like [he] was being intoxicated by the second hand toxic smoke, he could not sleep and he wanted to know if (the toxic smoke) it was effecting his health?* Nurse LPN **Burden** told the plaintiff to *"order Tylenol from commissary [and] no further treatment would be provided unless [the plaintiff] informed medical as to 'what were inmates smoking.'"* The plaintiff in fact explained that he believed that the inmates were smoking the same *"stuff"* that people were overdosing on, hallucinating and being brought to medical for.

---

[16] Which although seen by an Eye doctor no treatment was provided, whereas it was written off as affects from aging
[17] Branchville Correctional Facility

27

77.    A month later, after no treatment was provided to the plaintiff for his complaints of migraine headaches, the plaintiff wrote another healthcare request form explaining that he was told by medical to order *'headache medication off commissary'*. The plaintiff explained that he was *"indigent [he explained that he now] has $6.00 on his account, [he] had ordered pain relief off commissary but commissary was out of stock, [he explained that] the $6.00 will now be taken for this specific healthcare request, therefore [he] is back to being indigent, [he explained that] he could not sleep, loss of appetite and bad migraines for almost a month, [he] asked if they could tell him that problem.* Medical told him nothing, nor did the facility or Wexford medical staff recommend that the plaintiff see a doctor to assess his condition.

78.    The plaintiff then filed grievances explaining that he was not being provided treatment for his complaints *'of loss sleep, loss of appetite and bad migraines for almost a month'* and the defendants **Diana Pfeiffer, Kathy Alvey** and **IDOC** failed to act and were deliberately indifferent to the plaintiffs medical needs where he was told during the facility grievance process, to; *"provide the names of the people who are smoking and to keep complaining"*

79.    The plaintiff appealed to the Warden **Kathy Alvey** and she stated that is was not a facility issue. However, admitting that there was an issue of drugs being smoked.

80.    The plaintiff appealed to the IDOC final reviewing authority and it had concurred that it was not a facility issue, nor did the facility or Wexford medical staff recommend that the plaintiff see a doctor to assess his condition.

81.    However, the Branchville Correctional facility and IDOC refused to allow the plaintiff to access Four Hundred and sixty seven dollars **($467.00)** of his earned income that was being placed in a re-entry account, in which the plaintiff had not consented to placing this money in such account, this deprived the plaintiff of the monetary benefit of his earned income. Therefore, if the facility and medical were unwilling to provide pain relief to the plaintiff and in fact required him to order the pain relief from commissary, depriving the plaintiff from the use of these funds prevented the plaintiff, who was indigent from purchasing pain relief from commissary as recommended by medial and therefore subjected the plaintiff to an unreasonable and prolonged infliction of pain.

82. The plaintiff also contacted **Nikki Tafoya,** ED of physical Health IDOC, IGCS Room W341 302ʷ Washington St. Indianapolis Indiana, 46204 and lodged a complaint with this Dept. in regards to the inadequate treatment by the medical dept. in regards to the plaintiffs complaints of his migraine headaches and the inhalation of the toxic drug smoke, the plaintiff did not receive a response.

83. The plaintiff wrote **Richard Wright** who is the Wexford Health Care Administrator at the BCF facility and the plaintiff went on to explain that he went a whole month in the indigent status ($0) and he did not receive any pain relief or treatment by medical for his complaints of migraine headaches. The defendant **Richard Wright** told the plaintiff that he received treatment in accord with IDOC policy and procedures, **Ex.C,** and Richard Wright then sent a printout of the plaintiff's purchases from commissary prior to his complaints of migraine headaches and the defendant **Richard Wright** advised the plaintiff that he should have ordered headache medication. Richard Wright was therefore indifferent to the plaintiff's serious medical needs, because the defendant **Richard Wright** was suggesting that the plaintiff order pain relief prior to any complaints made by the plaintiff or prior to his current conditions. However, the commissary order from July 7ᵗʰ 2020 did reflect that the plaintiff did in fact order Ibuprofen from commissary. [**Ex.D**].

84. After the exposer to the unknown toxic second hand drug smoke the plaintiff is suffering from blurred vision and he filled out a health care form and was seen several times, but; no diagnosis' was given and to date the plaintiff still suffers from blurred vision and migraine headaches.

85. The plaintiff continued to complain to Wexford medical staff of his migraine headaches by filling out several more health care forms explaining that Tylenol and the Ibuprophen on commissary was not working, he explained that it seemed as though the medication was making the situation more stressful, the pain was still there, he's not sleeping and he had no appetite. The plaintiff was then seen by a doctor for the first time and although the cause of the migraines, and blurred vision and loss of appetite was not diagnosed the plaintiff was put on **Acetaminophen**, which then seemed to be working for the migraines.

86. On a follow up, in regards to the migraines, the plaintiff was seen by the doctor again by the doctor and the plaintiff explained that the **Acetaminophen** was working, however the plaintiff was taken off the **Acetaminophen** and the plaintiff began suffering from the migraines again.

87. The plaintiff wrote a health care request to medical asking why was he taken off **Acetaminophen** after he had advised the doctor that the medicine was working, and explained that he was still suffering from the migraines. After the plaintiffs complaint he was put back on the medication, after an additional week of suffering from migraines.

## Claim 6: 8th Amendment Violations

In regards to the plaintiffs 8th Amendment claims **IDOC and Kathy Alvey, Richard Wright, Wexford Medical** are liable for failing to act on the plaintiff's complaints of air pollution, where these air pollutants were causing the plaintiff harm. The defendants were deliberate indifferent to the plaintiffs serious medical needs when they suggested that the plaintiff tell the names of the people who were smoking, and therefore suggesting that the plaintiff tell the names of the people who were smoking before he will receive treatment and\or because he did not tell names of the people that were smoking, that was the reason why he was not receiving treatment, however, requiring the plaintiff to tell the names of the people who were smoking before he received treatment was a violation and furthermore subjected the plaintiff to additional risk to his safety by being a "snitch" in prison in the very dorm where a sergeant Easton was trafficking with an inmate, thus, because she was the sergeant over this dorm she would have known that the plaintiff had made complaints about the smoking and she would have informed the inmate who she was bringing the smoking material in to.

## Claim 7: Inadequate medical treatment\ deliberate Indifference

**IDOC, Kathy Alvey, Wexford and Nurse Samantha Burden** were deliberate indifferent to the plaintiffs serious medical needs where he complained of the loss of sleep, loss of appetite, and bad migraines, and no medical treatment was provided for his complaints. **Wexford and the nurse S. Burden** are liable where the plaintiff was told by the medical department to purchase his own pain medication although it was known that the plaintiff was indigent, (requiring indigent inmates to purchase their own medication is a common practice amongst the **IDOC and Wexford** at the Branchville Correctional Facility), therefore, IDOC and Wexford are liable for

their common practices and procedures. **IDOC** is also liable because **IDOC** refused to allow the plaintiff to access $467.00 of his earned income to purchase the pain medication that medical suggested that he should purchase off commissary. Because the plaintiff was indigent and **IDOC** failed to act on the plaintiffs complaints that he was suffering from migraines, **IDOC** failed to provide the plaintiff with pain medication upon his request, the **IDOC** should have allowed the plaintiff to access the monies in his re-entry account in order to suppress the pain, however because the **IDOC** refused to allow the plaintiff who was indigent to access this money and because the **IDOC** failed to act on the plaintiffs complaints of pain and refused to provide pain medication the plaintiff went on to suffer migraine headaches for over a month or more. **Richard Wright** is liable where he failed to act on the plaintiff's complaints that he was not receiving any treatment for his pain and migraines. **Richard Wright's** responsibility is to handle all complaints directed towards medical staff at BCF.

## B. Failure to Act/Retaliation

### a) 1ˢᵗ Amendment Retaliation and 8ᵗʰ Amendment Cruel and Unusual Conditions Violations

88.    The plaintiff also alleges addition claims in this 42 U.S.C § 1983 complaint where the **Indiana Department of Corrections** were deliberate indifferent to the plaintiff prison conditions and allowed the plaintiffs prison conditions to progress and get worse when IDOC and its agents failed to act on the plaintiffs prior and current complaints of **discrimination, retaliation, inadequate medical care, First Amendment violation, Due process violations, infringement on property rights, denial of adequate access to the courts, infringement on religious freedoms, equal protection violations and complaints of cruel and unusual punishment,** when the IDOC and its agents denied most of the plaintiffs grievances and then in retaliation for the plaintiffs grievances, the

plaintiff was disciplined for filing his meritorious complaints when the Department\facility, Kathy Alvey and **Diana Pfeiffer** deemed the plaintiff a grievance abuser status as an intent to restrict his speech and attempt to hinder and frustrate the plaintiffs civil claims process against the IDOC and its agents, and this status hindered the plaintiffs ability to seek relief and challenge his conditions of confinement at the facility level, and seek additional witnesses\ names of participating parties and evidence, where the plaintiff was prohibited from filing any grievances for 30 days in which he could not file any complaints challenging his conditions of confinement, which led to a continuation and cumulating number of deprivations and constitutional violations.

89.   The plaintiff attempted to file a grievance complaining that the grievance abuser status was unreasonable, arbitrary, capricious and retaliatory and that Diana Pfeiffer and Kathy Alvey conspired together and deemed the plaintiff a grievance abuser in an effort to deter, hinder and frustrated the plaintiff access to the court in order to seek judicial review of his conditions of confinement, the plaintiff was asked by the grievance specialist, defendant **Diana Pfeiffer**, *'why did he [the plaintiff] file so many grievances'?* The plaintiff stated ***"because [he] was attempting to exhaust his administrative remedies per PLRA"*** . Three days later the plaintiff filed a grievance in which his incoming correspondence was denied delivery to him and he was not given an adequate due process for the denial whereas the plaintiff was not provided any reason for the denial of his incoming correspondence.  However, because of this complaint of the interference with the plaintiff's incoming mail, the grievance specialist Diana Pfeiffer submitted her request to deem the plaintiff a grievance abuser, to the warden, defendant **Kathy Alvey**, in which **Diana Pfeiffer** and **Kathy Alvey** consider the following complaints an abuse of the grievance procedure

a.   **Log Id.** 110668, **Topic:** Housing-Cell provisions, <u>**Issue:**</u> PREA, In which the plaintiff complained that

b.   **Log Id.** 110738, **Topic:** Legal Matters , <u>**Issue:**</u> Denied Access to Courts

c.   **Log Id.** 110756, **Topic:** Confiscation of personal property, <u>**Issue:**</u> Discrimination

d.   **Log Id.** 110765, **Topic:** Confiscation of personal property, <u>**Issue:**</u> Discrimination

e.   **Log Id.** 110798, **Topic:** Medical, <u>**Issue:**</u> Denial of Adequate Treatment

f.   Log Id. 111034, Topic: Complaints against staff, Issue: Unlawful detention\Due process violations.

g.   Log Id. 11318, Topic: Medical, Issue: Denial of Adequate Treatment[18]

h.   Log Id. 11320, Topic: Environmental Conditions, Issue: Exposure to toxic smoke

i.   Log Id. 111457, Topic: legal Matters, Issue:

j.   Log Id. 11458, Topic: Correspondence Destroyed, Issue: Destruction of correspondence[19]

k.   Log Id. 11459, Topic: discrimination, Issue:

l.   Log Id. 111671, Topic: special diet, Issue: Denial of religious diet

m.   Log Id. 111672, Topic: personal property confiscated, Issue:

n.   Log Id. 111674, Topic: Rejection of Correspondence, Issue:

o.   Log Id. 111797, Topic: trust fund, Issue:

p.   Log Id. 111800, Topic: legal mail, Issue:

q.   Log Id. 111899, Topic: rejection of correspondence, Issue: [20]

r.   Log Id. 112003, Topic: Rejection Of Correspondence, Issue: [21]

s.   Log Id. 112078, Topic: Environment-Conditions, Issue: Sanitation

t.   Log Id. 112145, Topic: Correspondence rejected, Issue:

u.   Log Id. 112147, Topic: complaints against non-staff, Issue:

v.   Log Id. 112417, Topic: Visitation complaints, Issue: Visits Taken

w.   Log Id. 112493, Topic: Discrimination, Issue: granted

x.   Log Id. 112546, Topic: Institutional operation, Issue:

y.   Log Id. 112780, Topic: Food Quality, Issue: granted

z.   Log Id. 112781, Topic: Safety, Issue: Denial of Adequate Treatment

aa.   Log Id. 113350, Topic: Mail communication, Issue: Denial of correspondence with media

bb.   Log Id. 113771, Topic: Visit time and conditions, Issue:

[18] This issues survived screening by the U.S Dist. Court case # 3:20-cv-265-RLY-MPB
[19] This issue survived screening in Perry County Court case # 62C01-2008-MI-339
[20] Civil suit U.S Dist. Court case # 3:20-cv-255-RLY-MPB
[21] Civil Suit 3:20-cv-255-RLY-MPB

33

cc. **Log Id.** 113797, <u>Topic:</u> Institutional operations, <u>Issue:</u>

dd. <u>Log Id.</u> 113882, <u>Topic:</u> safety, <u>Issue:</u>

ee. <u>Log Id.</u> 113886, <u>Topic:</u> safety, <u>Issue:</u>

ff. <u>Log Id.</u> 114282, <u>Topic:</u> Mail rejected, <u>Issue:</u>

gg. <u>Log Id.</u> 114333, <u>Topic:</u> Access to medical care, <u>Issue:</u>

hh. <u>Log Id.</u> 114768, <u>Topic:</u> mail communication, <u>Issue:</u>

ii. <u>Log Id.</u> 114850, <u>Topic:</u> Religious program service, <u>Issue:</u>

jj. <u>Log Id.</u> 115007, <u>Topic:</u> law library access, <u>Issue:</u>

kk. <u>Log Id.</u> 115013, <u>Topic:</u> Correspondence rejected, <u>Issue:</u>

ll. <u>Log Id.</u> 115240, <u>Topic:</u> food quality, <u>Issue:</u>

90. Wherefore, as a collective the above complaints were an accumulation of deprivation and violations of numerous Constitutional rights, which affected the plaintiffs conditions of confinement and therefore warranted exhaustion of remedies

91. Therefore, the plaintiff now raises a cumulating of claims of harassment, retaliation, discrimination, cruel and unusual conditions, denial of access to the court, First Amendment violations, due process violations and denial of adequate medical treatment,

92. Whereas, he claims that after he filed his initial informal grievance on 12-19-19, and initiated several civil suits against the Branchville Correctional facility and its employees these state officials colluded together as well as acted individually and began threating the plaintiff with disciplinary action,

93. The plaintiff was threatened with conduct reports, if he did not stop filing grievances, in which he would be charged with **Disciplinary Code #213B** which is the disciplinary code for threating, which states that the plaintiff would be written up on conduct for lying in a grievance.

94. These threats by the defendants frustrated and hindered the plaintiff because 'how could he make a complaint and prove the complaint was true whenever, an official's word will always be taken as true over and inmate's word?' Even, when officials have been proven to have lied.

95. The plaintiff also faced additional adverse measures, whereas, the officials began interfering with the plaintiffs incoming and outgoing correspondence, infringing upon and frustrating his access to the courts and taking actions that would deter, hinder and

frustrate or preventing him from seeking redress to challenge his conditions of confinement and seeking compensation for the destruction of personal property.

96.    The actions taken by the defendants were all done in retaliation for the plaintiffs complaints, anticipated civil suits and actual state civil claims filed against the named defendants and state employees

97.    Furthermore, whenever, some of the very complaints were screened by the state and U.S Dist. Courts and were in fact deemed claims that shall proceed against the defendants, presents facts that the grievances filed by the plaintiff were not frivolous or an abuse of the grievance process.

98.    And due to the arbitrary, capricious and retaliatory grievance abuser status the plaintiff was unable to challenge his conditions confinement as it related to the plaintiff's 1st , 8th and 14th amendment rights whereas;

## Claim 8: Retaliation\ 8th Amendment Violations

As it relates to the plaintiffs' claims of failure to act and retaliation, the **IDOC** are liable where the defendants were deliberate indifferent to the plaintiffs prison conditions and allowed the conditions to worsen even after the plaintiff raised his complaints to the Department of Corrections given them numerous opportunities to correct the conditions.

## C. Retaliation\Discrimination\Equal Protection\1st and 14th Amendment Violations

### a) 1st Amendment Violations

99.    On 7-2-20 Diana Pfeiffer spoke to the plaintiff about her anticipation of submitting a request to the warden Kathy Alvey to deem the plaintiff a grievance abuser in which the defendant complained that the plaintiff had filed 39 grievances within a 6 month period.

100.    However, most of these grievances involved the facility interfering with the plaintiff's incoming and outgoing correspondences with the public.

101.    A few days after the defendant Diana Pfeiffer advised the plaintiff of her anticipation of submitting her request to the warden to deem the plaintiff a grievance abuser, the facility had yet again denied the delivery of the plaintiffs incoming mail and had not provided the

plaintiff with an adequate notice of the rejection of his correspondence, he was not notified of any specific reason or description of any prohibited material, he was not notified as to who made the decision not to deliver the correspondence, the plaintiff was not provided any form of due process as to the rejection of his correspondence therefore, in accord with IDOC policy, which states 'when a determination is made that any correspondence will not be delivered to the inmate that inmate may challenge the decision by filing a grievance',[22] the plaintiff there filed his grievance attempting to challenge the decision that was made to censor and reject his correspondences, whereas;

102.  On July 7th 2020, an unidentified[23] state employee intercepted a correspondence, on the Facility GTL (email) inmate messaging service[24], addressed to the plaintiff from Erick Collins and a determination was made that the correspondence would not be delivered to the plaintiff, therefore, GTL system generated it's generic and vague notice simply stating *"Erick Collins has attempted to sent you a message and due top facility policy the message will not be delivered to you"* This message failed to include any information regarding the name of the staff person who made the determination that the message would not be delivered, information regarding the specific facility policy that prohibited the delivery of the correspondence, nor did any notice  identify whether there was any prohibited material within the correspondence or what that prohibited material consisted of.

103.  On July 9th 2020 the plaintiff attempted to send an email correspondence to his daughter Aneesa Wheeler, however, this correspondence was intercepted by an unknown facility staff and a determination was made that the letter from the plaintiff addressed to Aneesa Wheeler would not be delivered to the plaintiff's correspondent. A generic GTL system message was sent to the plaintiff merely stating *"hi Tracey Wheeler, your message was not sent to Aneesa Wheeler, Reason: your message was deemed inappropriate' Subject; the meaning of my characters"* However, this notice did not identify any inappropriate

---

22 IDOC policy offers no other means of challenging the rejection of correspondence
23 The state defendants fail to tell the plaintiff the name of the staff member who rejected his correspondence.
24 GTL is a private company that partners with federal, state and county correctional facilities to provide prisoners mail services. IDOC correspondence policy provides that the GTL mailing services are subjected to the policy and procedures of the IDOC correspondence policy.

material that would be prohibited by policy, thus the plaintiffs correspondence only complained about his conditions in prison. The notice itself was inappropriate where it was not in accord with IDOC policy or state law, where the notice did not specify what the inappropriate material consisted of. For all the plaintiff knows, 'his correspondence was denied because it contained complaints against the facility to the public.'

104.    On July 11th, 2020 and the facility denied the delivery of a correspondences addressed to the plaintiff from Aneesa Wheeler, the plaintiff attempted to file a grievance stating that he was not given a proper notice as to why there was a determination was made not to deliver the correspondence to the plaintiff. The plaintiff complained that there was no adequate description of any prohibited material as required by IDOC policy *#02-01-103*, and in accord with the 1st amend., to the U.S Const., which states that the plaintiff should be notified as to why a letter\correspondence addresses to him was not delivered. The plaintiff also complained that the 1st amend. also provided that the prison was required to justify its need and interest for disallowing such correspondence. However, the plaintiff's grievance was rejected due to the grievance abuser status and the facility went on rejecting a number of the plaintiff's incoming and outgoing correspondences without any reasonable or legitimate justification.

## Claim 9: 1st Amendment Violations

As it relates to the 1st Amendment violations regarding the delivery of the plaintiffs incoming and outgoing correspondence; **Kathy Alvey and Diana Pfeiffer** are liable, where the defendants prevented the plaintiff from challenging the decisions made on his communication to\form the public where the defendants prevented the plaintiff from filing any grievances, thus, the facility staff went on denying the delivery of the plaintiff's incoming and outgoing correspondence for arbitrary, retaliatory and unreasonable reasons unrelated to any legitimate penalogcial interests,[25] and because the plaintiff was barred from the grievance process he was not allowed to learn the names of the staff that were interfering with and rejecting his mail, nor was the plaintiff able to learn the reason why his mail was being rejected.

---

[25] The prior to deeming the plaintiff a grievance abuser the defendants in fact indicated to other staff members that the plaintiff would soon be prevented from filing any more grievances, thus, this action was premeditated.

### b) 1st Amendment Retaliation and 14th Amendment Discrimination and Equal Protection violations

105.    The plaintiff filed grievances alleging that the denial of his email correspondence was retaliatory and discriminative because the facility allowed white inmates to receive the same email correspondence, video and photographic material that depicted the same images and material that were in the correspondences that were denied to the plaintiff who is African American.

106.    The plaintiff's incoming GTL email correspondence was being subjected to the **"dress standards"** of the IDOC visitation policy, however the plaintiff complained that such restrictions severed no reasonable legitimate penological interests and were a violation of equal protection, whereas; the facility allowed "white" inmates to received video messages that were not in compliance with the visitation dress standards, but requires the plaintiffs email\video messages to comply with an unreasonable dress standard that served no penalogcial interest, whereas, photos of women barely clothed were allowed, and where the "white inmates" were allowed video messages depicting "white" women in thongs, high heels, hats, and tank tops and hoodies, whereas all these mentioned dress attires are prohibited under the visitation policy. However the plaintiff's videos were denied because his email\video messages depicted black women in tank tops, high heels, or tight fitting jeans.[26]

107.    The plaintiff complained in his grievance that his video messages[27] were being denied based on discrimination because the videos depicted African American women who had **"big rear ends"** although dressed appropriate in a public setting.

108.    The plaintiff also alleged that the messages were being denied in retaliation due to the plaintiff filing previous grievances against the very facility staff who viewed incoming GTL email correspondences for approval or denial.

---

[26] In the African American culture African American women are well endowed and therefore their clothing fits tightly due to body types.
[27] Not to be construed as video visits. Video messages are 15 second video messages

109.   No action was taken by the facility or the Department of Corrections on the plaintiff's allegations and therefore his correspondence continued to be rejected and the White inmates continued to receive email correspondence's containing video images and photos of the same material that was being denied to the plaintiff an African American inmate.

110.   The plaintiff alleged in his grievances and complaints that because he was indigent and therefore was not able to order or purchase postage stamps on commissary, that the GTL email services that provide mailing services for Indiana inmates, was the plaintiffs alternative means of communicating with the public, family and friends.[28]

111.   In addition, the defendant's actions, in which they failed to act on the plaintiffs complaints, affected the plaintiff's conditions of confinement where he suffered unusual conditions, discrimination, first amendment violations and inadequate medical care and treatment, whereas,

## Claim 10: 1st Amendment Retaliation and 14th Amendment Discrimination and Equal Protection violations

As it relates to the plaintiffs 1st Amendment retaliation and discrimination claims **Kathy Alvey, and Diane Pfeiffer** are liable where the plaintiff made many complaints regarding his incoming \outgoing mail being rejected, the defendants did not like the fact that the plaintiff flooded the grievance process with grievances regarding his correspondence and therefore challenging the procedures set forth by the defendants, the defendants therefore retaliated by deeming him a grievance abuser in an attempt to silence and deter the plaintiff from filing any more complaints regarding his correspondence and if he continued to file grievances regarding his correspondence he would continue to be punished and silenced through the grievance process. Thus, the plaintiff was prevented from challenging any future conditions of confinement, thus the grievance abuser status was purely retaliatory, especially where most of the plaintiffs grievances were ruled in his favor, thus, there had been no abuse of the process.

---

[28] Also the GTLvideo messaging services was the only alternative for the plaintiff to see his family and have a more intimate relationship with his family and friends whereas the plaintiff's family and friends and from out of state and the furthermore the whole state has been on covid lockdown.

**IDOC** is liable where it enacted a policy that requires inmates to be placed on a grievance abuser status because an inmate files many grievances that were ruled in favor of the inmate, violating the first Amendment.

## D. Failure to Act\ Cruel and Unusual Conditions\Discrimination\Inadequate Medical Care\RLUPIA

### a) 8th Amendment failure to Act and Cruel and Unusual Conditions Violations and 14th Amendment Equal protection violations

112. On 12-18-19 the plaintiff arrived at the Branchville Correctional facility, and when the plaintiff went to make a bowel movement he was forced to sit on a toilet that was facing multiple mirrors where other inmates were standing in the mirror shaving and etc.

113. The plaintiff noticed that while these inmates were standing in the mirror, while the plaintiff was on the toilet, these inmates were looking at the reflection of the plaintiff in the mirror while he was on the toilet.

114. This made the plaintiff uncomfortable, unsafe and at fear of attack, whereas the plaintiff had nothing to block his private parts, or block the inmates from starring at the plaintiff while he sat on the toilet in a vulnerable position with his pants down and his bottom half of his body was exposed, which could be sexually arousing to homosexual and sexual violent inmates.

115. Because the plaintiff felt unsafe, the plaintiff filed his PREA complaint to the warden **Kathy Alvey** in which the plaintiff stated that he wanted to report a PREA.

116. Defendant **Kathy Alvey**, instead of investigation, looking into the issue or even attempting to remedy the situation or even looking into the complaint, she suggested[29] that the plaintiff be placed in segregation (which would have stripped the plaintiff of all

---

[29] This was a statement made to Burkett the director of the DOC Ombudsman Bureau

40

privileges equal to inmates in general population) as a remedy to the plaintiffs PREA complaint.

117. The plaintiff then filed his informal complaint to the defendant **Kathy Alvey** and in response **Kathy Alvey** stated *"we recently passed our PREA audit. This is not an area of concern for any of the auditors"*[30]

118. The plaintiff then filed his formal grievance and stated that *"although the issue may not have been a concern of the PREA audit doesn't mean that this isn't an issue because it is a concern to me and I feel unsafe, and uncomfortable. exposing myself to potential predators leaves an opportunity for someone to make a sexual comment while I am in a defenseless posture and if someone is looking in the mirror and we happen to make eye contact he may take this as an invitation"*

119. The defendant **Kathy Alvey** responded suggesting that because it has never been an issue in the past that it cannot be an issue at that present moment. This attitude of Kathy Alvey was deliberate indifferent. Especially when the facility has had various complaints of sexual attacks and sexual activity accruing in the bathroom facilities.

120. The plaintiff suggested as a relief that the facility place a 3 foot door on the front of the stalls whereas this would allow inmates a little privacy and blockage for the peering eyes of any sexual predators and this still would allow officers a clear view of inmates sitting on the toilet, whereas a 3 foot door or even a 10 foot door would not interfere with the officers visual surveillance into the bathroom.

121. The plaintiffs suggested remedy and grievance was denied at all stages.

122. The peering and on looking began to get worse as inmates began making sexually suggestive comments and harassing the plaintiff while he was on the toilet and because the defendant **Kathy Alvey** and the **Department of Corrections** fail to take any action on the plaintiffs complaints the defendants therefore allowed these actions to continue and therefore frustrated the plaintiffs grievance process because his complaints were rejected and any further complaints of the same issue would have resulted in restrictions on his grievance process.

---

[30] This statement is contrary to the audit at the CIF facility whereas as the bathroom set up at CIF is the same set up at BCF and the PREA auditors determined that there was a PREA concern and required that the CIF facility add doors to the toilet stalls

## Claim 11: 8th Amendment failure to Act and Cruel and Unusual Conditions Violations and 14th Amendment Equal protection violations

**IDOC** and **Kathy Alvey** are liable for the claims related to the PREA concerns. Where after the plaintiff brought notice to **Kathy Alvey** and **IDOC** of the potential risk of sexual assault, the **IDOC** and **Kathy Alvey** continued to subject the plaintiff to the risk where it failed to correct, attempt to correct or remedy the situation, whereas at all other IDOC facilities the **IDOC** created a safer environment by adding doors to all the toilet stalls that had a bathroom set up such as the bathroom at BCF, therefore violating the equal protection clause of the 14th Amendment. **Kathy Alvey** also showed deliberate indifference to the plaintiff's safety when her only suggestion to remedy the issues was to place the plaintiff in segregation.

## b) 8th Amendment Inadequate Medical Care and Cruel and unusual Conditions and 14th Amendment Equal Protection Violations

123. On or about December, 27th the plaintiffs was subjected to cruel and unusual treatment, inadequate medical care and unequal medical care, whereas;

124. Upon arrival to the Branchville Correctional facility on 12-18-19, the plaintiff's personal property was confiscated for inventory.

125. In the plaintiff property he had **Hypo-Allergic Lotion** (which he purchased off commissary) to treat his chronic dermatitis, however, when the plaintiff eventually received his property he was told that he would not be allowed to possess the **Hypo-Allergic Lotion** because the Branchville Correctional facility does not allow it in its facility and it is not sold on their commissary.

126. On 12-19-19 the plaintiff submitted a health care form stating *"in the past I was treated for dermatitis (skin rash) and I was told to use the hypo-allergenic lotion on commissary whereas the only lotion that don't cause my skin\face to inflame\get rashes. I came from another facility with this lotion purchased from commissary but*

42

*here it's not allowed of sold on commissary, I would like to be prescribed something new."*

127.   On 12-20-19, the plaintiff was seen by Wexford medical personal, defendant **C. Hubbal** the plaintiff explained to the defendant nurse that he was having discomfort where his skin was itching and burning. The plaintiff explained to the defendant that he was on chronic care for Dermatitis and that he was prescribed to use Hypo-Allergenic lotion however the facility does not sell the lotion on commissary, and therefore the plaintiff was looking to be prescribed an alternative.

128.   The defendant **C. Hubbal** checked the plaintiff medical history and seen that the plaintiff was prescribed Hydrocortisone cream in the past to treat his dermatitis issue, however the defendant went on to tell the plaintiff that there was nothing she could give him[31] and that she would refer him to see the doctor.

129.   On 12-26-19 the plaintiff was seen by **Dr. K. Dew** and the plaintiff explained to the doctor that his skin was itching and burning and causing discomfort, the plaintiff explained that he had been treated for dermatitis for nearly 7 years, he explained that he was prescribed **Triamcinolone Acetonide and Betamethasone and ultimately hydrocerin** , whereas the plaintiff was having an allergic reaction to the lotions sold on commissary, however once commissary began selling hypo-allergic lotion the plaintiff was taken off the hydrocerin and was prescribed when told to purchase the hypo-allergenic lotion off commissary, however the BCF facility does not sell the hypo-allergenic lotion on commissary, therefore the plaintiff was seeking an alternative to his treatment.

130.   The defendant, **Doctor Dew**, told the plaintiff that there was nothing that he could prescribe the plaintiff and instructed the plaintiff to purchase hydrocortisone cream from commissary to treat his itching and burning skin. The plaintiff explained to the defendant that he was indigent and could not purchase any items on the commissary, the defendant explained that there was nothing further he could do.

---

[31] On 1-31-20 inmate A. Collier went in to the same medical department at BCF on claims that his skin had an allergic reaction to the lotions on commissary, and even though this inmate had no history of treatment for any reactions, any signs of reactions or irritations he was given a type of petroleum jelly by the nurse on the same day of his medical visit, without seeing a doctor.

131. On 12-26-21 after the doctor for Wexford medical failed to treat the plaintiffs chronic dermatitis that was causing him discomfort from itching and burning, the plaintiff then filed his informal complaint to defendant, **Richard Wright,** Director of Wexford medical. In this complaint the plaintiff stated; *"I am a new arrival, I was at CIF , and previously I was treated for dermatitis whereas I had an allergic reaction to the lotions on commissary, I was treated with Triamcinolone Acetonide and Betamethasone and ultimately hydrocerin however once commissary began selling hypo-allergic lotion the I was taken off the hydrocerin and told to use hypo-allergenic, but now BCF don't sell it and medical said there is nothing here for my allergic reaction to the lotions."*

132. The defendant, **Richard Wright,** responded to the plaintiffs complaint stating; *"Mr. Wheeler, you saw the physician on 12-26-19, he told you to purchase the hydrocortisone cream from commissary for $1.50."*

133. Because the plaintiff was indigent and could not purchase the medication prescribed by the medical department the plaintiff filed his formal grievance on 1-7-20, **"after going nearly 20 days without any treatment and being left in the discomfort of burning and itching to his skin"** .

134. In the plaintiffs grievance he sated; '*in the past he was diagnosed and treated for dermatitis and he was prescribed Triamcinolone Acetonide and Betamethasone and ultimately he was placed on hydrocerin, whereas he was allergic to the lotions on commissary, he stated that once the CIF facility began selling hypo- allergenic lotion he was then taken off the hydrocerin cream and was prescribed to use the hypo- allergenic lotion. The plaintiff stated that he advised medical that the lotion that he was told to use is not sold at BCF, he advised medical that he had dermatitis and that he needed something for the itching, flaking, burning and inflammations. The plaintiff complained that he was told by medical that there was nothing that they could do for the plaintiff and that the medical told the plaintiff to order hydrocortisone cream off commissary. The plaintiff complained that he informed medical that he was indigent and could not purchase the cream prescribed by medical to treat his medical needs, the plaintiff stated that if medical suggests that he use hydrocortisone cream, that medical carries the cream and can prescribe the cream to the plaintiff whereas the plaintiff is*

*indigent. The plaintiff explained that dermatitis is not curable it is only treatable and the medical department is failing to treat the plaintiff.*

## Claim 12: 8th Amendment Inadequate Medical Care and Cruel and unusual Conditions

IDOC, C. Hubbal, doctor Dew, Richard Wright, and Wexford are liable for the claims related to the 8th Amendment for the Inadequate Medical Care and cruel and unusual conditions.

## Claim 13: 14th Amendment Equal Protection Violations

As it relates to the Equal Protection Claims **Wexford, Doctor Dew and IDOC** are liable, where the defendants failed to provide the same treatment and care that was provided to all other inmates who had money. Because the plaintiff had no money to pay for services he was denied adequate treatment and care. **Wexford and IDOC** are liable because the defendants were acting in accord with **Wexford and IDOC** policy.

### c) 8th Amendment Failure to Act Violations

135.    In response the grievance specialist acting on behalf of the defendant **IDOC** denied the plaintiff complaint and also suggested that the plaintiff order the hydrocortisone cream although the department was aware that the plaintiff was indigent and cannot purchase the $1.50 cream, therefore the plaintiff went on an additional 23 days in discomfort of the itching and burning of skin that led to loss of sleep and extreme discomfort and pain.

136.    On 1-30-20 the plaintiff, filed his appeal with the warden and in response the warden stated that ***"There will be more available creams on commissary"***. However, this response did not address the fact that the plaintiff was being left in the pain and discomfort of itching and burning of the skin and because the plaintiff was indigent and would not be able to purchase any available creams on commissary the plaintiff filed his appeal to the last stage of the grievance process and that appeal was too denied. Thus the department went on without acting on the plaintiff's complaints of pain and suffering.

45

137. Eventually after nearly two months of itchy and burning sensations of the skin the medical department finally prescribed the plaintiff hydrocortisone.

**Claim 14: 8th Amendment Failure to Act Violations**

As it relates to the 8th Amendment failure to act claims **IDOC** and **Kathy Alvey** are liable.

## d) 8th Amendment Cruel and Unusual Conditions; 1st Amendment Retaliation Violations; and 14th Amendment equal protection and Due Process Violations

138. The plaintiff was subjected to cruel and unusual punishment, unlawful detention, retaliation, and due process violation, whereas; beginning on 12-18-19 as the plaintiff newly arrived at the BCF facility; he began hearing that inmates were being placed in a temporary segregation cell for minor infractions for up to 4-8 hours without proper due process, without a toilet, and no water, also hearing that some inmates have urinated on themselves and defecated themselves while in this temporary segregation cell.

139. The plaintiff also heard that inmates had suffered from medical conditions where they were not being properly cared for while in this temporary segregation cell,

140. Therefore, the plaintiff began advising inmates to file grievances on these practices of the facility if they had been subjected to these conditions.

141. However, because of the plaintiff's fear of being placed in this temporary segregation for minor infractions and or arbitrary reasons and therefore concerned of his own safety the plaintiff filed an informal complaint to the Warden **Kathy Alvey** concerning reasons as to why inmates would be subjected to the cruel conditions of this temporary holding cell?

142. On January 7th, 2020 the plaintiff filed his informal complaint to the defendant, Warden **Kathy Alvey,** advising her that the practices of placing inmates in a temporary holding cell for '*"punishment" up to 4-8 hours, without due process, no toilet and no water was unconstitutional'* and the plaintiff explained that these actions were being committed by correctional officers on a daily basis and that the actions were purely arbitrary.

46

143.    On January 9th,2020, the defendant **Kathy Alvey** received the plaintiff's informal complaint about this "holding" cell being unconstitutional[32], and soon after Kathy Alvey received the complaint, the plaintiff was placed in this holding cell in which he complained to **Kathy Alvey** of being unconstitutional, whereas,

144.    **Beginning on 1-13-20,** after the plaintiff made complaints about the **"Hot Box"[33],** the plaintiff was improperly separated from the general population for disciplinary purposes and placed in a segregation unit several times, and at times 2-3 times a day, without notice or an opportunity to be heard and not committing any violation of the rules. Wherefore, the plaintiff had a state-created statutory right by the provisions of Ind. Code § 11-11-5-4 and Ind. Code § 11-10-1-7 protected by the Ind. Constitution, and that Indiana Constitution Art. 1 § 12 guarantees a right to judicial review of state laws where prison officials impose arbitrary forms of disciplinary punishment in direct violation of the statue, whereas;

145.    **On 1-13-20,** the plaintiff was waken up at 2am for a job in the kitchen, the plaintiff advised the officer that he did not have a job, (as he never received notice about any classification assignment to the kitchen), the plaintiff went back to sleep, figuring that the officer woke the wrong inmate up. About 15min. later officer **Ms. Patrick** came back instructing the plaintiff that if he did not get up that he would be *"going to segregation".*

146.    **At 3am,** the plaintiff arrived to the kitchen, he advised the Aramark staff, **Ms. Hearst,** that there must have been a mistake and that he did not have a job, he advised her that his *"Report for classification hearing"[34]* stated that he was *"Idle"* until **3-9-20,** and that an additional notice from Branchville facility dated **1-2-20,** from the classification department at Branchville indicating that he was *"Idle".* **Ms. Hearst** stated that the plaintiff was *"on the count letter for the kitchen"* so he *"had to work",* the plaintiff then told her *"I quit",* she called a signal 8 and told the **officer** to escort the plaintiff to segregation. **(None of these actions exhibited any risk to the safety and security of the facility that would warrant the placement in segregation, whereas the plaintiff's demeanor was calm and collective.)**

_____

[32] In which Kathy Alvey responded to the plaintiff denying any knowledge of the this holding cell that was being used to, hold inmates up to 4-8 hours without water, a toilet and used to discipline inmates without any due process.
[33] Also referred to as "Temporary Segregation" herein.
[34] State form 3412

147. **At approx. 3:15am,** the plaintiff entered segregation and he was placed in a segregation holding cell that had no toilet or running water. The plaintiff was held in this cell for **8 hours** until he was released at 10am or 11am and he returned back to his dorm.

148. While the plaintiff was being held in this holding cell for 8 hours he was not allowed to urinate, he wasn't given any water and he wasn't allowed to use the toilet. He was given lunch, **Officer Jon Doe#1** was responsible for providing the plaintiff a lunch, and when he asked officer John Doe#1 to use the restroom he was told that they were *"working on getting me out".* Segregation was under the supervision of **Sgt. John Doe** and **Lt. John Doe, who sat in a bubble directly in front on the cell that the plaintiff was being held in and therefore personally observed that the plaintiff had no toilet, or water, and had not been fed.**

149. On 1-13-20, the plaintiff filed an informal complaint to **Kathy Alvey** stating that he was placed in segregation, that he was being held in there for refusing a work assignment, that he was placed in segregation purely for punishment which violated his due process because his guilt was determined and he was punished before he could challenge any allege violations before a disciplinary board. Thus **Kathy Alvey**, who is the warden turned a blind eye and condone these actions of the defendants. And therefore yet again;

150. **On 1-14-20,** at approx. 2:30am the plaintiff was escorted to the kitchen again. Once in the kitchen the plaintiff was asked by the inmates if he had taken his Hep A shot? The plaintiff stated *"No"*, the inmates advised Aramark staff **Ms. Hearst** that the plaintiff had not taken his Hep A shot and that he should not be around food.

151. At approx. 3am, the plaintiff was then escorted out of the kitchen to the Dorm. **(Here the plaintiff was taken to the dorm without incident and he was not placed in segregation nor was his demeanor a threat to the safety and security of the facility).** Once the plaintiff got to the dorm the **Sgt. Flammarion** asked the plaintiff why was he sent back? The plaintiff stated *"I guess because I hadn't had a Hep A shot"* the defendant then asked *"have you been to medical to take a shot"* the plaintiff stated *"no".* **(This was not a lie whereas since the plaintiff had been at Branchville since 12-18-19 up until the present date he had not been to medical to take a Hep A shot).**

152. Approx., 2 hours later at 4:40am, the defendant **sergeant Flammarion** asked if the plaintiff was *"going back to work".*[35] The plaintiff stated *"no"* and the defendant **officer Flammarion** cuffed the plaintiff up and the plaintiff was escorted to segregation, by **John Doe#1**, where he sat in a holding cell for 4 hours with no toilet or water. **(here the plaintiff merely answered a question asked by the officer, in which, indicated that he had a choice, whereas, he did not give an order to go back to work, however, none of the plaintiffs actions exhibited any risk to the safety and security of the facility that would warrant the placement in segregation, whereas his demeanor was calm and collected.), (statement's from officer Brandon Sillings, also states that the plaintiff was calm and did not refuse any orders).**

153. The plaintiff was told by defendant **John Doe#2** that if he needed to urinate that he would have to urinate in a *"jug"*, this jug was small in circumference to the affect that it would be hard to urinate in without the plaintiffs penis touching the opening to the jug, in which it appeared that the jug had been used before as it smelled as urine and stained yellow with urine[36] thus it had been used by other inmates, *(this would subject the plaintiff to exposures of bacteria and diseases such as hepatitis, TB, etc.).* Furthermore, the plaintiff was not allowed to make a bowel movement and he was not given any water[37] for his entire stay. *(IDOC Policy # 02-04-101 Eff'd 6-1-15 pg.40 states in section f. "The following shall not be imposed as disciplinary action: (4) Restrictions on…use of hygiene facilities (5) or punitive inference with daily functions of living…).* At this time **Sgt. John Doe #3** was in charge of the segregation unit and refused the plaintiff to use the bathroom or provide any water.

---

[35] This statement was formed as a question, suggesting that the plaintiff had a choice.
[36] One court has stated that and "inmates exposure to sewage can constitute a serious risk to inmate health and safety and satisfy the objective component [of the Eight Amendment]"…Evidence in the record confirms what is obvious: exposer to human waste of others carries a significant risk of contracting infectious diseases such as Hepatitis A, Shigella and others. "There is no requirement that an inmate suffer serious medical problems before the conditions is actionable…" Shannon v. Graves, 257 f.3d 1164, 1168 (10th Cir. 2001).
[37] See; young v. Quinian, 960 f.2d 351, 364-65 (3rd Cir. 1992) (even if placement in a "dry cell" was justified, the refusal to let the prisoner out to use the toilet and to empty his urinal would violate the constitutions.)

49

154. **At 8:00am,** the plaintiff was released from segregation and he returned to the dorm. Approx. 10 minutes later he was called to the OIC desk, officer **Jane Doe,** (*smiling at me*), asked if the plaintiff was going to work, he said "No", *(as the shift in the kitchen was over so he figured this was a joke, especially when the officer was smiling*), the plaintiff was cuffed up and escorted back to segregation where he sat for another 3 hours without a toilet[38] or water for the entire stay.

155. **At Approx. 11:00am,** the plaintiff was released back to the dorm.

156. **At 11:30am** the plaintiff went to lunch, came back from lunch and sat through count and even watched some T.V all without incident....

157. **...However, at approx. 12:30pm,** the plaintiff was again called to the OIC desk, he was cuffed up and escorted to segregation yet again, and this time he was placed on administrative segregation for refusing a **Work Assignment, where the plaintiff sat until 1-21-20. (However, none of the plaintiff's actions exhibited any risk to the safety and security of the facility that would warrant the placement in segregation, or administrative segregation, whereas his demeanor was calm and collected.).** This action was ordered by **Capt. (Simpson**).

158. While being held in administrative segregation the plaintiff suffered from irregular bowel movements, from whenever he had to hold his bowel movement for 8 and 7 hours at a time for two days, for a total of 17 hours that he was placed in an isolation cell without a toilet[39], and the plaintiff suffered a mental breakdown, whereas after he was placed in Administrative Segregation he began hearing voices, which resulted in the plaintiff being seen by mental health.

159. On **1-17-20,** the plaintiff filed his formal grievances in which he stated that he had a "concern about the way that staff members and BCF officials are interpreting the policies and procedures at BCF, whereas on 1-13-20 as a common practice at BCF I was placed temporarily in segregation hold for punitive purposes" During the investigation of the grievances, it was concluded by the grievance specialist that the plaintiff provided

---

38 When he was released a t 8am he had no time to use the toilet in the dorm whereas he was immediately called to the OIC desk and cuffed up and escorted back to segregation.

39 See; **Attorney General v. Sheriff of Worcester County, 382 Mass. 57, 413 N.E.2d 722 (Mass. 1980)** (State regulations require that all isolation cells contain toilets).

false information and that he refused to work, and this this was the reason why he was placed in RHU (segregation), and the grievance specialist went on to say that the plaintiff was placed in an observation cell monitored closely by staff for the protection of offender and facility. However, **there was no indication as to how the plaintiffs actions exhibited any concern for safety and security, especially when he was not placed into RHU until several hours after the incident had occurred**, even if the grievance specialist believed that the plaintiffs placement in segregation was justified, the fact still remains that he was placed in segregation and he was not provided the opportunity to use the rest room and drinking water, make a bowel movement, and even on one occasion, on 1-13-20, the plaintiff was not fed lunch, the grievance specialist response seemed as though no investigation was done at all, especially when the plaintiff instructed the grievance specialist to review camera footage, whereas, multiple trips in the same day for the same incident, to RHU, seemed to be more retaliation then safety and security, in which the plaintiff brought this issue up with **Kathy Alvey** during the grievance appeal process. However, in the grievance response it was admitted that the plaintiff was placed in segregation in order to send a statement to the inmate population, '*that this type of behavior would not be tolerated*'.  See, **Wilson v. Seiter, 501 U.S 294, 297-303 (1991) (8th Amendment prohibits only "cruel and unusual punishment; and 'the infliction of punishment is deliberate act intended to chastise or deter.") (Quoting Duckworth v. Franzen, 780 f.2d 645, 652 (7th Cir. 1985).**

160.    Therefore, absent any misconduct it seems as though the placement in segregation was in retaliation for the plaintiffs protected speech in which he expressed his verbal informal grievances at the time advising the offices that he was not supposed to be at any job assignment and that there had been a mistake. However that facility had to continue on its course because they did not want the rest of the population to see that they too could contest a job assignment that was wrongfully assigned to them.

161.    **On 1-24-20, Warden Alvey**, called the plaintiff to the visiting room for a meeting about the complaints of the placement of the plaintiff in segregation without proper due process and where the placement was used as for punitive purposes and "**chastisement**", and

arbitrary purposes, which was a violation of **IDOC Policy #02-04-101, Aff'd 6-1-15,** **which states; *"Temporary confinement shall: '1. Not be punitive'".***

162. The plaintiffs explained to **Alvey** that he was being placed in segregation for refusing a job assignment that he never knew he had, whereas he had previously received disciplinary sanctions and classification paperwork stating that I was **"Idle"** until 3-9-20, and that he had also received classification paperwork, as recent as 1-12-20 (12 days prior to this allege job assignment began), indicating that he was Idle and the plaintiffs provided information that he was informed by counselor **Thomas** that once his idle time was completed on 3-8-20, that she would submit his classification paper for **"ROP"**.

163. Once Alvey became aware of the circumstances, she ordered on 1-24-20 **"per administrative decision that any conduct relating to not accepting a job assignment will be removed."**

164. However, this did not remedy the plaintiffs violated constitution rights. Thus, Indiana law creates a liberty interest in not being confined or held in **"Punitive Punishment"** without proper due process. There was no compensations or retributions for being wrongfully accused and punishment by being placed in segregation, thus, suffering liberty losses prior to and after being found not guilty. Whenever, any cruel and unusual treatment and conditions could have been avoided by simply affording the plaintiff the proper due process before any determination of guilty or punishment. **Policy #02-04-101 (eff.'d 6-1-15) page 8 paragraph 5**, states, ***"An offender shall be afforded a hearing prior to the imposition of disciplinary actions"*** page 10-11 states for *"Minor offences (CLASS C AND D conduct) 1. WARNING: or 2. INFORMAL CONDUCT REPORT: "*[40] However, there is nothing in the policy that requires an inmate to be placed in segregation for a Minor Offence, especially without a hearing, and absent any safety and security concerns.

165. Here, the plaintiffs guilt was determined before any hearing, whereas, he was punished for allege conduct, in which the allege conduct was ultimately dismissed, however, although the conduct was dismissed the plaintiff still suffered from the unlawful detention and cruel and unusual punishment, all in violation of his first, eightieth, fifth and fourteenth

---

[40] Because I had a liberty interest in remaining free of disciplinary segregation and punitive segregation there is a disputed question of whether I had received all of the process due under **Wolff v. McDonnell, 418 U.S 539, 41 L.Ed.2d 935 S. ct. 2963**

amendments, as well as in violation of Indiana Tort Laws. Whereas, placing the plaintiff in segregation was arbitrary thus the defendants violated I.C 11-11-5-4 (4) (6) I.C 11-11-5-5 (a), I.C 11-11-5-6, I.C 11-11-5-7 (a) and I.C 11-10-1-7, by separating him from general prison population and placing him in segregation and restricting the plaintiff the use of hygienic facilities, deviation from the diet provided to other committed persons in the facility, disciplinary action was taken before a finding of guilt, where there was no need or appropriateness for segregation for a class C minor offence and where there were no safety and security concerns for the need to place the plaintiff in segregation and where the prison officials admitted that the placement was for chastisement in order to show the population that a particular behavior would not be tolerated, which that behavior seemed to be exercising the right to grieve an unjust action because that was the only behavior that the plaintiff exhibited, when he made informal verbal complaints that he was not supposed to be going to work, therefore it also seems that the prison officials also are admitting that the action taken against the plaintiff was because of his speech, whereas, he had not committed any conduct, thus such speech is also protected by Indiana and the U.S constitution.

166. The plaintiff was deprived of liberties within the meaning of the Due Process Clause of the 14th Amendment, by being placed in disciplinary and administrative segregation.

167. Therefore, in deciding whether such deprivation accrued, the conditions in segregation must be compared to the conditions in which the general population of the prison is confined or with those in which the general population of any prison in the state is confined, and here, no inmate in general population of the prison; is subjected to the conditions of this practice of temporary confinement, whereas, the general population may use the bathroom when they want, they may use the toilet when they want, they are not subjected to urinate in a used jug, they are not denied drinking water when they want it, inmates in general population are given 3 meals a day. Inmates in general population are not subjected to holding their bowel movements for so long that it interferes with regular bodily functions in the future, inmates in general population are not subjected to unlawful detention in administrative segregation subjecting them to a mental breakdown.

53

168.    Therefore, because there is a state created interest in **Art 1§ 15 of the Indiana Constitution Not to be Treated with Unnecessary Rigor;** the plaintiff's interest in confinement are protected by the **14th Amendment of the U.S Constitution.**

169.    However, inmates who engaged in more serious offenses such as; being in possession of controlled substances, caught smoking, or intoxicated are not subjected to the punitive or temporary holding cell "hot box" for several hours, thus this violates the equal protection of the 14th amendment.

**Claim 15: 8th Amendment Cruel and Unusual Conditions;** As it relates to the claims of cruel and unusual conditions **IDOC, Kathy Alvey, Capt. Simpson, Officer John Doe#1, John Doe #2, Sgt. John Doe, and Lt. John Doe,** are liable where the defendants actions, omissions, policies, and\or personal involvement deprived the plaintiff of food, water, toilet, and where the plaintiff suffered from irregular bowel movements. Here refusing to work did not justify continuing segregation, especially when the plaintiff did not know he had a job.

**Claim 16: 1st Amendment Retaliation Violations;**

As it relates to the 1st Amendment claims of retaliation Kathy Alvey is liable.

**Claim 17: 14th Amendment equal protection and Due Process Violations**

As it relates to the plaintiffs Due Process Rights of the 14th Amendment the defendants, **Ms. Hearst, Kathy Alvey, sergeant, Captain Simpson,** are liable violated the plaintiffs due process rights where the plaintiff was placed in a cell for disciplinary purposes without notice or opportunity to be heard.[41] And due to the actions of the defendants **Capt. Simpson, and Kathy Alvey,** the plaintiff suffered a mental break down when he began hearing voices after being placed in Administrative segregation, for arbitrary reasons[42], for conduct that did not warrant placement in Administrative segregation[43], thus the conduct was dismissed.

---

[41] **McGee v. Milwaukee City (2020)**
[42] **Surprenant v. Rivas, 424 f.3d 5 (1st Cir. 2005)** (affirming jury verdict for plaintiff against officer who fabricated charges knowing the plaintiff would be placed immediately into segregation).
[43] Placement in isolation was disproportionate to the offense. Refusing to work did not justify continuing segregation especially when the plaintiff did not know he had a job.

### e) 8th Amendment Cruel and Unusual Conditions of Confinement

170. The plaintiff further alleges that he was subjected to cruel and unusual conditions of his confinement, whereas, on 2-3-20 while working in the kitchen the plaintiff noticed a posted rule exclusively stating; *"any heavy lifting,, pulling Aramark is to only use inmate labor".*

171. Although this may have always been protocol, this practice was inappropriate, and the plaintiff felt unsafe working in the kitchen because the deliberate stipulation to subject 'only' inmates to the tasks that are deemed unsafe for Aramark workers to perform, suggested that if the plaintiff did not complete the unsafe task he would be subjected to a conduct report for refusing to work or refusing to complete a task.

172. This sign did not specify that "all job duties" are to be performed by inmate labor, this sign specifically stated to use *"inmate labor"* exclusively for *"heavy lifting"*.

173. On 2-3-20 the plaintiff filed his formal grievance with the warden **Kathy Alvey,** in which she forwarded the complaint to **Dea Goad** stating that the posted statement was equivalent to describing the use of a 'pack mule' and coupled with the fact that the plaintiff was working in the kitchen involuntary makes the practices of the Aramark department a form of involuntary servitude as a violation of equal protection and 8th amendments rights.

174. The plaintiff went on to state that defendant, **Dea Goad's** response to his informal complaint was untrue where the defendant stated; *"offenders are assigned to the kitchen as a job and are given the supplies and tools, along with supervision to accomplish the kitchen job tasks".* The plaintiff explained that statement was untrue whereas the plaintiff had been forced to work in the kitchen he had not had more than a 5 word conversation with any Aramark staff, thus the plaintiff was unaware what his duties were, what tasks he were required to do, nor was he aware of how to adequately perform his tasks. The plaintiff went on to explain that he was not given any safety training, or informed of any safety protocols or safety precautions. The plaintiff stated that he did not feel safe in the kitchen and feared injury and/or conduct simply because of the inadequate training and information of food services.

175. The plaintiff requested in his grievance that video evidence be reviewed however the facility failed to review any video evidence in fear that the plaintiffs' claims would be substantiated by clear evidence. Thus the plaintiffs grievance was denied as the facility stated that it seen no displays of inequality or discrimination and that the requiring inmates to complete such tasks complained about was all part of IDOC policy and means of rehabilitation.

176. The plaintiff disagreed with the facilities reasoning of requiring him to do all the heavy lifting deemed unsafe for Aramark staff, and therefore filed his grievance appeal with the warden **Kathy Alvey**, stating within; *"requesting inmates to perform tasks that staff otherwise knows are unsafe for them to perform, is not a means of rehabilitation, this policy is clearly placing inmates at risks of serious injury and is a callous disregard for prisoners safety and violates the 8th Amendment, (equal protection), of the U.S Constitution where it creates an unreasonable risk of injury in the working conditions. See; Jones v. Morris, 777 f.2d 1277, 1280 (7th Cir. 1985) (prison officials could be liable for fall if they know of dangerous working conditions and acted with deliberate indifference, in failing to cure them); Onnette v. Reed, 832 s.w.2d 450, 453, (Tex. App. 1992) (allegation that the plaintiff was made to work on an unsafe scaffold as a result of deliberate indifference stated a constitutional claim). Dawson v. State through Dep't of Corrections, 452 so.2d 357, 359 La.App. 1984) (prisoner injured by machine he knew was not contributory negligent, he was told to work and 'act in a manner expected of him as an inmate'); Marian v. State 31 Misc.2d 241, 222 N.Y.S.2d 968, 971 (N.Y.Ct.C1.1961) (Prisoner injured by defective machine was not contributory negligent because he had been ordered to keep working). Thus; the constitution permits that prisoners may not be required to do unsafe work; see; Fruit v. Norris 905 F.2d 1147 (8th Cir. 1990) (unsafe work requirements).*

177. The very fact that one of the Aramark staff members took the sign down indicating "use inmate labor for any heavy lifting and pulling is an indication of Aramark's knowledge of the unlawful and unconstitutional requirement. **Aramark** is liable where it enacted such policies and customs that **Aramark** staff were following.

178. Thus; plaintiffs appeal was denied.

## Claim 18: 8th Amendment Cruel and Unusual Conditions of Confinement

As it relates to the plaintiffs 8th Amendment claims of Cruel and unusual conditions defendants **Kathy Alvey, Aramark and Dea Goad** are personally responsible where **Dea Goad** is the Aramark supervisor and allowed the practices subjecting the plaintiff to cruel and unusual conditions. **Kathy Alvey** failed to do anything about the plaintiff's complaints allowing the conditions to continue, **Aramark** is liable where it enacted such policy and procedure.

## f) 1st Amendment Retaliation\14th Amendment Discrimination Violations\ 8th Amendment violations

179. On 2-7-20 the plaintiff filed his informal complaint with the defendant **D. Goad** (Aramark food service director) alleging that on 2-7-20 after he informed defendant, **Ms. Goldman (Aramark supervisor)** of discrimination that he was retaliated against.

180. In the plaintiff's informal complaint he stated the following facts; *" on 2-7-20 I informed Ms. Goldman of my grievances I had against Ms. Hearst in which I informed Ms. Goldman that Ms. Hearst was not being racially fair; whereas beginning at approx. 6am Ms. Hearst came into the dining area and issued duties, however she ensured that she gave duties to all the 'Black' offenders, while a large mass of 'white' offenders sat around and did nothing, then at approx. 7:50am, Ms. Hearst came and sat at a table in the dining room for about 10min., she got up and came to the group of 'black' offenders and told all of us to bag cookies[44] these were the only duties she issued. However in the back of the dining room there was a larger mass of 'white' offenders not working. Ms. Goldman confronted Ms. Hearst and asked her that they speak in private about my complaint. A short time later Ms. Hearst approached me, she was upset, and stated "next time I go over her head she will send me to segregation", therefore I challenged her threat and said "well I see Aramark staff are sticking together, so I want to see a Lt.[45]she then call a signal 8[46]and had me escorted to segregation. Where I sat from 8:00am until 1:00pm and did not receive lunch. See camera in RHU."*

---

[44] This is the least desired job in the kitchen and is normally assigned as a disciplinary measure.
[45] Facility lieutenant
[46] A radio call for distress or assistance for the removal of an inmate.

181. In response the defendant **D. Goad** stated; *"An assigned duty and cleaning job is given to each offender daily. Each offender is accountable for the specific assignment. Extra duties are then assigned evenly by the supervisors so all duties and cleaning is done daily. An offender that has finished his assignment may be found sitting and an offender who has not finished his assignment may be asked to get up from sitting to finish his assignment. You were being held accountable for your assigned job."* [47]

182. Here the response had nothing to do with the complaint, the complaint was in regards to the fact that although duties were being handed out, the plaintiff had a right to protest the decision that was being made thus he had a right to voice his grievance if he felt that something was being done to him unfairly and because he felt that the job duties were being given unfairly he made a claim of the staff being racially unfair, and because of the plaintiffs complaints the defendant Ms. Hearst acted in retaliation. [48]

183. Because the response from **D. Goad** did not address the retaliatory acts by **Ms. Hearst** the plaintiffs filed his formal grievance, alleging within; *"*video evidence will substantiate these claims of retaliation* I filed an informal grievance in regards to retaliation and discrimination and the response had nothing to do with the incident, as I know I am supposed to do my job at work, however these cleaning duties mentioned in the response had nothing to do with the incident. As Ms. Goad was not there on 2-7-20, she couldn't possibly account for anything that accrued thus she did not address the fact that only black inmates were assigned extra duties on 2-7-20. However, on 2-7-20, I was retaliated against by Aramark staff, Ms. Hearst, where after I stated my grievances to Ms. Hearst's supervisor, Ms. Goldman, about how Ms. Hearst was being racially unfair, Ms. Goldman asked to speak to Ms. Hearst in private about my complaint, at approx. 7:55am, soon after Ms. Hearst spoke to Ms. Goldman, Ms. Hearst became angry and threatened me by stating that the next time I go over her head about anything else she'll send me to segregation ( she was speaking about me going to Ms. Goldman about my complaint), so I challenged her threat and I stated "*

---

[47] Ms. Goads reasoning, for the actions of Ms. Hearst singling out all the black inmates for cleaning, seems to suggest that all the white inmates were done with their duties and all the black inmates were not done with their duties.

[48] However, the response to the complaint did not deny the fact that all the black inmates were given duties and none of the whites were given any duties.

since you Aramark workers are sticking together I want to talk to a Lt." she got on her radio and called a signal 8 and sent me to segregation.[49] The plaintiff went on to allege in his complaint, "However, my complaints of Ms. Hearst being racially unfair are valid whereas, the camera will show on [2-7-20 at approx. 5am] in the dining hall Ms. Hearst announced assigned job duties to all the black offenders, camera will show that in the kitchen area only all blacks doing the cleaning, however in the dining hall, most of all the white offenders aren't doing any work, some even sleep. At [approx. 7:50am] in the dining hall Ms. Hearst can be seen sitting at a table for about 10 min., she then got up and walked to the group of "Black" offenders and told all of us to get up and go bag up cookies. However, again, in the back of the dining hall all the "white" offenders are sitting not working and some even sleep[50] but Ms. Hearst never says anything to them. At [Approx. 5am], after the serving line was completed the camera will show that Ms. Hearst caught a "White" offender stealing eggs, she orders him 2-3 times to give her the eggs, he refuses but eventually gave it up, she took the egg destroyed it and threw it away, however, he was not written up or taken to RHU, whereas all the signs in the kitchen states 'stealing food is a class B write-up' a major offense. However, I was escorted to Seg.\RHU and written up on conduct for a minor offense "refusing to Work", where I was held in RHU from 8am to 1pm, where I did not receive lunch, forced to urinate in used 'piss' bottle where the officer had to put on gloves to handle the bottle, but I could not have gloves, this seems like extreme punishment for a class "C" conduct compared to the theft by the "White" inmate that Ms. Hearst witnessed but took no action, however I was sent to RHU and written up. However, the conduct report was dismissed which makes the punishment I suffered without due process all the more extreme and excessive, and constitutionally unfair. Especially when myself, a "black" inmate, was punished for an allege minor offense, more harshly than the non-punishment of the white inmate who had committed a

---

[49] None of these events involved any job duties, the incident now only relates to Ms. Hearst's reaction to the plaintiffs complaints to her superior.
[50] Whereas sleeping is prohibited and inmates are subjected a conduct report and termination for sleeping.

*major offense such as theft in the presence of Ms. Hearst, the same person who punished me*

184. On 7-29-20, the retaliation and discrimination continued by the Aramark staff after the plaintiff was approved to received his religious Kosher diet and the Aramark staff personally had to prepare and serve the plaintiffs specific dietary needs and therefore the Aramark staff felt like they were now catering to the plaintiff who had spent so many months grieving the actions of the Aramark staff, therefore in an attempt to disrupt, frustrate and deter the plaintiff from practicing his religious beliefs and receiving the kosher diet the Aramark Staff and the department began reducing the portion sizes of the plaintiffs meals.

185. Within a weeks' time the plaintiff lost 5-7 pounds whereas the plaintiff was only being fed;

   - Breakfast: (1) fruit and 3-4 1oz. peanut butter packet.[51]
   - Lunch: (1) 6-8oz. frozen microwave dinner
   - Dinner: (1) 6-8oz. frozen microwave dinner[52]

186. On 8-10-20 the plaintiff filed his first grievance #117157, complaining about the portion sizes. He complained that the portion sizes were not equal to the offender population whereas he gave examples, the plaintiff complained that he lost 5-7 pounds, he complained that the meals were not nutritionally adequate to sustain good health, he complained that the portion sizes were cruel and unusual punishment, he complained of discrimination and that he was suffering from starvation, the plaintiff also added that he was not receiving anything to drink with his meals whereas they had to be consumed in the dining hall.

187. The facility grievance specialist, **Diana Pfeiffer**, acting on the behalf of the facility and the **Department of Corrections**, responded to the plaintiff's grievance and stated; *"I have attached the kosher menu approved by Aramark and IDOC"*, and went on to say

---

[51] However, at the beginning of the plaintiffs kosher diet at breakfast he received, 1 cup of cereal, 1 packet of powder milk, 2 peanut butter packets, and 2 apple jelly packets
[52] All meals were served with 5 slices of non-kosher bread therefore the plaintiff did not eat the bread, however the plaintiff was advised by medical that he should not be consuming 15 slices a bread a day.

*"I don't know why you don't receive a breakfast drink"[53]* which this was her responsibility as actor on behalf of the facility and the department, to find out why the plaintiff was not receiving a drink with his meals.

188.  However, on the menu that was provided to the plaintiff by the grievance specialist, in the small print on the menu it stated; that at *"a. breakfast kosher meals: Cold tray: must receive fruit, bowl of cereal, bread margarine, and Hot tray: must receive a break entrée' b. Lunch and dinner: serve meals on paper; cold tray: wrap fruit, bowl of salad and margarine;*

189.  Furthermore, the facilities response was not adequate for the plaintiff's complaints of weight loss, hunger pains, discrimination and equal protection. Thus the facility failed to take any action such as schedule and track the plaintiff's weight, document the plaintiff's weight loss etc. lastly the facility failed to provide any suggested relief nor did the facility provide any of the plaintiffs suggested relief which he was merely seeking information.

190.  On 9-10-20 the plaintiff went on to file his grievance appeal with the Warden **Kathy Alvey** wherein he stated; *" various individuals as BCF have hindered my ability to [freely] practice my faith…"* the plaintiff went on to say; *" the frozen kosher meals entrees at BCF do not contain sufficient calories whereas if I would eat all the food at all three meals including that non-kosher bread I'm given (unsealed), I would get a little over 1700 of the 2500 calories I should be getting. At breakfast I receive 5 unsealed slices of bread, 3 or 4 peanut butter packs and an apple (this is deficient in calories, especially for the first meal of the day, an apple contains 40 calories, (3) 1oz. peanut butter packets contain a total of 580 calories); at lunch I receive a frozen entrée containing 360 calories… at dinner I receive another frozen entrée that a total of 1340 calories, which is insufficient to sustain my good health. And to suggest that the bread is to make up the bulk of my 2500 calories would be inadequate nutrition, whereas consuming 15 slices of bread a day doesn't contribute to good health [54] and in fact promotes bad dieting and subjects me to future health risks such as; diabetes, high*

---

[53] Thus once the plaintiff was moved to a new facility he was given milk packets, jelly, and fresh vegetables. All items that were available at BCF but was not provided to the plaintiff.
[54] Plaintiff was advised by medical that he should not be eating 15 slices of bread a day, this was bad for his health.

*cholestroaol and etc., almost half of my calorie intake, 1200 calories, are contributed by bread which raises an issue of cruel and unusual punishment [55]\conditions [56] and violates the equal protection clause of the U.S constitution..."*

191.    The defendant Kathy Alvey denied the plaintiffs appeal taking no action, nor offering no alternative to the plaintiffs complaints of weight loss, hunger pains, discrimination and equal protection, in fact the inaction of defendant Kathy Alvey, was deliberate indifferent to the plaintiffs serious needs, and Kathy Alvey in fact turned a blind eye to the plaintiffs complaints and condoned the actions of the officials in which she held authority over.

192.    On or about 9-23-20, the plaintiff filed his appeal to the Ind. Department grievance manager, in which the Indiana Dep't of Corrections has delegated authority to handle complaint regarding inmate complaints of conditions of confinement.

193.    The department grievance manger received and denied the plaintiffs complaints of weight loss, hunger pains, discrimination and equal protection, all within 24hours.[57] Thus the IDOC failed to take any action, nor did the IDOC offer any alternative to plaintiff's complaints of weight loss, hunger pains, discrimination and equal protection, in fact the inaction of the IDOC defendant, was deliberate indifferent to the plaintiffs serious needs, and IDOC in fact turned a blind eye to the plaintiffs complaints and condoned the actions of the officials in which she held authority over.

194.    Furthermore, on Nov. 11-25-20 the plaintiff filed a Health care form in which he explained that he had concerns of his rapid weight loss, loss of energy and loss of sleep at night due to lying awake at night due to hunger pains.

195.    The plaintiff was seen by medical and it was determined by medical that the Kosher meals that were being provided by IDOC were inadequate and the plaintiff was advised by medical that the Kosher meals provided by the state did not contain adequate calories

---

[55] Upon arrival to a new facility on 3-19-21 the plaintiff was still housed in IDOC and he received the same kosher diet however this facility only gave the plaintiff (6) slices of bread a day and made up the rest of his calorie intake with items offered by all IDOC facilities.

[56] This also is a violation of equal protection whereas the general population were not fed an unhealthy diet dependent on mostly bread

[57] Which would seem impossible to do given the multitude of grievances received on a daily thus it would be impossible to examine the facts, evidence and witness' and then make an informed decision involving complaints of constitutional violations within 24hours.

and that is why the plaintiff was losing weight and energy and advised the plaintiff that he must increase his calorie intake if he wanted to gain his weight and energy.

196.    Therefore, the plaintiff filed his formal grievance and advised the facility of the opinion from the medical department; and in the facilities response to the plaintiffs grievance, the facility agreed that the kosher diet that the plaintiff was mimicking was insufficient and that the plaintiff must follow the instructions provided by medical, but;

197.    Once the plaintiff filed his grievance appeal informing the facility that he was indigent, and therefore he could not afford to buy the foods from commissary that would increase his calorie intake, thus advising the facility that because he was indigent that it was the Departments responsibility to follow the opinions medical requiring that the plaintiff increase his calorie intake, the facility then changed its position and opinion, (once the plaintiff said he was indigent), on the advice from medical, stating that *"the kosher meals were sufficient"*.

198.    The facility only made this opinion, after it had become known to the facility that the plaintiff was indigent, so that the facility would not have to assume the cost of providing the plaintiff the proper meals as directed by the medical department. Thus; no changes were made to the 11-25-20 instructions by the medical department encouraging the plaintiff to increase his calorie intake.

199.    The defendant Kathy Alvey and the IDOC was notified of the medical advice instructing the plaintiff to increase his calorie intake, the defendant Kathy Alvey and IDOC was notified that the plaintiff was indigent and therefore could not do otherwise on his own, thus no action or alternative, by the defendants were attempted to remedy the issue.

200.    On 9-5-20 the plaintiff filed an additional grievance claiming violations of equal protection, discrimination and 8th Amendment violations, whereas during the weekends and Holiday food schedules all other inmates at BCF[58] were receiving 3 hot meals on the weekends consisting of full course fulfilling meals, while the plaintiff was receiving meals 7 days a week that were consistent to the 5 day a week sack menu, whereas the plaintiff would only receive (2) hot meals all week long, including the weekends.

---

[58] Branchville Correctional facility

201.  The plaintiff began explaining in his grievance, related to his equal protection claims, where on 9-4-20, the facility controlled by the defendant Kathy Alvey, and IDOC defendants who has control over the menu for the entire IDOC adult population, provided lunch to the entire inmate population at BCF excluding the plaintiff, consisting of:

    a.  2 chicken quarter

    b.  1 hot dog

    c.  1 hamburger

    d.  Potato salad

    e.  Baked beans

    f.  Cake

    g.  Hamburger bun

    h.  Hot dog bun

    i.  Corn bread

    j.  And butter

202.  However, the plaintiff only received in his meal

    a.  2 Salisbury patties

    b.  1 cup of Mashed potatoes

    c.  peas

    d.  5 slices of bread

    e.  1 cup of grapes

203.  However, the plaintiff's grievances and complaints were denied in its entirety, with the defendant Kathy Alvey and the IDOC defendant subjecting the plaintiff to a continuation of discrimination against his religious practices and unreasonable risk towards the plaintiff's health.

204.  The actions by the facility and its staff and agents went on for a period lasting over a year.

## Claim 19: 1st Amendment Retaliation\ Discrimination

**Ms. Hearst,** in her individual capacity is liable for the claims of 1st Amendment retaliation and discrimination claims where Ms. Hearst personally retaliated against the plaintiff for voicing his complaints to Ms. Hearst's supervisor and therefore, the defendant wrote a conduct report on the

plaintiff and sent him to segregation for the conduct that was eventually dismissed. Ms. Hearst discriminates where she punished the [Black] plaintiff for engaging in alleged minor conduct while a white inmate who engaged in major conduct (stealing) was not punished.

## Claim 20: 14th Amendment Discrimination Violations\8th Amendment Violations

**Aramark, Dea Goad, IDOC and Kathy Alvey** are liable for the claims of continued retaliation and discrimination, where the plaintiff was approved for his kosher diet, the defendants created a menu with an attempt to disrupt, frustrate and deter the plaintiff from continuing his religious diet, at times this menu was inconsistent with IDOC menu and the plaintiff was not receiving meals equal to the general population. As a result of the defendants actions, and omissions the plaintiff began losing weight, suffering from hunger pains and lack of sleep, therefore, violating the plaintiffs 8th Amendment Rights. **Aramark and IDOC** are also liable because they are responsible for providing adequate meals to the plaintiff.

## g.  Infringement upon Religious Practices\1st, 14th  8th  Amendment violation\RLUPIA

205.    On or about 12-26-19, the plaintiff applied for a kosher diet, for religious reasons.

206.    In regards to the kosher application it is stated that *" offenders who has been waiting 60 days for a decision the facility is to* begin *the kosher the facility is to begin the kosher meals until a decision is made"*

207.    During the 60 day waiting period, awaiting a decision on the plaintiffs kosher application, the IDOC had not been providing the plaintiff koshers meals; therefore the plaintiff was forced to eat from the regular diet, however, the plaintiff only ate the salads and vegetables from the regular diet and supplemented his diet with kosher items from commissary in an effort to honor his religious beliefs and practices.

208.    Thus, after the plaintiff waited the 60 day period, for the decision on his kosher application, and nearly starving himself, the plaintiff notified the defendant chaplain Gray

advising him that a decision had not been made, however this notice was 5 days early and therefore the defendant responded, stating *"we will discuss being provided the kosher after 60 days or when a decision is provided"*.

209.    On 2-21-20 after the plaintiff waited the required 60 days for a decision on his kosher diet, the plaintiff notified the defendant chaplain Gray, by filing an informal complaint, advising the defendant chaplain, yet again, that no decision had been made within the prescribed time frame, therefore *" therefore, per policy the plaintiff was entitled to receive his religious meals until a decision was made"*

210.    On 2-23-20 in response to the plaintiffs informal complaint the defendant Chaplain Arndt responded via email stating that he sent an *" email to Aramark staff to request that they serve [the plaintiff] kosher meals until he hears an answer on his application."*

211.    On 2-24-20 at 11am the plaintiff was notified by the defendant chaplain Arndt that he would begin receiving kosher meals at lunch.[59]

212.    At lunch the plaintiff went to the facility dining hall to pick up his kosher meal for lunch, and he was told to wait.

213.    The plaintiff waited for over an hour and by this time the defendant Ms. Goad came into work, (in which Ms. Goad is the Aramark staff member named in numerous complaints by the plaintiff claiming retaliation), **Ms. Goad** went to acknowledged that a kosher meal was available at breakfast but that plaintiff did not come and get it, therefore she was denying the kosher meal for lunch without any explanation, whereas that chaplain had already approved the kosher diet which he was authorized to do, in accord with IDOC policy, at that time and circumstances.

214.    Thus, per policy and the contract between Aramark and IDOC the Aramark staff was required to serve the plaintiff kosher meals upon direction of the facility chaplain.

215.    **Officer Hochadal** and Aramark staff **Ms. Brewer** had personal knowledge that the plaintiff was to receive a kosher meal.

216.    However, Ms. Goad stated that she was never notified *'that if a decision hadn't been made in 60 days that [the plaintiff] was entitled to receive a kosher meal'*, however, **this**

---

[59] The plaintiff was notified at this same time that his kosher meal was available at breakfast however the plaintiff had not showed up breakfast as he was not aware until 11am that his kosher meals was available.

**reasoning exceeded her scope of authority whereas she was required to provide a kosher meal upon direction of the chaplain, this was all the notice she was required.** However the statement by the defendant Ms. Goad was not true, whereas Ms. Goad was notified on 2-23-20 by chaplain Arndt via email that she was to begin serving the plaintiff a kosher meal. Regardless, the defendant **Dea Goad** denied the plaintiff a meal altogether, whereas he was not even served a regular meal on 2-24-20.

217.    Per IDOC policy, once the chaplain notifies the Aramark staff that a religious diet is to be provided the Aramark staff are to begin serving that meal and no other notification is needed.

218.    On 2-24-20, the plaintiff filed his informal complaint to chaplain **Andrew Arndt**, as it was the chaplains duty to ensure that inmates are begin provided their religious diets and the plaintiff advised the chaplain that Ms. Goad stated that he never notified her that the plaintiff was to receive a kosher meal until a decision was made at central office for IDOC.

219.    **Chaplain Arndt** responded and stated that he called and spoke to Ms. Goad that morning and read to her the part of the application that discusses the 60 day issue. **(this makes defendant Dea Goad personally involved with the infringement on the plaintiffs religious rights and cruel and unusual claims whereas after she was directed by a chaplain and hearing what policy stated she went beyond her authority and denied the plaintiff a religious meal and a regular meal, all in retaliation).**

220.    On 2-24-20 the plaintiff filed his informal complaint to the defendant Ms. Goad requesting she provide information as to why she denied that plaintiff a kosher meal on 2-24-20 after it was approved by the chaplain?

221.    Per the contract between IDOC and Aramark, the defendant Ms. Goad who was the food service director for BCF had a duty to ensure that the plaintiff was served his religious preference diet upon authorization of the facility chaplain.

222.    In response to the plaintiffs informal complaint to the defendant Ms. Goad, she responded *" diet was denied due to commissary orders"*

223.    However, this could not had been her personal reasoning because the plaintiff's kosher diet was not denied by IDOC central office until 2-25-20, therefore, her reasoning for

refusing to provide the plaintiff a kosher meal on 2-24-20 was not justified, because the action taken on 2-25-20 had not occurred yet.

224. On 2-25-20, the plaintiff filed an informal complaint to the defendant Kathy Alvey, advising her that on 2-24-20 the plaintiff was denied a meal and that the facility kitchen was not following policy. (**This makes Kathy Alvey personally involved because she failed to take any action on the plaintiff's complaint of being denied a meal, this was deliberate indifference).**

225. On 2-24-20 the plaintiff suffered mental harm and he was forced to break his religious commandments instructing him not to eat anything that was unclean or uncommon[60], the plaintiff suffered anxiety and stomach aches after a long 60 day test by the defendant IDOC where his dietary intake was being scrutinized because of his religious practices ( **this is sufficient for a claim of discrimination against the named defendants)**

226. For the 60 days the plaintiff had not been eating facility provided meals on the regular diet, because the meals were not kosher, and had only been eating kosher items he purchased on commissary.

227. However, the plaintiff could no longer afford to purchase these kosher items towards the end of the 60 day scrutiny of his diet

228. Therefore on the 60th day the plaintiff was looking forward to be severed a nutrition kosher meal on 2-24-20, however, defendant **Ms. Goad** denied the plaintiff a meal altogether on 2-24-20.

**Claim 21: Infringement upon Religious Practices\1st and 14th Amendment violation\RLUPIA**

The defendants, **IDOC, Aramark, Ms. Goad, Kathy Alvey,** are liable for the claims relates to the infringement upon Religious Practices and Discrimination.

**Claim 22: Infringement upon Religious Practices\1st, 14th and 8th Amendment violations**

The defendants, **Dea Goad** is liable in her individual capacity for the claims of retaliation and discrimination for the claims that the plaintiff was denied his kosher meal on 2-24-20 before his

---

[60] The dietary laws are an important integral part of the covenant between Hebrews and the god of Israel.

application for kosher had been denied. Dea Goad is also liable for the 8th Amendment claims where the defendant denied the plaintiff any meal on 2-24-20, where the plaintiff was not fed.

## h. Discrimination\Retaliation

229.  On or about March 6th, 2020 the plaintiff was subjected to retaliation and discrimination, whereas, the plaintiff was called to a meeting with the warden **Kathy Alvey** in the visiting room, in which she was accompanied by the Major and a big guy name "Mitchell", the environment was hostile, and the plaintiff had not committed any wrong doing nor was he accused of any wrong doing, this meeting was for the sole purpose of the plaintiff filing grievances against several staff at Branchville and informing the warden in writing that she was not doing her job and did not have control of her facility.

230.  Once the plaintiff entered the room he was immediately yelled at, told to shut up and sit down by **"Kathy Alvey"** and once that Plaintiff began asking what *'was this all about'* he was told to shut up again by the "Mitchell" guy and **Kathy Alvey** told this "Mitchell" guy if the plaintiff said another word to *"take his ass to seg."*[61]

231.  Kathy Alvey began talking and she asked the plaintiff why was he filing grievances?

232.  The plaintiff explained that he filed grievances because the staff at the facility were not following policy.

233.  **Kathy Alvey**, yelled, telling the plaintiff that he was not to worry about how staff conducted their jobs, and then the defendant **Alvey** went on to ask why did the plaintiff send a request to her telling her that she did not have control of her facility, the plaintiff attempted to answer and he was immediately shut up, and the defendant stated that that plaintiff is not to write her request like that, and that if he did not like how she was running the facility she 'would set the plaintiff in seg. for a while and see how he likes that'

234.  The defendant and her henchmen attempted to provoke the plaintiff several times and as a last attempt, the defendant, looked at the plaintiff ID tag and seen that the plaintiff's hair

---

[61] Seg. is defined as segregation

in his id was in a ponytail and the warden Kathy Alvey, stated *"why isn't your hair the same as it is in that id"*? The plaintiff stated that because he choose to wear his hair down *"today"* the defendant **Kathy Alvey** then ordered the plaintiff to put his hair in a ponytail as it is in his photo.

235.  The plaintiff looked at the defendant confused as to what she was saying because this was an unusual request, and therefore, the plaintiff ask her what did she mean, and the defendant told the Major to cuff the plaintiff up and take *"his ass to seg. if he doesn't put his hair up"*

236.  The plaintiff then put his hair in a ponytail and he was told by the warden that if she sees him again with his hair down she will place him in segregation.

237.  The plaintiff immediately filed his grievance, complaining that he was being discriminated and retaliated against.

238.  In the plaintiff's grievance he stated *" I am being told that I cannot wear my locks down and that I can only wear them in a ponytail"* the plaintiff went on to state that *" this was not policy and that policy only stated I cannot change my appearance, if I have long hair I must keep long hair and if I have short hair I must keep long hair....policy doesn't state that I cannot style my long hair"* the plaintiff went on to explain that all other inmates were allowed to wear their hair as they please and was not threatened with discipline.

239.  The plaintiff went on to explain in his grievance that **Kathy Alvey's** actions were only a result of retaliation and discrimination for the pervious complaints that he filed, whereas he was called by Kathy Alvey to a meeting to address the complaints the plaintiff had been fling.

240.  At the end of the grievance it was concluded that the plaintiff did not have to get a new id.

241.  However, due to the defendants continuous threats of placing the plaintiff in segregation for no reason other than retaliation, the defendant in fact violated the plaintiff's constitutional rights, 1st and 14th amendments. Whereas, all other inmates with locks were allowed to wear their hair in any style that they wish, thus **Kathy Alvey** had never threatened any other inmate to change their hair or be placed in segregation. Therefore, violating the plaintiff's equal protection.

## Claim 22: Discrimination\Retaliation

The defendant **Kathy Alvey,** acting under the color of law, violated the plaintiffs 1st and 14th amendment rights, where the plaintiff made complaints to and against **Kathy Alvey** and she did not like the fact that the plaintiff challenged her authority, therefore, in retaliation the defendant Kathy Alvey, threatened the plaintiff with segregation if he did not put his hair up in a ponytail, ordering that if the plaintiff ever took his hair down from a ponytail that he would be placed in segregation. These action were arbitrary and retaliatory whereas; there was no IDOC policy or facility rule that required the plaintiff to wear his hair in a ponytail, the actions were also discriminatory because no other inmate at the BCF facility was required to wear their hair in a ponytail nor were any other inmate threatened with being placed in segregation for not wearing their hair in ponytail style.

### i. Equal Protection\inadequate medical care\cruel and unusual conditions

242. On 4-8-20, during the outbreak of the Covid-19 virus the plaintiff became concerned about his health, not knowing anything about the Covid-19 virus, the plaintiff requested that he be tested for Covid-19.

243. The plaintiff filled out a health care form to **Wexford**, the IDOC medical provider, requesting to be tested for Covid-19.

244. On or about 4-9-20 the plaintiff received the health care form back and stated that the plaintiff would not be tested because he has no symptoms, however, the plaintiff was not seen by any medical personnel prior to this decision thus, it was impossible to determine if the plaintiff had any symptoms thus there was no basis for the denial of the plaintiffs request.

245. Therefore, the plaintiff filed his grievance, and stating within *"in accordance to the CDC and the public health Guidelines refusing to test me simply because I have no Covid-19 symptoms is not proper public health procedures. This facility should be conducting contact tracing whereas there are covid-19 cases in this facility and where the infected people had contact with people throughout this facility, therefore people have been*

71

exposed to the virus including myself through one source or another, whether it was direct contact with the infected inmates or where officers who supervised the dorms in which the infected inmates were housed and these officers had contact with the officers and offenders who were not in infected dorms. Even in society people are encouraged to be tested even if they are not having symptoms, whereas there are random drive-up testing sites. Also CDC say people should be tested if they had contact with people who were infected, CDC also say that a person can be infected and not show signs. Next it could not be IDOC policy not to test me because I am not having symptoms whereas this is a new pandemic so there couldn't be a policy on this. However, there is a 8th Amendment right to be free from unreasonable risks to my health and life, and the public health has set guidelines regarding this infectious and deadly virus; and refusing to test me for a deadly virus whereas no symptoms could be present but still could be infected violates my rights and puts me at an unreasonable risk to my life

246.    Here, the plaintiff complained to **Richard Wright** who is the Wexford medical administrator, and he is responsible for the medical staffs training and resolving issues, defendant **Richard Wright** healthcare Administrator, stated that due to the plaintiff's age he had little to worry about, and *"did not need to be tested"*. However, due to the nearly 1 million deaths due to covid-19 a high percentage of that number was attributed to people who were 40 years old (whereas the plaintiff is 42), thus, based on CDC guidelines, the reasoning for not testing the plaintiff amounted to inadequate medical care and deliberate indifference.

247.    Also in response to the plaintiffs informal complaint to **Richard Wright**, in which the plaintiff advised the defendant, that *'there was confirmed case and that the inmate who had the virus went to chow with other inmates in the plaintiffs dorm therefore the plaintiff was concerned that he might be infected'* , the defendant, stated that the plaintiff *'was not experiencing any symptoms that the center of diseases control states you do not need a covid-19 test at this time.'* however, the defendant could not have known whether the plaintiff had any symptoms because he never came to see that plaintiff so that he could make an informed medical decision.

248.    Next, the defendant, **Richard Wright**, stated in another informal complaint regarding the same issue, *"Dear Mr. Wheeler Wexford did everything appropriately according to the*

*Indiana Department of Corrections medical division"* , thus because the plaintiff was not ever seen by medical, in order for medical to make an informed decision, in accord with **IDOC policy**, IDOC is also personally involved where IDOC enacted a procedure that required inmates not to be tested, or seen by medical if they had no symptoms (however medical cannot determine if there are any symptoms if the plaintiff is not seen, thus he was not seen in accord to IDOC procedures.).

249.   The plaintiff was subjected to cruel and unusual conditions of confinement where he was placed at an unreasonable risk of contracting Covid-19, in fact the plaintiff had contracted Covid twice while at the BCF facility due to the defendant's indifference.

250.   Although the defendants suggest in numerous responses to the plaintiffs complaints, that the plaintiff had no symptoms, the plaintiff did in fact mark on a State form that he had a covid symptom and unknown to the plaintiff a medical staff crossed the symptom out, the plaintiff was not aware that this was crossed out until he had received discovery documents for an unrelated civil matter.

251.   The defendants continued to subject the plaintiff to cruel and unusual conditions when the plaintiff ask for a face mask in order to prevent catching Covid-19 and on 3-19-20 the defendants **Kathy Alvey and Richard Wright** told the plaintiff that he did not need a mask, see; shortly after the plaintiff contracted the Covid-19, suffering from lack of sleep, hunger pains and body aches.

252.   On or about 10-26-20 the, Warden **Kathy Alvey, Branchville correctional facility** and **IDOC** subjected the plaintiff to Covid-19, whenever, several officers had attempted to call in sick with covid-19 related symptoms, however, the officers were forced to come into work with threats of termination.

253.   On 10-26-20 Officer J. Taylor attempted to call in sick with covid-19 related symptoms.

254.   However this officer was forced to come in to work.

255.   This officer was taken out of D-Dorm where the plaintiff was housed with a temputure and later it was determined that the officer was ill with covid-19.

256.   This officer worked in E-Dorm where there has been a continuous confirmation of covid-19 cases and this officer has been moved dorm to dorm. This concern has been brought to the IDOC and BCF administration and the defendants failed to act, whereas each dorm that the officer J. Taylor had worked in there has been a spike in confirmed covid-19

73

cases, and due this failure to act there had been a spike in covid-19 cases in the dorm that the plaintiff was in and therefore subjected to covid-19, whereas prior to placing the infected officer in D-Dorm, D-Dorm had the lowest number of covid-19 cases. The state employees and the Warden who is responsible for the plaintiffs safety were deliberately indifferent and put the plaintiff at an unreasonable risk of contracting the covid-19 which is a deadly virus, violating the plaintiffs 8th amendment rights.

257.    The facility also refused to accepted the plaintiffs grievance on this issue,

**Claim 24: Cruel and unusual conditions of confinement**

The defendants **Kathy Alvey, IDOC, Wexford** and **Richard Wright** subjected the plaintiff to covid when the defendants refused to give the plaintiff a covid test or provide the plaintiff with a face mask, and where the defendant's policy, procedures and practices prevented the plaintiff from receiving proper treatment. The actions of the defendants were 'Deliberate indifferent', when the defendants **Kathy Alvey, IDOC, Wexford** and **Richard Wright** failed to protect the plaintiff from Covid-19. Subjecting the plaintiff to cruel and unusual conditions where he could have died from Covid when he had contracted and the Defendants failed to treat the plaintiff even after asking for a test to find out if he had covid. IDOC is liable where they enacted a policy that prevented inmates from being tested based on not having symptoms (**whenever a person could have covid and not have symptoms**), and failed to act on the plaintiffs complaints. IDOC and Kathy Alvey are liable the correctional staff refused to follow Centers for Disease Control and Prevention Guidelines, and IDOC allowed the facility discretion on what guidelines to follow from the CDC.

**Claim 24: 'Deliberate indifference\ inadequate medical treatment**

**Kathy Alvey and Richard Wright were** deliberate indifferent to the plaintiffs serious medical needs, where the plaintiff feared that he had covid-19 and he requested for a test and a face mask to protect him from the virus and the defendants did nothing and refused to provide a test or a mask.

**E. First and 14th Amendment Violations\ Denial of Access to Court\Discrimination\Equal Protection Violations**

74

## a) 1st and 14th amendment discrimination

258. On 12-30-19 the plaintiff arrived at the Branchville facility and upon arrival he brought with him from another IDOC facility 10 photo albums, over (200) single photos and (4) magazines (**Straight Stuntin Black Lingerie, Dime Piece**), all of which were publications targeted towards the African American men.

259. These magazines contained models who wore bathing suits, lingerie, thongs and\or G-String. All of which per IDOC policy is permitted, however, C\O Cassidy confiscated all the magazines. (one magazine did have loose pages)

260. Amongst these magazines were 80 photos in a photo album that were all pictures of African American women who wore bathing suits and lingerie, however all these photos were confiscated.

261. The plaintiff was discriminated against when he was denied his first amendment right to possess (4) African American publications and 80 photographs that were part of correspondence that was sent through the U.S mail (these photos were photos of female friends in which had taken photos in bathing suits and lingerie).

262. The defendant Cassidy explained to the plaintiff that the material was being confiscated because it contained nudity, and the material was either thrown away or sent out in the mail.

263. Defendant **Patricia Cassidy** confiscated these items which all depicted African American\ Urban women.

264. The defendant told the plaintiff that the material was prohibited at BCF. The plaintiff was blatantly told by the defendant, **Patricia Cassidy** *"the facility does not allow these type of magazines of photos"*

265. And because all the magazines and photos depicted African American women, the plaintiff asked, *"What type is that"*?

266. And then the defendant went on to explain *"these women in G-String"* and she turned to another page where a Black woman had her arms across her chest and the defendant stated *"here nudity"*, the plaintiff asked *how is that nudity"*? the defendant stated,

75

*"although her breast isn't exposed, she doesn't have a shirt on"* and in another magazine she pointed out a black woman who had her actual back turned to the camera and her actual back was showing and the defendant Cassidy stated, *"because she doesn't have a shirt on, it is considered nudity"* and the defendant never gave the plaintiff a reason why the 80 photos were not allowed. However, during the grievance processed the defendant did try to justify her actions for the denial of the photographs inferred that because African American women who were well endowed (who had big rear ends), explaining that the images were considered nudity. Thus, the reasons for the confiscation was not documented.

267. However, the reasons the defendant was telling the plaintiff as to why he could not have his publications and personal photos the defendant did not indicate those facts on paper as the plaintiff began explaining to the defendant that her comments on material was a bit racist and discriminatory.

268. These acts were totally motivated discriminatory, and prohibiting these magazines and photos were racially motivated given the fact that there is not one magazine depicting African American women in bathing suits a the Branchville Correctional facility. However, there are magazines that depict "white" women in bathing suits, lingerie, even in tee-shirts that expose the outline of their breast and nipples, thus not one urban magazine in the whole facility.

269. Prisons must abide by the 14th Amendment, which guarantees equal protection of the laws to all citizens. This means that the prison cannot restrict/prohibit access to materials targeted to an African American audience, if they do not restrict similar material popular amongst a white audience.

270. Most courts have said that prisoners do have the right to non-obscene, sexual explicit material that is commercially produced. **Thornburg v. Abbot, 490 U.S at 405 (1989).** Also IDOC's own policy #02-01-103 stated that *"printed matter may not be excluded from an adult facility solely on the grounds that it is obscene or pornographic…"*

271. Therefore, the plaintiff began his grievance process in which throughout the process the plaintiff raised several issues; 1) the denial of possession of his photos were racially motivated, discriminatory and discriminative against his heterosexuality; 2) that the grievance process denied the plaintiff proper due process where no one of the reviewing

authority viewed the (first amendment material) magazines or photos to make an informed decision as to any prohibition of these items. Whereas no one gave any description as to what constituted "nudity" in the photos or the magazines whereas neither contained actual "nudity", whereas possession of actual "nude" images are a violation of the IDOC disciplinary policy #02-04-101 and surely if the plaintiff would have been in violation of a disciplinary code he would have received a conduct report, also per IDOC policy #02-04-103 states *" the facility shall ensure that an adequate description of the printed matter is sent to the reviewing authority so that a decision may be rendered"*

272.    However, this description was not provided therefore the plaintiff was not given proper due process as to determine whether the facility was permitted to deprive the plaintiff of property protected under the first amendment, which led to these items being destroyed.

273.    Thus, the description was not given because there was not any prohibited material and the decision made by the defendant **Patricia Cassidy** was solely based on discrimination whereas; a person cannot and will not document or describe their discriminatory actions.

274.    Denying the plaintiff proper due process means that the facility and the defendant Patricia Cassidy interfered with the plaintiffs his protected property interest as it relates to his first amendment rights.

275.    Here, BCF prohibits any and all lingerie and swimsuit magazines containing exclusively photos of African American women, as well as all urban magazines.

276.    It is common practice of the BCF facility to scrutinize photos and magazines possessed and received by African American inmates and scrutinize photos and magazines targeted towards the urban and African Americans.

277.    Further, the Branchville facility, and Warden **Kathy Alvey**, discriminated against the plaintiffs sexual orientation whereas; the plaintiff is heterosexual[62], and the plaintiff was not allowed to receive or possess photos and magazines that were suiting to or targeted towards his sexuality, however, the warden and BCF allowed homosexual inmates to receive photos and magazines that contain the exact material that were in the photos and magazines that were confiscated from the plaintiff, but vice versa and more suiting to the

---

[62] Warden Kathy Alvey is in fact a lesbian

homosexuals sexual preference, instead of women these magazines and photos would contain men, which included men in (speedoos, bathing suits bottoms that expose the bulge and imprint of the men penis and shirtless, no underwear with their buttocks turned towards the camera and etc.). **This is sufficient to state a claim of discrimination violating the plaintiff's 1st and 14th amendment rights**.

278.    Thus, these magazines that were confiscated were allowed at a previous IDOC facility that the plaintiff was transferred from in which all IDOC facilities follow the same IDOC policy.

## Claim 26: 1st and 14th Amendment violations

Defendants, **Patricia Cassidy**, **Kathy Alvey** and **IDOC**, acting under the color of law, violated the plaintiff's first amendment, and 14th amendment, rights where the defendants covertly discriminated against the plaintiff's sexual orientation, and race. Whereas; the **Branchville facility**, **Kathy Alvey** enacted a procedure that placed more scrutiny on African American printed material than material that was targeted towards "whites" and Homosexuals, especially those materials that depicted African American women. And based on this scrutiny, **Patricia Cassidy**, without any legitimate reason confiscated and denied the plaintiff from possession any of his magazines popular among African Americans and all photos that depicted his African American female friends in bathing suits and lingerie (in which these photos part of the plaintiffs U.S mail). **Kathy Alvey** was the warden at the BCF facility and she had a ban on all printed material that depicted African American woman in lingerie and bathing suits and to justify this ban Kathy Alvey allowed her staff to place an arbitrary reasoning that the images contained within were nude, however, the defendants at no time presented any evidence that the printed material contained any nudity, the only fact that was presented was the fact that the printed material depicted African American Women, and the material was confiscated. **Thomas v. Scully, 943 F.2d 259, 260 (2d Cir. 1991) (a complaint that a ban on noncommercial nude photos violated the first amendment was not frivolous)**.  And **Warden Alvey's** polices exhibited extreme bias against heterosexual males, whereas Warden Alvey is a lesbian.

## b) <u>1st amendment denial of access to court</u>

279. On 12-31-19 Tracey Wheeler was in the law library and he asked the law library supervisor **Paula Mitchell** for a large 8x11 (sic) envelope so that he could mail out a 30 – 40 page 42 U.S.C § 1983 civil complaint

280. **Ms. Mitchell** told the plaintiff that he had to receive the envelope from his counselor.

281. The plaintiff returned to his dormitory and he told his counselor, **Travis Goffinet**, that he needed an 8x11 envelope so that he could mail out his legal documents. The plaintiff explained that he was on a time sensitive deadline.

282. **Travis Goffinet** told the plaintiff that he must purchase his own envelope off commissary if he wanted to mail any legal documents.

283. The plaintiff told **Mr. Goffinet** that he just recently arrived at the facility on 12-18-19 and the he was indigent and therefore he could not order any envelopes. However, **Mr. Goffinet** stated that it was policy.

284. The plaintiff asked **T. Goffinet** for the **IDOC** policy that governs Branchville's decision of not providing indigent inmates with the proper materials to mail legal documents?

285. The plaintiff was then given a copy of a Branchville interdepartmental memorandum, issued by **Kelley Hubert** and **Tim Jellison**, stating that offenders must purchase their own envelopes on commissary, that they will hand out two free envelopes at the beginning of each month as usual, "but legal envelopes must be purchased off of commissary".

286. On 12-31-19, the plaintiff filed his informal complaint, which was emailed, to the superintendent, **Kathy Alvey**, stating: "while in the law library, I needed to mail out legal documents.." the plaintiff explained that he "was told to mail through the counselor", the plaintiff then stated " I spoke to the counselor, **T. Goffinet**, telling him that I had to mail legal documents and I needed an envelope, and he said that the facility doesn't provide envelopes for legal mail".

287. In response to this informal complaint to the superintendent, **Kathy Alvey**, the plaintiff was told "you were not denied access to legal envelopes, you were told that they were no longer sold through the case worker. You were informed that you had the option to purchase them on commissary."

288. On 12-31-19, the plaintiff filed another informal complaint to the law library stating that; "IDOC policy# 00-01-102 states that the department shall afford offenders reasonable access to legal materials for the preparation and filing of legal documents, this including, providing paper, pens and envelopes, denial of these materials is a denial of my access to the courts."

289. On 1-2-20, in response to the plaintiff's informal complaint, **Cris Mitchell** responded, via email, stating; "...It was decided that the law library would no longer provide envelopes. Offenders should purchase envelopes from commissary or use the state provided envelopes. If the paperwork is time sensitive the unit team should provide envelopes."

290. On 1-4-20, the plaintiff filed a remittance form to the **BCF business office** in order to purchase the envelope he needed to mail his legal documents. However, the remittance form was sent back indicating that I had no funds on my account to purchase the envelope.

291. On 1-4-20, the plaintiff then filed his formal grievance stating within, that he spoke to **T. Goffinet** about being provided an envelope for the purpose of mailing out legal documents. He was told that the facility does not provide envelopes to mail legal documents...he was told that he must purchase his on envelopes...he explained that the denial of the envelopes was a denial of his access to the courts...and that his access to the court was being denied....he explained that he was not able to mail his legal documents out because he had no envelopes...he explained that he was unable to purchase envelopes on commissary because he was indigent...he explained that he had no money to purchase envelopes from the business office, whereas he sent a remittance from to the business office and it was returned due to having no money...he went on to state IDOC policy in regards to the facilities duties of providing the proper legal material for the purpose of mailing legal documents...whenever an inmate did not have the funds to purchase them himself.

292. On 1-16-20, **S. Howerton**, concluded the investigating of the plaintiffs formal grievance and issued a response stating that "the process needed to be reviewed to consider the purchase of envelopes for indigent inmates." However, the plaintiff's grievance was approved but he was not given a legal envelope to mail his legal documents.

293.    On 1-17-20, the plaintiff filed an Appeal to the formal grievance to the superintendent, **Kathy Alvey**, stating that he still had not been able to mail his legal documents and that he still needed a legal envelope to do so.

294.    On 2-6-20, **Kathy Alvey**, responded to the grievance appeal stating that she concur with the previous decision, however, she made no order that the plaintiff be provided a legal envelope.

295.    On 2-8-20, the plaintiff filed an appeal of the superintendents decision to the Department Grievance Manger, **Ike Randolph**, stating within, " that because of the policy at BCF that prohibits the facility from providing new arrivals or indigent inmates with legal envelopes upon request, it had impeded the plaintiffs access to the courts whereas he could not file his 42 U.S.C § 1983 civil complaint with the court due to the fact that the plaintiff was not provided the 9x12 envelope that was needed at the time when the plaintiff was indigent, and whenever the plaintiff did receive funds on his account, over a month later, he had already lost the opportunity to file his 42 U.S.C § 1983 civil complaint whereas the two year statutory requirement had tolled. And to file after the two year statutory time limit would have resulted in a frivolous claim which would have resulted in disciplinary action against the plaintiff at the facility, pursuant to IDOC policy#00-01-102 and 02-04-101 and the frivolous claim would have count towards the "Three Strikes" provisions under 28 U.S.C. § 1915 in the U.S District Court preventing the plaintiff from future claims, therefore, the plaintiffs right to seek redress in the U.S District Court and challenge his conditions of confinement as guaranteed by the U.S Constitution was lost.

296.    On February 11, 2020, Ike Randolph responded to the plaintiffs appeal and concurred with the facilities response.

297.    Because of the defendants actions, omissions and policies the plaintiff was not able to mail his section 1983 complaint to the court.

298.    At the time that the plaintiff arriving to the Branchville Correctional facility, the plaintiff had not known about E-file, had never filed an E-file prior to 12-19-19 thru 2-8-20, and the defendants did not inform the plaintiff of E-File when the plaintiff inquired about filing a civil complaint to the U.S Southern District nor had the defendants offered any alternative to filing.

# Claim 27: 1st Amendment denial of adequate access to the court

The defendants, **Paula Mitchell, Chris Mitchell, Kathy Alvey, IDOC, Travis Goffinet, Kelly Hubert-Allen and Tim Jellison,** are liable for the claims of denial of access to the court where the defendants denied the plaintiff's access to the court where the defendants actions, omissions and policies deprived the plaintiff who was indigent, access to a legal envelope that would accommodate the mailing of his legal documents for filing with the court. The defendants are also liable in their individual and official capacity where the defendants enacted a policy that prevented the plaintiff, who was indigent and unable to purchase his own envelopes, from obtaining legal envelopes so that he could mail his documents, therefore causing the plaintiff from filing his documents to wit; Civil Complaint with the court, in which he intended on challenging his conditions of confinement while housed at another facility. Thus per IDOC policy it was the defendants responsibility to ensure that materials needed for drafting and mailing legal documents are available in the law library thus these materials were not available to the plaintiff in the law library or anywhere else in the facility.

## c) 1st amendment violations against correspondence rights

299.    The plaintiff filed additional grievances associated with violations of his first amendment rights, to send and receive correspondence from family and friends, in which those rights were infringed upon based on retaliation, discrimination and policy and procedures set forth by the IDOC.

300.    On 4-7-20, the plaintiff filed his informal complaint in relation to (4) electronic correspondences that were undelivered to the plaintiff on 4-7-20 from Erick Collins.

301.    The plaintiff stated that per IDOC correspondence policy "Email\Video grams are subjected to the same procedures as regular correspondence". Thus, the plaintiff was not told why his Email correspondence was not being delivered to him. Therefore, in this informal the plaintiff wanted to know why his correspondence was not delivered to him?

302.    **Tim Jellison,** who is the facility grievance specialist, unit team manager and also in charge of the approval and denial of GTL Email correspondences, responded and stated

"the DOC policy, nudity policy applies to still photos not videos[63]. All videos [64] should be compatible to the visiting room policy. The individuals in your videos would not be allowed at any facility as dressed".

303. However, because this this response failed to describe what was inappropriate about the dress attire of the individual depicted in the plaintiffs email video messages (whereas the plaintiff claimed that the email messages were denied based on the fact that the individuals depicted in the emails were expressing their African American Culture[65] thus the denial was based on discrimination), and because this response did not explain why the written portion of the email correspondence was not allowed the plaintiff went on to file his grievance #112417.

304. In response to grievance #112417, the defendant, grievance specialist Diane Pfeiffer, stated "I reviewed your video grams in question from 4-5-20, and you will not be permitted to have them." Thus this response did not covey any prohibited material, and therefore was a covert way of discriminating against the images depicted in the email messages whereas all of the state employees involved with the deprivation of the email correspondence failed to document on record the specific reasons why the email correspondences were being denied, in order for no reviewing authority outside of the facility to know that the determination to deny the correspondence was based upon racial bias'.

305. The email video message in fact did not display any inappropriate material or behavior, besides the individuals in the videos being African American and expressing their self in their culture.

306. The grievance specialist, Diane Pfeiffer's response avoided any explanation as to how the dress attire of the persons in the email video messages were inappropriate, especially when the plaintiff claimed in his grievance that the video mail were denied based on racial reasons, whereas, in the plaintiffs grievance he provide evidence by stating that 'the woman in one video were fully clothed from head to toe, even her arms were cover,

---

[63] This is not factually stated in policy, and there is no penological interest in subjecting email video massages that depict the same images as still photos to a different standard.
[64] This referrers to videos attached to emails
[65] The email video attachments were videos of family members dancing, wearing high heels, and African American men wearing excessive jewelry.

she had no skin revealing, thus there was no reason for the email video message to be denied, besides the fact that she was African American and did not look like what the staff wanted her to look'

307. Furthermore, there was no explanation as to why the written portion of the email was not allowed.

308. The plaintiff filed his appeal with the warden, Defendant **Kathy Alvey**, in regards to grievance #112417 in which she personally stated, without any investigation or reviewing the correspondence for any prohibited material, "I concur with the findings of the grievance." Thus **Kathy Alvey**, was aware of the claims of racial discrimination as it related to 1st amendment rights to correspond and allowed the discrimination to continue as many of the plaintiffs correspondences were being rejected without reasonable or legitimate reasons.

309. **Kathy Alvey** fail to act or investigate the plaintiffs' claims that the plaintiffs correspondence was denied based on racial bias and because, Alvey concurred with the denial of the correspondence she is also held liable whereas the warden condones and approves such behavior, whereas racial bias' was the only motivating factor of denying the plaintiff of his incoming correspondence whereas, at every stage of the grievance process the prison officials failed to give a specific description of any prohibited material in any of the (4) email messages and this description was lacking because no prohibited material existed and the fact that massages depicted African Americans enjoying themselves within their culture in which the prison officials at the Branchville correctional facility were not accustom to seeing African Americans interacting naturally.

310. Also, at no stage of the grievance process did any state employee rebut the plaintiffs' claims that the denial of the correspondence was racially motivated.

311. The plaintiff filed his grievance with the grievance manager who is the final stage of the grievance process and at this stage the grievance was denied.

312. On 6-26-20, in relation to (2) emails sent by Shyreeta Members on 6-26-20, the plaintiff received a system message in his GTL email message inbox, stating; " Shyreeta Members

84

has attempted to send you a message but due to facility policy the message will not be delivered to you" [66]

313. On 6-29-20, after the plaintiff received the system message indicating that he would not receive the correspondence, the plaintiff filed his informal complaint to Diane Pfeiffer asking for the "name of the person who censored and denied [my] two GTL messages?"

314. Diane Pfeiffer responded stating "**Nicole Morris**" [67]

315. Diane Pfeiffer went on to state; "I reviewed these video messages and she isn't dressed appropriately if she was coming to visit she wouldn't be allowed in this violates policy."

316. Because Diane Pfeiffer did not describe how Shyreeta Members dress attire violated policy, as she was required to do, the plaintiff followed his informal complaint up with an additional complaint on 6-30-20 stating; " you said that my 6-26-20 GTL video messages from Shyreeta Members were denied because she was not dressed appropriately, what is the difference between her dress attire from these videos from the dress attire in videos I've received on, please see; 8-10-19 @ 12:41am from Erick Collins he is in the club and one woman in short shorts shaking her butt and another woman in tight jeans shaking her butt, 4-6-19, from Aneesa Wheeler where my kids mother is in her panties shaking her butt for the camera, and 6-25-10 from Erick Collins where there is a pool party and everyone is in a swimsuit?"

317. However by this time Diane Pfeiffer was familiar with the plaintiffs legal pursuits against the facility and facility staff members involved with the denial of the plaintiffs emails, therefore, Diane Pfeiffer, who is the grievance specialist refused to answer or justify the approval of prior email messages depicting woman dressed inappropriately for visits but denied email video messages of women who were dressed appropriately, ironically after

_____

[66] Note that on **5-5-20** the plaintiff received the same system message, in which Shyreeta Members sent an email with a photo attachment, the email was denied, the plaintiff filed his informal grievance and because the email was not inappropriate and therefore the email and photo was released to the plaintiff, thus another example of the vindictiveness of the facility staff who view the emails for acceptance and denial.

[67] Note: Nicole Morris was the staff person involved with 4-5 previous grievances beginning in February 2020 (also case# 3:20-cv-00255-RLY-MPB) involving Nicole Morris interfering with the plaintiffs U.S mail transmitted through the U.S postal service by Shyreeta Members, addressed to the plaintiff and the grievances were ultimately decided in the plaintiffs favor.

the first filing of grievances against the mailroom staff responsible for accepting and denying emails.

318. In the 6-26-20, email video messages Shyreeta was in fact dressed appropriately, especially compared to previous video messages that were allowed prior to the filing of any grievances against any facility staff. And it is suspicious that no one wanted to document what Shyreeta Members dress attire consisted of.

319. Therefore, on 7-1-20, the plaintiff followed his informal complaint up with the warden, defendant Kathy Alvey, in which, this informal complaint was emailed to **Kathy Alvey**, witnessed and sent by defendant **Karen Godare** and in this complaint the plaintiff stated; *"I received two GTL messages from Shyreeta Members, these messages contained two videos of Shyreeta at a family resort in Scottsdale Az. Neither of the videos were sexual or STG, she was dressed in attire appropriate to be worn in a public atmosphere"*, the plaintiff went on to add that he did not receive proper notice or a specific description regarding any prohibited content in the emails.

320. The defendant **Kathy Alvey** responded stating; *"video grams are subjected to the same behavior and dress standards outlined in our operational procedure for visitation. If her attire does not meet these standards, your access to the video gram will be denied."*

321. However, this response indicates that the email messages were not viewed by Kathy Alvey and therefore, she is liable for failing to act to complaints involving an unreasonable denial of correspondence, furthermore, the wardens response did not notify the plaintiff as to how the dress attire in the email message violated policy and not an act of retaliation, especially when on 6-29-20 Shyreeta Members in fact sent the plaintiff an email stating; *"I sent you (2) videos, why you didn't get them I don't know nothing was inappropriate"* , thus this indicates that the plaintiff correspondent also was unclear as to why her correspondence was not delivered to the plaintiff.

322. Therefore because the plaintiff was not provided the specific description of any allege prohibited material in his incoming correspondence, the plaintiff was not allowed to properly challenged any judgment or determination made in connection with denying the delivery of correspondence addressed to the plaintiff.

323. Lastly, even if the facility deemed the email video attachments to be inappropriate, the plaintiff was still denied the written portions of the correspondence that the video

message was attached to, whereas, the facility could have blocked the out the video portion and still delivered the written portion of the correspondence, whereas, IDOC policy stated, that 'if a part of a correspondence is prohibited an inmate shall receive any portion that is not prohibited,' ( for example, if prohibited photos are sent to an inmate with a correspondence, the photos may be rejected but the letter must still be delivered), "prohibited contents of a correspondence does not contaminate the entire correspondence."

324.    The plaintiff filed an appeal to the denial of his grievance complete with the Department of corrections grievance manage Ike Randolph, therefore giving the IDOC notice of the plaintiffs conditions at the IDOC facility and the Department concurred with the decisions made by the facility although the Department was not provided with a specific description as to how the dress attire in the plaintiffs video message violated facility or IDOC policy, therefore the Department failed to make an informed and competent decision as it related to the plaintiff's 1st amendment rights and therefore further violated the plaintiffs 1st and 14th Amendment rights.

325.    On 7-7-20 in relation to (2) GTL email correspondences, sent by Erick Collins addressed to the plaintiff, that were not delivered to the plaintiff, the plaintiff filed the plaintiff filed his informal grievance stating that "on 7-720 at 1:29pm and 1:27pm two electronic messages were not delivered to me and that I received a the generic and vague GTL system message stating that the message would not be delivered to me due to facility policy".

326.    Therefore the plaintiff demanded in this informal to know why weren't his messages delivered to him? And the plaintiff wanted to know why there had been a consistency of interference with his correspondence and communication with the public?

327.    After going back and forth in communication with the grievance specialist Diana Pfeiffer, informing her that the videos were videos of the plaintiff's family 'get together on the fourth of July, videos of all the kids' thus what would be inappropriate or a violation of facility with videos of children?

328.    In addition the plaintiff advised the grievance specialist that he was intending on filing a civil claims alleging that his first amendment rights were being violated as it related to the unreasonable censorship of his incoming correspondence.

329. The grievance specialist then wrote the plaintiff back and suspiciously stated that she attempted to view the messages but "Nothing was there...they were blank"[68] (however, the written portion of the correspondence was released).

330. The plaintiff then attempted to file to file his formal grievance indicating that the video portions of the messages were deleted by facility staff, I an attempt of preventing the videos from being reviewed during the grievance process and eventually being released to the plaintiff due to the staff arbitrary and capricious actions.

331. Therefore the plaintiff went on to allege that there was an intent to impede the grievance process and restrict his speech, because at the time that the video messages were delivered to the facility for inspection the videos were viewable, whereas, the initial reason that the video messages were not delivered it was alleged that "the individuals in the videos were not dressed appropriately", evidence also shows that at 1:29pm and 1:27pm on 7-7-20, the facility staff viewed the videos and then generated the GTL system message, indicating that the video messages were viewed, stating " Erick Collins has attempted to send you a message but due to facility policy the message will not be delivered", this indicated that the message was viewed and that the facility staff allegedly saw prohibited material and rejected the message. Or else why state violation of facility policy for a blank massage? Even if this message was not viewable it would have been released whereas a blank video message is not a violation and the plaintiff was entitled to the written portion of the message.

332. On 7-8-20, the plaintiff attempted to send a letter on GTL via Email, to his daughter Aneesa Wheeler, however, this correspondence was intercepted and not allowed to be sent out and the plaintiff <u>did not receive an adequate notice as to why this correspondended to the public was not being delivered</u>, <u>the plaintiff was not notified as to who was the staff person who made the decision not to deliver the correspondence</u>, and the plaintiff <u>was not allowed to challenge the decision that was made not to deliver his outgoing correspondence.</u>

333. On 7-10-20 the plaintiff attempted to file a grievance regarding this issue whereas the grievance form was stamped received, however, the plaintiff was told that he was not

---

[68] However the messages were previously viewable whenever the staff made a decision that the message would not be delivered.

allowed to challenge the decision made on his correspondence because he was deemed a grievance abuser. Thus, the plaintiff had attempted to exhaust his administrative remedies as to where his 1st and 14th amendment rights were violated when he was denied deliver of his outgoing correspondence without any due process.

334. On 7-11-20 the Aneesa Wheeler, attempted to send the plaintiff correspondence deliverable on the GTL inmate email services, however, **this correspondence was not delivered to the plaintiff,** the **plaintiff was not given proper notice in regards to the denial of delivery,** the **plaintiff was not informed as to who was the staff member who denied delivery of said correspondence , the plaintiff was not allowed to challenge the decision made not to deliver said correspondence** and the **plaintiff was not given an adequate description of any prohibited material that would reasonably justify the denial the delivery of such correspondence as required by IDOC policy 02-01-103, Ind. Statutory law I.C sec. 11-11-3-4 (e) (5) (f), Indiana Constitution art 1 § 9 and the 1st and 14th Amendments rights protected by the U.S Constitution, which states that prisoners must be notified as to why a correspondence address to him will not be delivered.**

335. Because the prison was required to justify their needs and interest for disallowing such correspondence the plaintiff filed his grievance as to why his correspondence from his daughter, Aneesa Wheeler, was disallow and the plaintiff demanded justification for the prisons need and interests for interfering with the delivery of his correspondence. However, the grievance was stamped received by the grievance specialist **Diana Pfeiffer** on July, 14 2020, but the grievance was returned without a case number being assigned and the plaintiff was notified that because he was deemed a grievance abuser that he was not allowed to challenge the decisions made restricting the delivery of his incoming correspondence.

336. On or about 4-15-20, the plaintiffs outgoing mail to the media to wit; Perry County News Paper was 1) inspected by Officer John Doe while plaintiff was not present[69] 2) the letter was confiscated by **Officer John Doe#2** without giving the plaintiff notice of the

---

[69] Travis v. Lockhart, 607 F.Supp. 1083 (E.D Ark 1985) (Media correspondence to be treated like legal Mail and afforded privileged status); Ramos v. Lamm, 520 F.Supp. 1059 (D.Col. 1981) (outgoing legal, if opened, must be opened only in presence of sending inmate.).

confiscation and then held for several weeks by **I&I**[70] defendant, **Mr. Hendershot** without the plaintiff knowledge, nor did the defendant notify the plaintiff that the letter was being held.

337.  In this letter to the Perry County News, the plaintiff had informed the newspaper about the *"treatment of inmates at the Branchville facility in response to an article that was ran about the handling of the Covid-19 outbreak, and the plaintiff advised the Newspaper that the statements given by the warden were untrue and that the inmates were not being protected or provided adequate medical care, or masks etc."*

338.  The letter was never addressed by the newspaper therefore the plaintiff family member called that newspaper asking if that letter had been received and the news editor stated no, therefore the plaintiff filed his grievance.

339.  The grievance specialist admitted to the Ombudsman bureau that the plaintiff's letter was intercepted by **Officer John Doe#2** because the plaintiff *"sent a negative letter to the Perry County News about Branchville"*.

340.  Thus the plaintiff's letter was in fact stopped from going out because of his words and speech to the public and the media, which is a violation of his First amendment rights.

341.  This is not a onetime incident whereas the plaintiff had been having a continuous problems with his incoming and outgoing mail and had made several complaints to the warden **Kathy Alvey** and **IDOC** regarding the staff's interference with the plaintiff's mail, and no action has been taken, whereas the newspaper still had not received the plaintiffs letter, thus, there was reason to believe that the letter was never sent, whereas this is a common practice at Branchville and other IDOC facilities.

342.  **Diana Pfeiffer** and **Kathy Alvey and IDOC** are liable because they refused to tell the plaintiff the name of the officer who intercepted the letter, whereas, the plaintiff asked **Diane Pfeiffer** the name of the officer who intercepted the letter, but **Diane Pfeiffer** stated that she did not know the name of the officer. However, **Diane Pfeiffer** is the grievance specialist and she invested that grievance and state in conclusion of the grievance that the officer was notified that the plaintiff had a freedom of speech right, thus, if the officer was notified, then the name of the officer who was informed should be

---

[70] I & I (investigations and intelligence)

known. And in the plaintiffs appeal to **Kathy Alvey** and **IDOC** the plaintiff stated that he needed to know the name of the officer who intercepted the letter but the defendants refused to tell the plaintiff the name of the officer in an attempt to protect the officer from civil litigation. The officers name was in fact known by the defendants because the defendants stated the officers reason for intercepting the letter, and the fact that all outgoing mail the is delayed a state form must be created and on this confiscation form the officer must sign the form.

## Claim 28: 1st Amendment violations against correspondence rights\ denial of access to the court

The defendant, IDOC is liable for the 1st Amendment Violations, where IDOC enacted a policy related correspondence that denied the delivery of the plaintiffs incoming corresponded based on the procedures set forth in the visitation policy, thus the corresponded was being denied without any reasonable or legitimate penalogcial justifications.

The defendants **Diana Pfeiffer, Kathy Alvey and IDOC** liable for violating the plaintiffs access to the court where the defendants failed to provide the plaintiff with the name of the officer who intercepted his letter to the media in an attempt to protect the officer from civil litigation, therefore, the plaintiff was unable to name the officer in this action in which the plaintiff has a viable claim against the officer.

The defendants **Tim Jellison, Kathy Alvey and Nicole Morris** are liable for the claims related to First amendment, retaliation and discrimination violations in regards to the plaintiff's correspondence being rejected whereas there were no reasonable legitimate prison interests in delaying and denying delivery of the plaintiff's incoming and outgoing communications.

**Defendant's Officer John Doe and Mr. Hendershot** violated the plaintiffs First Amendment rights when the defendants withheld the plaintiff's correspondence to the media based on his speech.

**IDOC** was liable because the officer was acting on a common facility procedure to intercept inmate mail that complained to the media about the conditions in Branchville and\or IDOC facilities.

343.    On 5-27-20 the plaintiff became concerned about his incoming mail whereas ho has had several issues with the facility interfering with his outgoing and incoming mail.

91

344.    The plaintiff was expecting a letter and photos for Shyree Members in which she mailed the items out on 5-20-20 and he was expecting photos from **Freeprints** mailed by Erica Morris, however, the plaintiff had not received neither of the mailings.

345.    Therefore the plaintiff sent an informal complaint to the Diana Pfeiffer stating he had been having issues with his outgoing and incoming mail in the past and he has reason to believe that the mailroom has received incoming mail addressed to him and the mailroom has not delivered the mail to him and has not notified the plaintiff that the mail was being withheld.

346.    Diana Pfeiffer responded and stated on 6-4-20 *"Mrs. Morris states that the mailroom has not confiscated any of your mail. Once mail is received they have 24-hours to disperse mail or violate policy. Individuals cannot upload pictures to a company[71] to have mailed in. they have to send in themselves"*

347.    Thus, in an Email dated June 4th 2020, defendant **Nicole Morris** also stated; *" No, we don't have any confiscations for him"*

348.    However, in another Email from the defendant **Lora Purcell**, dated June 4th 2020, the defendant stated *"We haven't received any mail for Mr. Wheeler, other than legal and it goes right up for processing. He did have pictures from Free prints on May 15th, but offenders are not allowed to receive from free prints, so they were returned."*

349.    Therefore, because Lora Purcell returned incoming mail from a company (Free prints) without notifying the plaintiff that correspondence was received and returned therefore violating IDOC policy, and federal constitutional rights the plaintiff filed a grievance on 6-4-20.

350.    In this grievance the plaintiff stated that the mailroom received incoming correspondence addressed to the plaintiff from a company called free prints, in which Erica Morris sent him photos. However, without any notification to the plaintiff that he received mail and that it would not be delivered and that the mail would be retuned back to the sender. The defendant Lora Purcell returned the mail back to the correspondent therefore violating IDOC policy and the plaintiffs 1st Amendment rights. Which the constitution states that

---

[71] This is not IDOC policy or Branchville policy

the prisoner should be notified if a letter addressed to him is returned to sender. See; ***Pell v. Procunier, 416 U.S at 419-20.***

351.  Here the plaintiff was never notified that he received mail and that it would be returned, and that plaintiff was not notified as to the reason why this mail was being returned, whereas there is no IDOC policy that prohibits photos or mail from free prints, in fact the plaintiff has received photos from free prints while in IDOC and at Branchville. The plaintiff stated he had evidence of this fact.

352.  However, the defendant could not have possible known what was in the correspondence sent by Free Prints because the defendant did not open the envelope to examine the contents. This is in fact true because the defendant admits that the correspondence was returned to sender, thus, the facility is not allowed to return to sender opened mail, this violates federal law as well as IDOC policy.

353.  Therefore, the defendant did not have a reason to even return the correspondence to free prints, thus it is not prohibited to receive correspondence, pamphlets, catalogs or informational packets from free prints.

354.  There was no justification in denying delivery of correspondence\photos from free prints.

355.  Photos that are coming from a company serves a better interest for the safety and security to the facility then photos being mailed directly from a family member, whereas the photos would less likely to be tainted with illegal substances being printed from a company.

356.  The plaintiff went on to complain that the mailroom stay allows "Girly" photos that inmates order from catalogs to be sent in, thus ordered photos ordered from a catalog (a company) is no different from family photos being sent from free prints (a company).

357.  The plaintiff also tried to file an additional grievance, whereas IDOC policy requires one issue per grievance[72], on 6-8-20 complaining that he was being denied the right to receive correspondence from a company. In this grievance the plaintiff stated that the company Free Prints sent the plaintiff some family Photos along with order forms, a catalog and a valued customer letter, however, the correspondence was returned ant the plaintiff was

---

[72] See defendants reply in support of defendants motion for summary judgment regarding exhaustion in case# 3:20-cv-96-RLY-MPB at [dkt. 109 at 4,6]

not notified that the correspondence was received by the facility and then returned to sender.

358. The plaintiff went on to complain that even if the mailroom believed that the photos were not allowed that he should have at least gotten the written correspondence and the informational packets, thus these surely were not prohibited material.

359. Thus the defendant Lora Purcell violated the plaintiffs First Amendment rights to receive correspondence from the Company Free Prints.

360. The incident with the plaintiff's mail was not a onetime incident, issues with his mail and this defendant has accrued several other times, whereas the plaintiff filed over (10) grievances against Lora Purcell regarding mishandling and refusing to deliver to the plaintiff correspondence all resulting in Federal and State civil actions, and the defendant even continued to interfere with the plaintiffs 1st amendment rights even after he was transferred to another facility.

361. And the plaintiff ask in this grievance as to why free prints was not allowed to correspond with him?

362. However, the grievance was returned and the plaintiff was not allowed to file the grievance.

363. On July 15th, 2020 in response to a complaint to the **Indiana Department of Corrections, Richard Brown, Executive Director of Adult Facilities,** regarding correspondence from Free Prints.

364. **The Department** responded stating *"Thank you for contacting the Indiana Department of Corrections, your correspondence has been forwarded to me for response" "I have read your complaint concerning correspondence and in response to your first question "Free Prints" and "Shutterfly" are allowed".*

365. Thus, no policy existed prohibiting such correspondence. However, policy did exist outlining the procedures mailroom staff must follow when a decision is made not to deliver correspondence to an inmate.

366. Therefore, **Lora Purcell,** violated the plaintiff's 1st amendment rights, depriving the plaintiff his correspondence without any legitimate penalogcial interest and violated the 14th amendment as it relates to the 1st Amendment due process rights.

## Claim 29: 1st amendment violations and 14th amendment due process violations

**Laura Purcell**, in her individual capacity confiscated and returned to sender incoming correspondence, without notifying the plaintiff. This violated the plaintiffs 1st and 14th amendment due process rights, whereas there were no legitimate penalogcial reasons for denying delivery of the plaintiffs incoming correspondence from free prints, whereas per IDOC policy the particular correspondence was not prohibited.

**Lora Purcell**, violated the plaintiff's rights because acting in accordance with recognized IDOC policy and constitutional rights the defendant knew that returning correspondence without notice violates the plaintiffs correspondence rights to receive correspond from the company free prints, thus there was no penalogcial interest in denying such correspondence nor did the defendant possess any reason to return the correspondence where the defendant did not even open the letter to determine whether the correspondence contained any prohibited material. The defendant also violated the plaintiffs 14th Amendment due process rights related to the plaintiffs 1st Amendment rights where the defendant did not observe any of the Due process provisions set forth by the 1st and 14th Amendment, where the defendant did not notify the plaintiff that the facility had received that correspondence and that the correspondence would be returned, or that the correspondence contained prohibited material and indicating what that prohibited material was, however given the fact that the defendant did not open the correspondence the defendant did not know herself know what the correspondence contained.

## F.  Failure to Act 8th Amendment/Retaliation 1st Amendment

367.    Several months after the plaintiff initiated a grievance claiming discrimination and inadequate dental treatment for his 10 month prolonged dental pain, the plaintiff was deemed a grievance abuser for a second time. This grievance abuser status was in fact based on the plaintiffs complaints for inadequate dental treatment and discrimination ; whereas,

368.  On January 15th 2021 during a conversation regarding the plaintiff's grievance abuser status, **Michelle Woodland** asked the plaintiff about the incident with the dental assistant **Tricia**?

369.  The plaintiff advised the grievance specialist, defendant, **M. Woodland**, that '*on 1-13-21, he [the plaintiff] went to dental for pain related to a tooth that had been in pain for nearly one year, he asked the dental assistant, defendant Tricia, for effective pain relief whereas Tylenol was not working, he [the plaintiff] was told by the dental assistant that there was no other pain relief that could be offered, he [the plaintiff] advised the dental assistant Tricia, that her statement was a "Lie" because he knew that in December 2020 and January 2021 two white inmates were given 500mg Naproxen, and the dental assistant Tricia, then told him [the plaintiff] to 'be a man and deal with it' until his scheduled extraction'.*

370.  **Michelle Woodland**, based her recommendation, for the plaintiff's grievance abuser status, on the above complaint\ grievance, which was the last grievance received that prompted the grievance abuser status recommendation.

371.  The plaintiff asked defendant **Michelle Woodland** what else was '*he supposed to do rather than file a grievance after suffering from pain for nine months?*'

372.  **Michelle woodland** went on to state that the dental Assistant defendant **Tricia** was correct *"man up"* and **Michelle Woodland** went on to explain to the plaintiff how much more her husband was a man whenever he had two teeth knocked out and where he received no pain relief for so long. This explanation by the defendant **Michelle Woodland** seemed to suggest that her husband was more of a man and that the plaintiff just needed to live with the pain.

373.  The plaintiff went on to ask the defendant **Michelle Woodland** how was he being deemed a grievance abuser whenever most of his grievances were resolved in favor of him [the plaintiff] and had he not filed those particular grievances that particular situation would not have been resolved?

374.  The grievance specialist went on to answer the question by stating she *"shouldn't have allowed most of those grievances…."* but she *"knew [the plaintiff] wouldn't have dropped the issues, so why waste a few shirts investigating frivolous and baseless grievances?"*

96

375. **Michelle Woodland** went on to tell the plaintiff *"pick your battles wisely"* and then stated that she knew that all the plaintiffs complaints could not have been true and if she were to investigate she would prove that the plaintiffs allegations were untrue and that would be a conduct report for lying on a grievance which was violation of IDOC Disciplinary Code number **213 B (threating).**

376. The plaintiff took this statement as a threat as no matter what the truth was in his complaints that either **Michelle Woodland** and\or the facility would together deem the allegations untruthful, thus it is easy for any officer to say an allegation is untrue then it would be his word against the plaintiffs word, where it is common practice at BCF to issue conduct reports to inmates in retaliation when they file grievances as well as PREA reports against staff. This place the plaintiff in fear of reprisal and retaliation if he were to file any additional grievances challenging his conditions of confinement at BCF.

377. Thus, the plaintiffs complaints of his (9) month prolonged pain and suffering were deemed by the facility and the Department of Corrections as frivolous and an abuse of the grievance process, whereas had the plaintiff not filed the grievances relating to his pain he would not have been having the talk with the grievance specialist in regards to the grievance abuser status.

378. To date the Department has not done anything to relieve the plaintiff of his pain.

379. The defendant **Michelle Woodland's** statements and actions coupled with prior actions related to the plaintiff's grievances were a clear representation of actions condoned by the IDOC within its facilities and exhibits as to how officials are trained to treat and care for inmates.

380. The plaintiff attempted to file his grievances under this grievance abuser starts as an attempt to exhaust his administrative remedies but his grievances were rejected.

381. Defendant, **IDOC** and **Robert Carter** who is the commissioner of the **IDOC** and is responsible for the operation of all IDOC facilities and responsible for the acts and conduct of his subordinates and is further responsible for the conditions under which inmates are housed and forced to live. The acts and conduct complained of in this complaint were done with the knowledge, permission, consent and participation of **Robert Carter** in that **Robert Carter** promulgates regulations and rules and directives governing the conditions under which inmates are to be housed, treated and cared for.

382.    **Kathy Alvey** and **D. Mitchell** who was acting warden, is also responsible whereas they failed to act on any of that plaintiff meritorious complaints.

383.    And due to the grievance abuser status the plaintiff was unable to challenge his conditions confinement which led to:

# Claim 30: 8th Amendment Violations

**IDOC** and **Robert Carter** are liable because it is responsible for the operations of all IDOC facilities and responsible for the acts and conduct of his subordinates and is further responsible for the conditions under which inmates are housed and forced to live. Furthermore, it implemented a policy that restricted the plaintiff from filing grievances in order to challenge his conditions of confinement and because he was unable to file grievances the conditions and violations against the plaintiff's rights continued to happen, and failed to act on the plaintiffs complaints. **D. Mitchell** is liable whereas he placed the plaintiff on the grievance abuser status for unreasonable, arbitrary and retaliatory reasons, Kathy Alvey is also liable where she failed to act on any of the plaintiff's complaints, and condoned and turned a blind eye to the acts of the staff the facility.

# Claim 31: 1st Amendment Retaliation Violations

**Defendant Michelle Woodland**, in her individual and official capacity violated the plaintiff's 1st amendment rights when she retaliated against the plaintiff for his complaints against facility staff. The grievance abuser status was arbitrary and in fact a covert way to hinder and deter the plaintiffs ability to challenge the conditions of his confinement.

# G. Retaliation/Discrimination

384.    Due to the Departments arbitrary and retaliatory grievance abuser status placed on the plaintiff, he was prohibited from filing any grievances, therefore, subjecting the plaintiff to a continuation of arbitrary actions, retaliation, discrimination and unequal treatment,

385.    Whereas on 1-27-21 the plaintiff received a conduct report after he voiced his verbal complaints with his counselor, defendant, **Karen Godare,** whereas on 1-27-21, at approx. 6:30am the plaintiff went into the defendants office, **Karen Godare,** to address an issue in which his request to send money to his daughter from his inmate trust account

was denied, in which the plaintiff filed a grievance on 1-26-21 by placing it the counselors box the night of 1-26-21 and the morning of 1-27-21 after Karen Godare checked her mail box see seen that the plaintiff had filed the grievance naming **Karen Godare** as a staff member involved with the compliant and stated to the plaintiff that morning of 1-27-21 that she had spoken to assistant warden **Lagenauer** about the plaintiffs grievance and that **Lagenauer** stated that the plaintiff would not be able to send the money to his daughter and defendant Karen Godare listed several reasons why, the plaintiff began explaining to the defendant Karen Godare that her reasoning's were incorrect and the plaintiff began reciting IDOC policy and Branchville's own policy from the handbook, page 25-26, that was in effect on 1-27-21.

386. Because the defendant Karen Godare was refusing to send the plaintiff's request to release funds from his trust account to the Deputy Warden, the plaintiff demanded the defendant to call the Deputy Warden and **Karen Godare** refused to do so and the plaintiff informed the defendant that she could not prevent him from sending the remittance form, requesting to send money home and the plaintiff told the defendant that because the defendant **Karen Godare** was in fact preventing the plaintiff from submitting the (state form) remittance form that she was violating his rights and that it was "her job" to settle the dispute by calling **Lagenauer** to seek authorization to allow the plaintiff to submit the remittance for approval or disapproval by the deputy warden and the defendant **Karen Godare** got angry and stated *"you don't have any idea what my job is!"*

387. This tone suggested that the defendant would use her job and authority against the plaintiff in an effort to make his conditions of confident unusually harsh.

388. Soon after the encounter (a few hours later) the defendant **Karen Godare** began committing her retaliatory acts by issuing a conduct report against the plaintiff for allegedly lying down during work hours whenever other inmates who were actually sleep and lying down were not written up whereas the defendant personally witnessed an entire dorm sleep who also were supposed to be working. (However the plaintiff was not prohibited from lying down during work hours).

389. These actions were discriminatory because all other inmates that were sleeping, were no inmate is supposed to be sleeping during work hours, were not written up, waken up by or threaten with conduct by the defendant.

390. However this conduct report was dismissed.

391. The actions by the defendant Karen Godare was retaliatory, discriminatory, arbitrary, and subjected the plaintiff to a loss of liberties (more time in prison and segregation) and caused irreparable harm which would affect any motion for sentence modification and clemency eligibilities.

392. On or about 2-3-21 the defendant **Karen Godare** threatened the plaintiff with a conduct report for engaging in conduct that other inmates engaged in but these inmates were not subjected to the same treatment. Whereas, at 12pm the defendants came to the plaintiffs bunk and told him that he should not be laying down (although the plaintiff was sitting up but leaned back) and that the plaintiff should be up working. (The plaintiff duties include sweep and mop; buff the floor and wipe black marks off the wall); however, the floor had been swept and mopped; (since the pandemic the floor hadn't been waxed so there was nothing to buff) and the defendant checked the walls and they had no black marks, furthermore the day had not been over, the light in the dorm had just been turned on and commissary was running for the day and lunch and count had just cleared, however the plaintiff was not required to walk around with a broom in his hand all day.

393. As the defendant came up to the plaintiffs bunk she had passed 5 other cubes, which held 22 inmates each, in which none of the other cube mentors were doing any cleaning, in fact most of the cube mentors were sitting in front of the defendants office playing cards, when they also should be working, not playing cards. Thus, what was the difference between the plaintiff sitting or lying in his bunk, which is permitted, watching TV?

394. Thus, the plaintiff was told by the defendant that he was being placed on hold from his job, pending conduct.

395. This was discrimination and retaliation and unequal treatment, whereas there was no other reason for the defendants to get up, come out her office walk past 5 cubes, where no cleaning was being done, and come to the plaintiffs bunk to say that he should be up cleaning wherever the entire dorm was sleep. However, the plaintiff was not allowed to

file this complaint as it was retuned stating that he was on the grievance abuser restrictions.

396. On 2-24-21 the plaintiff attempted to file another grievance where he complained that the defendant **Karen Godare** continued to harass and discriminate against the plaintiff.

397. The plaintiff complained that the defendant allowed the "white" daytime workers and cube mentors to sleep when they are supposed to be up working, the plaintiff stated that even while he was writing the grievance @ 8am bunk 11-8 was sleeping and that he was a cube mentor and that this particular inmate is sleep every day, as well the plaintiff stated that none of the cube mentors were working.

398. However, on 2-24-21 the defendant **Karen Godare** wrote the plaintiff up for sleeping during program hours *(Note: no one is supposed to be sleep during program hours but nearly the entire was sleep and were not written up on conduct).* The defendant told the plaintiff that he should be up working. However, the defendant told the plaintiff on 2-3-21 that he was being placed on hold from working pending the outcome of a conduct report she wrote, therefore, the plaintiff did not know what work he was supposed to be doing.

399. Even so if the plaintiff was supposed to be working the defendant did not give the plaintiff time to complete any duties whereas it was 6-7am in the morning and the plaintiff had until 2pm to complete any job tasks.

400. But yet, on 2-24-21 the "white" cube mentor that was sleep[73] at 7am-8am in bunk 11-8, was not written up on conduct or even talked to about sleeping.

401. However this conduct report was dismissed as the plaintiff had not violated any rules.

402. Thus prior to the plaintiff making any complaints against the defendant the defendant had had no issues with the plaintiff's job performance.

403. As a result of the defendant actions that plaintiff was deprived of $102.00, and therefore, the plaintiff could not pay filing fees on several civil litigations and the actions were therefore dismissed, and these actions caused that plaintiff to be indigent for several months depriving him the benefit of the wages he could have earned.

---

[73] The plaintiff referred to camera footage at 7am-8am

101

## Claim 32: Discrimination

The defendant **Karen Godare,** violated the plaintiffs rights to equal protection and to be free from discriminatory actions, whenever the defendant written the plaintiff up on two conduct reports and fired his from his job (where he earned $50.000 a month), however, the very same conduct that the defendant alleged against the plaintiff, the defendant witnessed and allowed other inmates to engage in the same conduct however she did not write the white inmates up on any conduct nor did she fire them.

## Claim 33: Retaliation

The defendant **Karen Godare,** acted in retaliation for exercising his constitutionally protected right, whenever she became upset that the plaintiff made several complaints against her, the defendant then wrote the plaintiff up on several false conduct reports and fired the plaintiff from his job, and as a result, the plaintiff was no longer able to earn $50.00 a month, which part of this money was to be used to pay filing fees in his civil actions, and because he was able to pay the filing fees it led to several civil actions being dismissed including an appeal and since the plaintiff was removed from his employment due to the retaliatory actions, the plaintiff has since became and continue to be indigent for nearly a year.

## H. First Amendment Violations/Cruel and Unusual Conditions\Retaliation

### a) Cruel and unusual conditions

404. Due to the grievance abuser status the plaintiff was not allowed to challenge the restrictions placed on the plaintiff's abilities to send money home to help support his daughter and granddaughter.

405. On or about 1-25-21 the plaintiff attempted to send money home, $100.00 (One hundred dollars), to his struggling daughter, Aneesa Wheeler C\O Erica Morris-Olds, and granddaughter as the plaintiff was permitted to do per IDOC policy.

406.    Aneesa Wheeler and Erica Morris-Olds, are on the plaintiff's visiting list and per the BCF handbook the plaintiff was permitted to send money home.

407.    However, the plaintiffs request was rejected by the defendant, Deputy Warden **Nathan Lagenauer** in which he stated that approval to send money home was denied because sending money home to help with rent and Birthday gifts was not a good reason to send money home.

408.    Therefore, on 1-26-21, the plaintiff attempted to file his grievance against defendant **Nathan Lagenauer**, in which he stated;

409.    *"I attempted to send money home to my struggling family; (Erica Morris-Olds; who is the mother of two of my kids and Grandmother of 3 of my grandkids who all live at home, no job, no source of income and she is on my verified visiting list) per IDOC policy, I may send money home to family members on my visiting list; because Erica Morris-Olds is the mother of my child Aneesa Wheeler, and Erica is her guardian I attempted to send money to my child in care of Erica Morris.....*

410.    The plaintiff went on to state; *"this is an emergency grievance because my family are subjected to eviction..."*

411.    However, the plaintiffs grievance was returned with a notice stating that the plaintiff was not allowed to file any grievances for 60 days therefore the plaintiff was prevented from sending money home, so that he could help his family, and because of this it chilled the relationship between the plaintiff and his daughter because she thought that the plaintiff reason for not helping her out was just an excuse.

412.    Due to the grievance abuser status the plaintiff was not allowed to challenge the action taken on his correspondence;

413.    On 1-25-21 the facility received an incoming email from the plaintiff's correspondent Erick Collins, the plaintiff received a notice stating that the correspondence was confiscated by Defendant Smith, and that defendant smith was denying that correspondence because of a 5 point tattoo.

414.    However, because the plaintiff was on the grievance abuser status he could not challenge the decision being made by the staff, whereas the plaintiff alleges that there was no 5 point tattoo, thus the plaintiff was denied his correspondence without the proper due

103

process. Thus, the unreasonable denial of the delivery of incoming correspondence without due process is a violation of the 1st and 14th amendment.

415. Due to the grievance abuser status the plaintiff was not allowed to challenge his conditions where, on 2-17-21, the plaintiff was denied a meal that was required to be consistent to his religious requirements (per IDOC policy).

416. The plaintiff is a Hebrew Israelite and he is on the kosher diet.

417. However, at breakfast the plaintiff received from the Aramark staff a foam cup full of peanut butter (the peanut butter is supposed to be the plaintiffs main source of his calorie intake whereas that plaintiff only receives bread and peanut butter at breakfast), the foam cup, peanut butter and the utensil used to place the peanut butter in the cup was not kosher.

418. Because the plaintiff was not provided a kosher meal consistent with his religious requirements the plaintiff was not able to eat this particular day for lunch, in which he suffered hunger pains until lunch.

419. The plaintiff then attempted to file a grievance against **Aramark, Dea Goad**, regarding the actions of the Aramark staff and the grievance was returned and the plaintiff was notified that he was not allowed to submit any grievances for 60 days.

420. These actions infringed upon the plaintiffs religious rights, and 8th amendment rights.

421. Due to the grievance abuser status the plaintiff was not allowed to challenge his conditions at the Branchville facility in which he was subjected to discrimination based on his religious beliefs.

422. On 2-15-21 the plaintiff attempted to file a grievance against defendants **Arndt** and chaplain **Gray**, in this grievance the plaintiff stated;

423. *"This is a grievance for a continuation of discrimination against my religious group Hebrew Israelite, whereas I've filed (2) previous grievances in Jun.2020 and Sept. 2020, complaining that the facility and the chaplain refuses to make accommodations for fasting for Hebrews\Jewish inmates. Today is 2-15-21 there was a memo posted informing inmates if they wanted to participate in Ramadan to send a request. This Ramadan is in April. However, no memo was ever put out to Hebrews and Jewish inmates' notifying us if we wanted to participate in our (fast) for Passover, to place a request so that accommodations can be made for us to properly participate in fasting*

*for Passover. These accommodations are made in all IDOC facilities for Passover, why not at BCF? This is discrimination. Whenever other religions are afforded accommodations and not Hebrews.*

424. The plaintiff's grievance was returned with a notice stating that the plaintiff was not allowed to file a grievance for 60 days. Therefore he was not allowed to address the conditions of his confinement at the BCF facility as it relates to his constitutional rights.

425. Due to the grievance abuser status the plaintiff was not allowed to challenge his conditions at the Branchville facility in which he was subjected to cruel and unusual conditions;

426. Whenever, the Branchville Correctional Facility, per IDOC policy has been deducting funds for the plaintiffs account and placing the funds in a private account only accessible by IDOC to use for its own personal gain and use, thus the plaintiff is not allowed to use the funds for himself, which has accumulated $473.00,

427. whereas the plaintiff is an indigent inmate and due to his indigent status the plaintiff is unable to purchase hygiene products sufficient to properly cleanse himself whereas the hygiene products issued by the facility for free causes the plaintiff discomfort, rashes and itching of the skin, as the items are generic, whereas the medical department requires the plaintiff to purchase his own creams and lotions to relieve any discomfort of skin rashes, itching and burning

428. The plaintiff is unable to purchase food items recommended by the medical department that will sustain his health, whereas the facility requires the plaintiff purchase his own foods required to increase his calorie intake even though the plaintiff was prescribed by medical to increase his calorie intake.

429. The plaintiff is unable to pay filing fees in several legal litigations that has resulted in the plaintiff not being able to litigate his actions and resulted to dismissal, due to failure to pay filing fees.

430. And the plaintiff was not able to purchase pain medication where IDOC and the Wexford refused to provide pain relief to the plaintiff.

431. On 2-19-21, the plaintiff attempted to file his grievance and which he stated;

432. *"On 2-19-21, $6.52 of my earned income was placed into a re-entry account, in which I have not consented to. In this re-entry account is $473.00 that I have earned, however,*

105

*I am not permitted to access. I have been indigent for nearly 6 months, whereas since Sept. I have not had enough money in my trust account available for me to purchase a Bar of soap, whereas since July, 2020 I have owed the facility every cent deposited into my acct. however there has always been $450.00 plus in this re-entry account, that was money I earned but not allowed to use, but this money was held by the facility and IDOC to accumulate interest and to be invested and therefore profiting off my pain and suffering, whenever I was not able to purchase soap, toothpaste, food items prescribed by medical to increase my calorie intake when I was suffering from weight loss, energy loss, and hunger pains (all raised in previous grievances); I was not able to purchase pain medication and therefore required to suffer in pan for several months when medical and dental refused to provide pain relief; and I was not able to hire counsel in a criminal proceeding. For the Dept. to hold my money I've earned and not allowing me to access it, whenever, I was indigent and then for the facility and Dept. of Corr. to profit off my pain and suffering, is in fact cruel and unusual conditions and cruel and unusual punishment as to violate the 8th amendment to the U.S Constitution.*

433.  However the grievance was returned with a notice stating that the plaintiff was not allowed to file a grievance for 90 days.

434.  Thus subjecting to plaintiff to the conditions complained of in the above compliant for 60 days.

## Claim 34: Cruel and Unusual Conditions\Retaliation

**IDOC** is liable where IDOC enacted a policy that permitted facility staff to prevent inmates for access the grievance process when offenders file many grievances that held merit, in which the plaintiff choose to challenge his conditions of confinement at the Branchville Corr. Facility, but because the plaintiff filed many grievances, he would be considered an abuser of the grievance process despite the fact that most of the grievances were ruled in favor of the plaintiff.

**Deputy Warden D. Mitchell** violated the plaintiff's 8th amendment rights when he deemed the plaintiff an abuser of the grievance process for challenging his conditions or confinement at the Branchville Corr. Facility. This Grievance abuser status was arbitrary and capricious, whereas nearly every grievance the plaintiff filed between July 2020 to January 2021 were decided in favor of the plaintiff, thus each grievance had merit.

The plaintiff was deemed a grievance abuser in retaliation for his complaints against the Warden and the facility staff, and therefore this was an attempt to deter and hinder the plaintiff's ability to seek redress for his grievance and complaints regarding his conditions of confinement. **Lagenauer** is liable where he violated the plaintiffs 8th amendment rights when the defendant enacted a procedure that deprived the plaintiff from sending money home to his family to help them.

**Robert Carter and IDOC** are liable where the defendants enacted and enforced a procedure that deprived inmates from enjoying the benefit of earned income thus restricting inmates from accessing the monies he has earned. Due to the actions of **Robert Carter and IDOC**, the plaintiff was not allowed to purchase medication that would relieve him of pain whereas medical would not provide the pain relief and was instructed by medical to purchase his own medication, and required to purchase meals that were required to increase the plaintiffs calorie intake when he was losing weight and instructed by the medical department to increase his calorie intake. This made **IDOC and Robert Cater** personally involved because due to **IDOC** procedure the plaintiffs earned income was being placed in some sort of saving that the plaintiff had no access to and as this money was being taken from the plaintiff it caused him to be indigent and he could not purchase the medical items that were not being provided by medical or IDOC.

## b) <u>Cruel and unusual conditions\Retaliation\ Discrimination</u>

435.    Due to the grievance abuser status the plaintiff was not allowed to challenge his conditions at the Branchville facility in which he was subjected to cruel and unusual conditions whereas the plaintiff was being served microwaved kosher meals that are being prepared (microwaved) hours ahead of time, approx. at 12-3pm, and the meals are not kept warm or in a warmed, therefore, when the plaintiff comes to the dining hall at dinner time, approx.. 5pm, the meal is not served at recommended temperature and is extremely cold, while the rest of the population receives hot food and even temped before being served.

436.    On 3-10-21 the plaintiff attempted to file his grievance in which he complained that that the Aramark staff were preparing his kosher meals hours ahead of time and therefore

when the plaintiff came to the chow hall to eat his meals the meals were actually cold as if they had been pulled right from the refrigerator.

437.    The plaintiff was being served these cold meals in retaliation to his complaints against the Aramark staff and **Dea Goad**,

438.    The plaintiff was being served these cold meals however the rest of the population was not being severed cold meals, in fact the entire population meals were being held in warmers until the meals being served.

## Claim 35: 1st Retaliation\ 8th Amendment violations\ Discrimination

The defendant **Dea Goad** violated the plaintiffs 1st, 8th and 14th equal protection rights. Whereas **Dea Goad** was responsible for preparing the kosher meals for the plaintiff at the BCF facility, and in retaliation for the plaintiffs numerous complaints against the defendant, the defendant began serving the plaintiffs frozen meals to him cold, leaving him no way to warm the meals, while the rest of the population received hot or warm meals.

## c)  First Amendment Violations\14th amendment violations

439.    On or about 1-25-21, **officer Smith** rejected an incoming correspondence on GTL addressed to the plaintiff, Tracey Wheeler, from Erick Collins, and officer Smith Sent the plaintiff a notice of GTL communication denial and stated that the plaintiff would not be able to receive a photo due to a 5 point tattoo.

440.    However, because the plaintiff was placed on the arbitrary grievance abuser status he was not able to challenge that decision made on his incoming correspondence and therefore the plaintiff was denied incoming correspondence without any due process, therefore violating his first amendment rights.

441.    Especially, when the photo sent did not display any 5 point star and\or material associate with STG, other than possibly stars of an American flag.

## Claim 36: First and 14th Amendment

Defendant (officer) **Smith** violated the plaintiff's 1st and 14th amendment rights when Officer Smith refused to deliver to the plaintiff his incoming correspondence.

**Officer Smith** denied the correspondence for reasons that were untrue whereas no 5 point tattoo existed in the photo, however the plaintiff was not allowed to challenge the denial of his incoming correspondence based on an IDOC policy the served no penalogcial interests therefore this makes the **IDOC** liable for the violations against the plaintiffs 1st and 14th due process rights related to his incoming correspondence.

### d) 1st amendment retaliation and Infringement upon access to the court\ Discrimination\1st amendment violations\due process violations

442.  Beginning in November, 2020, the Branchville Correctional Facility began copying and destroying all of the plaintiff incoming legal documents and refused to allow the plaintiff to retain the original documents by sending the documents to a destination of his choice so that he could recover the documents at a later date and retain his property interest in such legal documents.

443.  The facility began copying and destroying these legal documents which are protected under the 1st and 14th amendment.

444.  IDOC enacted a pilot program at specific IDOC facilities, related to copying and destroying legal mail however, this procedure was only developed for the Correctional Industrial Facility and was not extended to the BCF facility in November 2020.

445.  Upon BCF copying and destroying the plaintiffs legal mail, the facility, defendant **Kathy Alvey**, issued a memo stating that inmates who were housed in A-Dorm would not be subjected to the copying process of the legal mail, this was a violation of equal protection, whereas if A-Dorm was not subjected to the procedures of legal mail being copied why was the plaintiff who was in a working dorm (D-Dorm) subjected to the procedures of copying and destroying legal mail? Why was A-Dorm allowed to retain their property interest in their legal mail but the plaintiff was not?

446.  Furthermore, it served no penalogcial interest in not allowing the plaintiff to send his legal mail home especially when the facility and the IDOC allowed the inmates to send

their general correspondence home in which general correspondence was subjected to the same copy and destroy procedure.

447. The procedure of copy and destroy the plaintiffs legal mail violated his 1st and 14th amendment rights and infringed upon the plaintiffs access to the court, where he was forced to either allow the facility make copies of his legal mail against his will, not knowing if the facility was keeping the original documents or not, whereas the plaintiff had not witnessed the defendants at any time shredding any documents, or refuse the documents and if he refuses the documents he would have never known what the court was sending to him.

448. The plaintiff was denied any due process where he was not given notice or the opportunity to challenge to action by the Department of copying and shredding his original legal documents.

449. These actions violated IDOC own policy which states that before the facility makes a decision on final disposition of an inmates property\correspondence that the inmate must be notified in writing that has a right to choose a disposition and that he has a right to file a grievance and that the property\correspondence that is the subject of the complaint must be held until the grievance is decided.

450. Here the plaintiff attempted to file a grievance in regards to his 1st amendment rights being violated and his legal documents being destroyed, however the grievance was returned by **Diane Pfeiffer** and the plaintiff was not allowed to file a grievance, thus this violated his due process rights as it relates to his 1st amendment rights.

451. On or about 3-17-21 the plaintiff was transferred from the Branchville Correctional facility to the Putnamville Correctional facility.

452. Since the plaintiffs transfer the Branchville Facility received numerous amounts of legal mail addressed to the plaintiff from various courts, lawyers and legal entities and each of the correspondences were returned to sender by the Branchville facility mailroom staff Laura Purcell and Nicole Morris.

453. The return (to sender) of the plaintiff's legal documents was done in retaliation to the plaintiffs various civil actions against the defendants, Laura Purcell and Nicole Morris, in State and Federal courts, in fact some of the returned mail pertained to civil litigations against the defendants, however, the plaintiff was transferred with 7 other inmate on 3-

110

17-21 and each of those inmates were forwarded all their mail, (general and legal) by the defendants without delay.

454.   Thus, because of the retaliatory actions by the defendants the plaintiff is unaware who had attempted to contact him whether legal or general correspondence, therefore the actions of the defendants infringed upon the plaintiff first amendment corresponds rights as it relates to his incoming mail.

455.   The defendants actions violated IDOC policy whereas IDOC policy # 02-01-103 page 21; specifically instructs mailroom staff to forward all incoming mail when an inmate is transferred. [74]

456.   Here the because the plaintiffs incoming legal mail was returned to sender the plaintiffs access to the court was infringed upon because he had an appeal dismissed in the Indiana Court of Appeals, related to a paternity case, because the plaintiff had been notified of a defect in his appeal, however, the defect notice was sent to Branchville and once Branchville received the notice it was returned to the court of appeals, and because the plaintiff did not correct the defect his appeal was dismissed.[75] The plaintiff, filed his notice of change of address to all the courts, but that did not correct the fact that must of the documents were sent while the plaintiff was being transferred.

457.   The plaintiff attempted to obtain any documents sent by the court of appeals which had been returned, by asking the court of appeals clerk to re-send the documents and the plaintiff was notified that he was required to send $1.00 per page if he wanted the clerk to resend the documents, however, plaintiff was indigent therefore he could not pay the fees imposed by the clerk therefore the plaintiff did not know of the defects and could not fix the defects.

458.   The facility also received legal documents from Vigo County Superior Court in which a motion was denied, however, because the courts order was not forwarded to the plaintiff he had not known about the denial of his motion and therefore was not able to file his appeal. The facility also received and retuned to sender legal mail from Perry County

---

[74] See; Guillen v. R.D.C mail clerk, 922 N.E.2d 121
[75] Simkins v. Bruce, 406 F.3d 1239, 1243 (10th Cir. 2005) (constitutional violation because non-forwarding of inmates legal mail caused him to not receive a summary judgment motion and thus resulted in "(1) admission of the defendants version of the facts, (2) inability to argue the legal issues, and (3) loss of the opportunity to appeal.").

Courts which was post marked 3-12-21, the plaintiff was not transferred until 3-17-21 thus this particular correspondence was received by the facility while the plaintiff was still at Branchville, whereas the mail was logged in and the correspondence itself contained the mailrooms markings indicating the plaintiff bed location, however, while the plaintiff was still at Branchville this particular correspondence was returned to sender, the Indiana Court of Appeals and the U.S Dist. Court for the Southern Dist. that was also returned.

459. The plaintiff filed his grievances and grievance appeals and the Department condoned the actions of the defendants Laura Purcell and Nicole Morris, and in one of the grievances the plaintiff informed the IDOC that the actions of Nicole Morris and Laure Purcell was done in retaliation but the grievance was returned and Laura Purcell and Nicole Morris was allowed by IDOC to continue their retaliatory acts.

**Claim 37:  Discrimination\1st amendment violations\Due process violation**

The defendants **Paula Mitchell** and **Chris Mitchell** are liable where Paula and Chris Mitchell copied and destroyed all of the plaintiffs' incoming legal documents between November 2020 through March 2021. The defendants violated the plaintiff's rights because in accord with facility procedure, they knew that copying and destroying the plaintiffs incoming legal mail would infringe upon his access to the courts and deprive the plaintiff of the property interest he held in possessing his original legal documents.

The defendant **Kathy Alvey**, **IDOC** and **Diane Pfeiffer** are liable because the defendants actions infringed upon the plaintiffs right to seek grievance as it relates to the due process rights related to the plaintiffs 1st amendment rights, where the plaintiff was denied the right to file a grievance, the right to file a grievance as it relates to 1st amendment violations is a right guaranteed by the constitution.

The defendant **Kathy Alvey,** is liable because she was the warden and **Kathy Alvey**, without out authorization from IDOC or IDOC policy, on her own accord personally enacted the procedure instructing facility staff to copy and destroy inmates incoming legal mail and not giving the plaintiff the opportunity to mail his original documents home or to a location outside of the facility so that the plaintiff could recover the documents at a later time when the originals would be needed. Thus not allowing the plaintiff the opportunity to send the original documents

somewhere so that they could be recovered at a later time violated the plaintiffs 1st amendment and the due process clause to the 14th amendment. **Kathy Alvey**, is liable and personally involved with the violation of the plaintiff's 14th amendment equal protection rights where her procedure regarding the copying and destruction of incoming legal mail was applied to all inmates except thus housed in A-Dorm, thus A-dorm[76] inmates were not subjected to the destruction of their personal property and were allowed to retain their property interest in their original documents, while the plaintiffs personal property and original documents were to be destroyed pursuant to this policy enacted by **Kathy Alvey** thus this procedure was not permitted by IDOC policy and therefore violated the plaintiffs 1st amendment rights.

Here the plaintiffs 1st amendment rights under the due process clause of the 14th Amendment was violated when the defendants destroyed 1) Two signed affidavits that related to a civil action, however because the document was copied by the facility the notary stamp was not able to be seen making the affidavit appear to not have been sworn upon a notary, 2) an original birth Certificate in the plaintiff's birth name Tracey Collins, that was being returned to the plaintiff after it had been confiscated in a Vigo drug raid, however, because the plaintiff had a name change over 30 years ago when he was a child and has no proof of the name change the plaintiff cannot receive a birth certificate, and 3) all the plaintiffs original documents. The plaintiff requested that the original documents, which were personal property, to be sent home. The plaintiff was not given the opportunity to challenge the censorship, copying and destruction of his original legal documents\personal property.

The plaintiff has a state created property interest in the original and authentic documents, and a property interest in the original and authentic signature affixed to those documents, and the due process clause of the U.S Constitution safe guards against the deprivation of such property. There was no penological interest in not allowing the plaintiff the due process of sending his property home. Indiana Statutory rights state under I.C 11-11-2-4 (c): Disposition of property;

*"Except as provided in subsection (d) or section 6 I.C 11-11-2-6 of this chapter when the department seizes prohibited property. It shall forward the property to a person or address designated by the confined person or make other reasonable disposition."*

---

[76] Which is not any type of special unit

Although illegal and a violation of the plaintiff's property interest to destroy the plaintiff personal property, received in the U.S mail, without consent or authorization; IDOC policy and IDOC directive #20-14 exclusively states; that *(1) " A pilot program for copying all legal mail and\or privileged correspondence is being developed at the Correctional Industrial facility"* thus this pilot was not authorized for the Branchville Correctional Facility, secondly, IDOC Directive #20-14 states in regards to the pilot program for copying all legal mail at the Correctional Industrial Facility in paragraph 6. *"the offender will sign state form 11984, acknowledging receipt of an accurate copy of their legal mail.."* , however, even if the BCF defendant Kathy Alvey had adopted the 'pilot program for the copying of all legal mail the facility had not followed the procedures for adopting such procedures where the facility had failed to provide the plaintiff with state form 11984; wherefore; any time an inmate's property or correspondence is confiscated or copied, written notice is required; stipulating the action and naming the staff involved with the censorship of said correspondence. Furthermore the plaintiff was told that the copied correspondence would be shredded, however, the plaintiff did not witness the shredding of these documents, thus whenever the department destroys or chooses a final disposition of an inmate's property, state form 11984 must be created indicating the disposition, and the name of the staff person executing said disposition (this is done to protect the parties during civil litigation), however no such notice was provided to the plaintiff by the defendants, which is required where the deprivation and destruction of property may be challenged in a post deprivation process and proof of such deprivation and destruction in required. Here the defendants provided no notice or proof that the documents was destroyed and not kept by the defendants. Furthermore, there was no notice created or provided for future references or for current litigations, indicating the people who all came in contact with the plaintiffs legal documents, who were involved with the confiscations, shredding, censorship and any allegations that mat be raised that the censoring party shared the documents with an outside party. Lastly, the plaintiff was not allowed by the defendants to inspect the original documents, therefore, the plaintiff does not know if the copies are accurate representations of the originals. In the court of law evidence gets authenticated and scrutinized and a person cannot authenticate copies therefore the evidence could be rejected in upcoming litigations.

114

The coping and destruction of the plaintiffs authentic documents is illegal; as the plaintiff raised this very issue with the U.S Dist. Court in case No. 3:20-cv-96-RLY-MPB (Wheeler v. Knight) and on 5-4-20 the U.S Dist. Court ordered that the plaintiffs original documents be returned. Thus, the defendant's decision to shred the plaintiff's original and authentic legal documents instead of allowing him to mail the documents home or even challenge the decision being made on the censorship of his legal mail was irrational, arbitrary and capricious, whereas, general correspondence sent by family and friends is also copied, however, the general correspondence is held for 14 days, inmates are allowed to file a grievance and challenge any decision, before any final disposition is made, in regards to the disposition of general correspondence and the general correspondence is held until the grievance is decided after which the inmate is allowed to mail the original and authentic general correspondence home, thus is seems as though general correspondence is more protected than legal mail. The Arbitrary and capricious standard focus on *'the reasonableness of an agency's decision making process' Bay v. Thompson, 246 F.3d 1218, 1223 (9th Cir. 2001). Agency action is invalid if the agency fails to give adequate reasons for the decision, fails to examine the relevant data, or offer no rational connection between the facts found and the choice made". Motor Vehicle Mfrs. Ass.'n of U.S Inc. v. State Farm Motor Auto Ins. Co., 463 U.S 29, 43 103 S.Ct. 2856; 77 L.Ed. 2d 443 (1983), also see; Encino Motocars, 136 S.Ct. at 2125 (quoting Mead, 533 at 227, "A rule is arbitrary and capricious is the agency has 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is implausible that it could not be ascribed to a difference in view or the product of agency expertise" State Farm, 463 U.S at 43.* Agencies are required to *"reflect upon the information contained in the record and grapple with contrary evidence "Fred Meyer Stores, Inc. v. NLRB, 865 F.3d 630, 638, 431 U.S App. D.C 283 (D.C Cir. 2017) (citing Haw. Dredging Constr. Co v. NLRB, 857 F.3d 877, 881-82, 429 U.S App. D.C 159 (D.C Cir. 2017)). Where "the agency has failed to 'examine the relevant data' or failed to articulate a rationale explanation of its actions" its decision is arbitrary and capricious. Genuine Parts Co. v. EPA, 890 F.3d 304, 311-12, 435 U.S App. D.C. 338 (D.C. Cir. 2018) (quoting Carus Chem. Co. v. EPA 395 F.3d 434, 441, 364 U.S App. D.C 339 (D.C. Cir. 2005)). And where an agency is uncertain about the effects of agency action, it may not rely on "substantial uncertainty' as a justification for its actions" Greater Yellowstone Coal Inc. v. Servheen, 665 f.3d 1015, 1028 (9th Cir. 2011)*

*(quoting State farm 465 U.S 52). Instead it "must rationally explain why the uncertainty" supports the chosen approach.* Here, the IDOC nor the Branchville Correctional Facility has put forth any explanation concerning its decision to immediately shred all the plaintiffs' original and authentic documents and not allowing the plaintiff to send the originals home just as he is permitted to do with items sent in general correspondence, where the facility holds general correspondence for up to 14 days and any original items apart of that correspondence can be mailed home at the inmates expense. The defendants have not presented the plaintiff with no reasoning for their decision, much less an adequate one as to why he could not send his personal property home, whereas all incoming general correspondence that has been copied, the correspondence is held for 14 days and the inmate is permitted to send the general correspondence home. However, if Kathy Alvey was justified in adopting IDOC directive #20-14 IDOC is liable for this unreasonable deprivation of personal property, whereas the department enacted a policy contrary to Ind. Law and also violating the plaintiff's equal protection rights.

## Claim 38: 1st amendment retaliation and Infringement upon access to the court\ Discrimination\1st amendment violations

Defendants **Laura Purcell** and **Nicole Morris** are liable for the violations against the plaintiff's 1st and 14th amendments rights where the defendants failed to follow IDOC policy regarding forwarding inmate's mail upon transferring to another facility. The defendants **Laura Purcell** and **Nicole Morris** retaliated against the plaintiff when the defendants refused to forward to the plaintiff his incoming correspondence and instead retuned all the plaintiffs incoming correspondence to sender, therefore none of the correspondents were aware that the plaintiff had been transferred and did not know where he was transferred to and did not know where the plaintiff had been transferred or where to re send the correspondence to. The defendants violated the plaintiff's equal protection rights, where the defendants forwarded all other inmates mail who were transferred with the plaintiff. The defendants are sued in their individual capacity. **IDOC** is liable because **IDOC** condoned these actions and allowed the actions to continue, and continue to allow the actions to continue.

116

## I.    Fourteenth, and first Amendment ; Violation of due process and interfering with access to the court, and denial of access to public record 14th & 1st   Amendment:

460.    On 10-15-20, Defendant, **Major Sturgeon** in her individual and official capacity violated the plaintiff's right to public information and interfered with the plaintiff's access to the courts.

461.    On 10-15-20 the plaintiff sent a written request to **Major Sturgeon** to obtain information where, the plaintiff requested for the name of the staff member, named as Jane Doe in civil action 3:20-cv-00265-RLY-MPB, working at the OIC desk in the MPB building on 1-27-20 at 4:30pm. Because the plaintiff was denied access to the records the plaintiff was not able to correctly name all defendants personally involved with that suit that eventually led to the dismissal of Jane Doe from that civil action where during the screening process the U.S district court held that the plaintiff stated a viable claim against Jane Doe, however because the plaintiff could not name the defendant she was dismissed from the action, therefore denying the plaintiff access to the court for redress.

462.    On 11-09-20, **Kathy Alvey**, in her individual and official capacity violated the plaintiff's right to public information and interfered with the plaintiff's access to the courts. On 11-09-20 the plaintiff sent a request, via email, to Kathy Alvey, to obtain information where, the plaintiff requested for the name of the staff member, named as Jane Doe in civil action 3:20-cv-00265-RLY-MPB, working at the OIC desk in the MPB building on 1-27-20 at 4:30pm. Because the plaintiff was denied access to the records the plaintiff is not able to correctly name all defendants personally involved with that suit that eventually led to a dismissal of Jane Doe from that civil action where during the screening process the U.S district court held that the plaintiff stated a viable claim against Jane Doe, however because the plaintiff could not name the defendant she was dismissed from the action, therefore denying the plaintiff access to the court for redress.

463.    **Kathy Alvey**, knew that the plaintiff was preparing several civil claims against her employees at Branchville correctional facility and as an attempted to impede the plaintiff's process and protect the BCF staff from legal action, she failed to provide the names of the staff involved with certain incidents involving this matter.

117

**Claim 38: Fourteenth, and first Amendment; Violation of due process and interfering with access to the court, and denial of access to public record 14th & 1st Amendment:**

**Kathy Alvey** and **Major Sturgeon** in their individual capacity are liable for the violations against the plaintiff's 1st and 14th amendment rights, and because of their intentional actions the defendants infringed upon the plaintiffs access to the court where the plaintiffs viable claims for defendant Jane Doe was actually dismissed for failure to name the defendant by her name. The plaintiff did all he could do to obtain the name on his own, but the plaintiff was not allowed access to the facility staffing logs that would have had to be signed by the Jane Doe, state forms that would have had to be signed by the staff member, Jane Doe, during counts. The plaintiff requested for the Jane Does name within a reasonable time frame when video footage would have been available, the plaintiff file a grievance detailing Jane Does actions as to how her actions violated the plaintiff, thus, any investigatory notes and interviews were available when Jane Doe was interviewed or questioned about the incident, however the plaintiff was not given the notes even though he requested for them. The defendants knew that the plaintiff was contemplating a civil action against Jane Doe therefore as an attempt to protect the state employee the defendant refused to give the plaintiff the name of the state employee. As a result the U.S District Court dismissed the plaintiff's civil claim against Jane Doe, whereas during the screening process in case # 3:20-cv-00265-RLY-MPB the court had a viable claim against the Jane Doe defendant. However, because the plaintiff was not able to name the Jane Doe defendant the court dismissed Jane Doe from the complaint from the civil complaint. Therefore, because of the plaintiff requested for the mane of Jane Doe during the time of the incident when facility records and camera footage was still available and **Kathy Alvey** and **Major Sturgeon** refused to utilize the resources available at the time to discover the name of the state employee, who was in fact involve with the plaintiffs grievance process regarding the civil matters, the actions by the defendants in fact denied the plaintiff access to the court regarding his viable claims against Jane Doe.

118

## J.  The Defendants

464.    During all times mention herein, the defendants, **IDOC, Robert Carter, Kathy Alvey, Languor, Richard Wright, Littlejohn, and Wexford Medical,** acted and threatened to act, on information and belief, sometimes individually but mainly through their numerous agents, servants and employees in various divisions of the Indiana Dept. of Corrections. The identities of agents and employees, mostly BCF staff members and other officials of the IDOC are presently unknown to the plaintiff but the persons are and will be agents of the state of Indiana Dept. of Corr., acting in the course of their employment under the color of state law and are and will be engaged in the performance of their duties as correctional officers or other officials or employees of the state of Indiana and further will be acting pursuant to directives, instructions or, orders from or with the permission of the defendants, all of them, or those acting in concert with them or at their discretion or under their control.

465.    The defendants, all of them, herein, under the color of the State of Indiana and statutes, customs, or usages of the State of Indiana, purposefully, along with other persons unknown to the plaintiff have caused or permitted the plaintiff, a citizen of the U.S, to be subjected to the deprivations of rights, privileges and immunities secured to him by the constitution and law of the U.S. Actions or threatened actions by the defendants are actions outside the scope of their authority and contrary to law.

466.    The defendants all of them are sued in their individual and official capacities.

## D, <u>Relief sought</u>

1. Plaintiff requests for a Preliminary injunction and request that the department Appoint a new Department grievance manager who will review, investigate and decide inmate complaints fairly, whereas the current grievance manager within in the last 10 years has denied nearly every grievance, filed by an inmate.

2. Plaintiff requests for a Preliminary injunction and request that the department of corrections enjoin from denying inmates the opportunity to send their original legal documents home that is received in the U.S mail and therefore allowing inmates to retain their property interest in their legal and original and authentic documents.

**Claim: 1** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 2** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 3** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 4** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 5** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 6** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 7** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 8** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 9** Each defendant is sued individually, under the color of individual and official capacity

**Claim: 10** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 11** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 12** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 13** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 14** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 15** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 16** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 17** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 18** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 19** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 20** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 21** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 22** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 23** Each defendant is sued individually, under the color of individual and official capacity

**Claim: 24** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 25** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 26** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 27** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 28** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 29** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 30** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 31** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 32** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 33** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 34** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 35** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 36** Each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**Claim: 37** Each defendant is sued individually, under the color of individual and official capacity

**Claim: 38** each defendant is sued individually, under the color of individual and official capacity for compensatory and punitive damages, in the amount of $10,000

**For a total of $380,000**

E. Previous Lawsuits
   And Administrative Relief

1. Have you begun other lawsuits in state
   or Federal court dealing with the
   same facts involved in this action or
   otherwise relating to the conditions of
   your imprisonment. Yes

   A.

   a. parties to previous lawsuits

      Plaintiff: Tracey Wheeler
      Defendants: Kathy Alvey, Laura Purcell,
      Nicole Morris

123

b. Name and location of Court and Docket #

   U.S Dist Court  Southern Dist of Ind.
   # 3:20-cv-00255-RLY-MPB

c. disposition of lawsuit- pending

d. Approx date of filing:

e. Issues raised: 1st and 14th Amend.

B.

   a. Parties of Previous lawsuits:
   Plaintiff: Tracey Wheeler
   Defendants: Wendy Knight: et al.

   b. Name and location of court and docket #
      US Dist. Court Souther Dist.
      # 3:20-cv-00096-RLY-MPB

   c. Issues raised: 1st, 14th, and 8th Amendment

C.

a. Parties of previous lawsuits

Plaintiff: Tracey Wheeler

Defendants: IDOC, Wexford

b. Name and location of court and Docket #

U.S District Court  Southern Dist.

# 3:20-cv-000265-RLY-MPB

c. Issues raised: Medical 8th, and 14th Amend.

D.

a. Parties of Previous lawsuits

Plaintiff: Tracey Wheeler

Defendants: IDOC et al

b. Name and location of court and Docket #

Perry County Circuit court

# 62CO1-2008-MI-000319

125

C. Issues raised: Denial of access to courts

2. I previously sought informal and formal relief from the appropriate administrative officials regarding the acts complained of in this complaint.

The plaintiff sought informal complaints after recieving no response or inadequate remedy, the plaintiff, filed his formal grievences, after the plaintiff recieved a denial to his formal grievences the plaintiff submitted grievence appeals to the warden, after the warden denied plaintiffs appeals the plaintiff submitted appeals to IDOC grievence manager, Eventually the plaintiff was prohibited from filling grievences on (2) occassions for a total of 3-4 months. The plaintiff then submitted complaints directely to Omsbusman and Richichard Brown.

126

3. I've exhausted available administrative remedies by
   - Submitting informal complaints on State forms 36935 or emailing informals to the injuring party,

   - Plaintiff filed several form grievances

   - Plaintiff filed appeals with the Warden and Department Grievance manager

Traccy Wheeler
Date 2-28-22

Declaration and Verification

Declaration and Verification:
I Tracey Wheeler, declare under the penalty of perjury that he is the plaintiff in the above action, that he has read the above complaint and the information contained in the

127

is true and correct.

Executed at: Putnamville Correctional Facility
                    1946 W. Hwy. 40
                    Greencastle, Ind. 46135

                                    _Tracey Wheeler_
                                Date: 2-28-22

## Jury Demand

Pursuant to Fed. Civ. Procedures Rule
38 (b) plaintiff hereby demands a trial
by Jury of all triable issues in this
case.
                                    _Tracey Wheeler_